**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **IN RE: POTASH ANTITRUST LITIGATION** | ) No. 08-cv-6910 |
| | ) |
| | ) Judge Ruben Castillo |
| | ) |
| **THIS DOCUMENT APPLIES TO:** | ) **JURY TRIAL DEMANDED** |
| | ) |
| **ALL INDIRECT PURCHASERS' ACTIONS** | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |

**INDIRECT PURCHASERS' AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**

Plaintiffs, on behalf of themselves and all other indirect purchasers similarly situated, bring this action against: Potash Corporation of Saskatchewan Inc., PCS Sales (USA), Inc., Mosaic Company, Mosaic Crop Nutrition L.L.C., Agrium Inc., Agrium U.S. Inc., JSC Uralkali, RUE PA Belaruskali, JSC Silvinit, RUE PA Belarusian Potash Company, BPC Chicago L.L.C., and JSC International Potash Company (collectively, "Defendants") for injunctive relief under the federal antitrust laws, damages and/or restitution pursuant to the State antitrust and consumer protection laws, and State common law claims of unjust enrichment.

Plaintiffs, individually and on behalf of all others similarly situated, for its Consolidated Complaint against Defendants, upon knowledge as to themselves and their own acts, and upon information and belief as to all other matters, allege the following:

## I. INTRODUCTION

1.      Plaintiffs bring this action on behalf of themselves individually and on behalf of a plaintiff class (the "Class") consisting of all persons and entities who purchased potash products in the United States indirectly from one or more named Defendants between July 1, 2003 and the present (the "Class Period"). Defendants supply a vast majority of the potash in the world. Defendants collectively had over $2 billion in gross revenue for the year 2007. During the Class Period, Defendants sold millions of tons of potash in the United States.

2.      In reaction to potash producers in the 1990's, particularly those located in the former Soviet Union, the supply of potash in world markets substantially increased, resulting in substantial price declines and limiting profits of producers around the world. In order to maintain price stability and increase profitability, Defendants conspired and combined to fix, raise, maintain, and stabilize the prices for potash that was sold in the United States. Defendants exchanged sensitive, non-public information about prices, capacity, sales volumes, and demand; allocated market shares, customers and volumes to be sold; and coordinated on output, including the limitation of production, to further and enact the price fixing conspiracy. Plaintiffs also allege, that to further the conspiracy, Defendants knowingly and fraudulently concealed their anticompetitive conduct from Plaintiffs and the Class.

2

3.     As a result of Defendants' unlawful conspiracy, the price for potash in the United States increased dramatically during the Class Period, and Plaintiffs and the other members of the Class paid artificially inflated prices for potash.  These artificially inflated prices exceeded the amount Plaintiffs would have paid if the price for potash had been in a competitive market.

## II. JURISDICTION AND VENUE

4.     This complaint is filed under Section 16 of the Clayton Act (15 U.S.C. §26) to obtain injunctive relief for violations of Section 1 of the Sherman Act (15 U.S.C. §1), and to recover damages under state antitrust, consumer protection, and unjust enrichment laws and to recover the costs of suit, including reasonable attorneys' fees, for the injuries that Plaintiffs and all others similarly situated sustained as a result of the Defendants' violations of those laws.

5.     The Court has jurisdiction over the federal claim under 28 U.S.C. §§1331 and 1337.  The Court has jurisdiction over the state law claims under 28 U.S.C. §1367 because those claims are so related to the federal claim that they form part of the same case or controversy.  The Court also has jurisdiction over the state law claims under 28 U.S.C. §1332 because the amount in controversy for the Class exceeds $5,000,000, and there are members of the Class who are citizens of a different state than the defendants.

6.     Venue is proper in this District under 15 U.S.C. §22 and 28 U.S.C. §1391 because Defendants reside, transact business, or are found within this District, and a substantial part of the events giving rise to the claims arose in this District.

7.     The activities of the Defendants and their co-conspirators, as described herein, were within the flow of, were intended to, and did have a substantial effect on the foreign and interstate commerce of the United States.

8.     Plaintiffs bring this action to obtain injunctive relief, costs of suit, and reasonable attorneys' fees arising from Defendants' violations of Section 1 of the Sherman Act (15 U.S.C. §1) and damages under various State laws as set forth herein.

### III. PARTIES

**A.     Plaintiffs**

9.     a.     Kevin Gillespie is a citizen of Grand Traverse County, State of Michigan. Plaintiff purchased potash indirectly for end use, from a retailer of fertilizer which purchased it from one or more of the Defendants during the Class Period, and has suffered antitrust injury as a result of Defendants' conduct as alleged in this Complaint.

b.     Gordon Tillman is a citizen of Wildwood, Florida. Plaintiff purchased potash indirectly for end use, from a retailer of fertilizer which purchased it from one or more of the Defendants during the Class Period, and has suffered antitrust injury as a result of Defendants' conduct as alleged in this Complaint.

c.     Feyh Farms Company is a citizen of Wabaunsee County, Kansas. Plaintiff purchased potash indirectly for end use, from a retailer of fertilizer which purchased it from one or more of the Defendants during the Class Period, and has suffered antitrust injury as a result of Defendants' conduct as alleged in this Complaint.

d.     William H. Coaker Jr. is a citizen of Leakesville, Mississippi. Plaintiff purchased potash indirectly for end use, from a retailer of fertilizer which

purchased it from one or more of the Defendants during the Class Period, and has suffered antitrust injury as a result of Defendants' conduct as alleged in this Complaint.

        e.      David Baier is a citizen of Waverly, Iowa. Plaintiff purchased potash indirectly for end use, from a retailer of fertilizer which purchased it from one or more of the Defendants during the Class Period, and has suffered antitrust injury as a result of Defendants' conduct as alleged in this Complaint.

**B.**     **Defendants**

10.     Potash Corporation of Saskatchewan Inc. ("Potash Corp.") is a Canadian corporation with its principal place of business in Saskatchewan, Canada. Potash Corp. is the world's largest producer of potash. Potash Corp. has a 22% market share by capacity and 17% of the global production of potash. In 2008, Potash Corp. sales in North America from potash products represented 37% of their total potash sales, substantially all of which were attributable to potash customers in the United States. During the Class Period, Potash Corp. has sold and distributed potash throughout the United States.

11.     PCS Sales (USA), Inc. ("PCS Sales") is a Delaware corporation with its headquarters in Northbrook, Illinois. PCS Sales is a subsidiary of Potash Corporation of Saskatchewan Inc. and executes potash marketing and sales on behalf of Potash Corp. within the United States. During the Class Period, PCS Sales has marketed, sold, and distributed potash throughout the United States.

12.     Defendants Potash Corp. and PCS Sales are collectively referred to herein as "PCS."

13.     Mosaic Company ("Mosaic") is a Delaware corporation with its headquarters in Plymouth, Minnesota. Mosaic is the world's third largest potash

producer. In 2008, Mosaic accounted for approximately 14% of global production and 38% of North American production of potash. Mosaic was formed in 2004 when Cargill Inc. purchased IMC Global Inc. and merged the business with its subsidiary, Cargill Crop Nutrition. During the Class Period, Mosaic marketed, sold, and distributed potash throughout the United States.

14. Mosaic Crop Nutrition L.L.C. is a limited liability company with its headquarters in Riverview, Florida. Mosaic Crop Nutrition L.L.C. is a wholly-owned operating subsidiary of Mosaic Company. During the Class Period, Mosaic Crop Nutrition L.L.C. marketed, sold, and distributed potash throughout the United States.

15. Defendants Mosaic Company and Mosaic Crop Nutrition L.L.C. are collectively referred to herein as "Mosaic."

16. Defendant Agrium Inc. is a Canadian corporation with its headquarters in Calgary, Canada. Agrium is the third largest Canadian potash producer. Agrium marketed, sold, and distributed potash throughout the United States during the Class Period.

17. Agrium U.S. Inc. is a wholly owned subsidiary of Agrium, with its headquarters in Denver, Colorado.

18. Agrium Inc. and Agrium U.S. Inc. are collectively referred to herein as "Agrium."

19. Defendant JSC Uralkali ("Uralkali") is a Russian joint venture with its headquarters in Moscow, Russia. Uralkali is the fifth largest potash producer in the world. Since April 2005, Uralkali has owned a half interest in the Belarusian Potash

Company, through which it markets, sells and distributes potash. During the Class Period, Uralkali marketed, sold, and distributed potash throughout the United States.

20.     RUE PA Belaruskali is a business entity organized under the laws of Belarus with its headquarters in Soligorsk, Republic of Belarus. Belaruskali has nearly a 18% share of the global fertilizer market.  Since April 2005, Belaruskali has owned a half interest in the Belarusian Potash Company, through which it markets, sells and distributes potash.  During the Class Period, Belaruskali has marketed, sold, and distributed potash throughout the United States.

21.     JSC Silvinit ("Silvinit") is a Russian joint stock company with its headquarters in Solikamsk, Russia.  In 2007, Silvinit had a market share for potash capacity worldwide of 12%.  During the Class Period, Silvinit marketed, sold, and distributed potash throughout the United States.

22.     RUE PA Belarusian Potash Company ("BPC") is a joint venture between Uralkali and Belaruskali with its headquarters in Minsk, Belarus, established in April 2005.  In 2006, BPC accounted for approximately 34% of world potash export volume. BPC is the exclusive distributor of potash produced by Uralkali and Belaruskali throughout the world.  During the Class Period, BPC marketed, sold, and distributed potash throughout the United States.

23.     BPC Chicago L.L.C. is a limited liability company with its headquarters in Buffalo Grove, Illinois. BPC Chicago L.L.C. is a wholly-owned operating subsidiary of Belarusian Potash Company. During the Class Period, BPC Chicago L.L.C. marketed, sold, and distributed potash throughout the United States.

24.     Belarusian Potash Company and BPC Chicago L.L.C. are collectively referred to herein as "BPC."

25.     JSC International Potash Company ("IPC") is a Russian joint stock company with its headquarters in Moscow, Russia. IPC, the exclusive distributor of potash produced by Silvinit, accounted for approximately 14% of world potash export volume. During the Class Period, IPC marketed, sold, and distributed potash throughout the United States.

## IV. AGENTS AND CO-CONSPIRATORS

26.     Various entities not named as defendants herein have participated in the violations alleged herein and have performed acts and made statements in furtherance of the illegal conspiracy alleged herein.  Plaintiff reserves the right to name some or all of these entities as defendants at a later date.

27.     The acts alleged herein that were done by each of the co-conspirators were fully authorized by each of those co-conspirators, or ordered, or done by duly authorized officers, agents, employees, or representatives or each co-conspirator while actively engaged in the management, direction, or control of its affairs.

28.     Defendants are also liable for acts done in furtherance of the alleged conspiracy by companies they acquired through mergers and acquisitions.

## V. CLASS ACTION ALLEGATIONS

29.     Plaintiffs bring this action as a Class action pursuant to Federal Rule of Civil Procedure 23(b)(3), on behalf of a Class consisting of: all persons or entities who purchased potash products indirectly for end use, from the Defendants in the United States, and/or Indirect Purchaser States (defined below), or the consumer fraud states

(defined below), and/or the unjust enrichment states (defined below) during the Class Period. The Class excludes Defendants, and their parents, subsidiaries, affiliates, officers, directors, and employees and any co-conspirators and their parents, subsidiaries, affiliates, officers, directors, and employees. Also excluded, are any federal, state, or local governmental entity, and any judge or judicial officer presiding over this matter, judicial staff and the members of their immediate families.

30. For purposes of the Complaint and class definition, the "Indirect Purchasers States" are Arizona, California, the District of Columbia, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Jersey, New Mexico, New York, North Carolina, North Dakota, South Dakota, Tennessee, Vermont, West Virginia, and Wisconsin.

31. For purposes of the Complaint and class definition, the "Consumer Fraud States" are Alaska, Arkansas, California, the District of Columbia, Florida, Idaho, Kansas, Maine, Massachusetts, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, Pennsylvania, Rhode Island, Utah, Vermont, West Virginia, and Wisconsin. The Unjust Enrichment States are all 50 States minus Indiana and Ohio, but include Puerto Rico and Washington D.C.

32. The Class is so numerous and geographically dispersed throughout the Indirect Purchaser States, Consumer Protection States, and the Unjust Enrichment States that joinder is impracticable. While the exact number of the members of the Class is unknown to Plaintiffs at this time, Plaintiffs believe, based on the amount of potash sold, as well as Defendants' market share, that there are hundreds of thousands or more members of the Class.

33. Plaintiffs' claims are typical of the claims of the other members of the Class it seeks to represent. Defendants' illegal and inequitable methods, acts, and trade practices have targeted and affected all members of the Class in a similar manner, *i.e.*, Plaintiffs and the Class have been overpaying for potash mixed into fertilizer purchased from retailers for end use. Because of the collusion of Defendants in setting prices for purchases of potash and potash containing products, Plaintiffs and the Class will continue to pay *supra*-competitive prices until the conduct of Defendants is ceased. Plaintiffs and members of the Class have all sustained damages arising out of Defendants' conduct in violation of the Indirect Purchaser States laws, the Sherman Antitrust Act, State antitrust and consumer protection laws, and the States' common law of unjust enrichment, as more particularly alleged herein.

34. Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

(a) Whether the alleged conduct violated the Indirect Purchaser States laws concerning antitrust as alleged in Count II of this Complaint;

(b) Whether the alleged conduct violated the State consumer protection and unfair competition laws as alleged in Count III;

(c) Whether the alleged conduct violated the Sherman and Clayton Act as alleged in Count I;

(d) Whether Plaintiffs and the Class have a common law claim for unjust enrichment;

(e)     The duration and extent of any such violations or unlawful conduct alleged herein;

(f)     The amount by which Defendants' illegal, inequitable, and unfair trade practices have inflated the prices paid by members of the Class for potash and potash containing products over the amounts they would have paid in a competitive market unaffected by Defendants' illegal acts;

(g)     Whether Defendants' conduct caused injury to Plaintiffs and the Class members they seek to represent and, if so, the proper measure of damages; and

(h)     The appropriate nature of Class-wide equitable relief.

35.     Plaintiffs' claims are typical of those of the Class they represent, because they and all of the Class members were injured and continue to be injured in the same manner by Defendants' illegal and unfair methods, acts, and practices and wrongful conduct in the conspiracy complained of herein, *i.e.*, Plaintiffs and the Class have paid and continue to pay *supra*-competitive prices, until the market for potash and potash products is truly competitive.

36.     Plaintiffs will fully and adequately protect the interests of all members of the Class. Plaintiffs have retained counsel who are experienced in class action and antitrust litigation and who are committed to prosecute this action vigorously. Plaintiffs do not have any interests which are adverse to or in conflict with other members of the Class.

37.     The questions of law and fact common to the members of the Class predominate over any questions which may affect only individual members.

38.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all class members is impracticable.  The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the courts, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class.  A class action, on the other hand, would achieve substantial economies of time, effort, and expense, and would assure uniformity of decision with respect to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.

39.     The interest of members of the Class in individually controlling the prosecution of separate actions is theoretical rather than practical. The Class has a high degree of cohesion, and prosecution of the action through representatives would be unobjectionable.  The damages suffered by the individual class members may be relatively small; and therefore, the expense and burden of individual litigation make it virtually impossible for them to redress the wrongs done to them.  Plaintiffs do not anticipate any difficulty in the management of this action as a class action.

## VI.  ACTIVE AND FRAUDULENT CONCEALMENT

40.     Throughout and beyond the conspiracy alleged in this Complaint, Defendants and their co-conspirators affirmatively, actively, and fraudulently concealed their unlawful conduct from Plaintiffs and Class members. Defendants and their co-conspirators publicly provided false justifications for their price increases. Defendants and their co-conspirators conducted their conspiracy in secret, concealed the true nature of their unlawful conduct and acts in furtherance thereof, and actively and fraudulently

concealed their unlawful activities through various other means and methods to avoid detection. Plaintiffs did not discover, and could not have discovered through the exercise of reasonable diligence, that Defendants and their co-conspirators were violating the antitrust, consumer protection, and/or unfair competition laws as alleged herein until at or near the time this Class action was commenced. As a result of Defendants' and their co-conspirators' active and fraudulent concealment of their conspiratorial acts and conduct, any and all applicable statutes of limitations otherwise applicable to the allegations of this Complaint have been tolled.

## VII. TRADE AND COMMERCE

41. During the Class Period, each Defendant, directly or through its subsidiaries, sold potash products in the United States in a continuous and uninterrupted flow of interstate and intrastate commerce and foreign commerce, including through and into this judicial district, and into the districts where each Plaintiff resides and purchased potash products and Defendants' activities had a substantial and reasonably foreseeable effect on such commerce.

42. During the Class Period, Defendants collectively controlled a vast majority of the market for potash, both globally, in the United States, in the Indirect purchaser States, the Consumer Fraud States, and the Unjust Enrichment States.

43. Defendants' business activities substantially affected interstate and intrastate trade and commerce in the United States and/or in the Indirect Purchaser States; and caused antitrust injury in the United States and/or in the Indirect Purchaser States. In particular: (a) Defendants' unlawful and conspiratorial acts and conduct alleged in this Complaint substantially affected commerce in each of the States identified herein; (b)

Defendants purposefully have availed themselves of the laws of each of the States identified herein in connection with their activities relating to the pricing of potash products; (c) Defendants produced, promoted, sold, marketed, and/or distributed potash in each of the States identified in this Complaint, thereby intentionally profiting from access to indirect purchasers in each such State; (d) Defendants' unlawful and conspiratorial acts and conduct alleged herein affected adversely every person in each of the States identified herein who indirectly purchased potash products for end use and not for resale. Defendants' conspiracy has lasted for several years and resulted in monetary damages to purchasers in each State identified in this Complaint; and (e) prices of potash in each State identified in this Complaint can be manipulated by conspirators within that State, outside of that State, or both. Without enforcing the antitrust, consumer protection, and/or unfair competition laws of each of the States identified herein, fraudsters, including Defendants, will go unpunished. Defendants knew that commerce in each of the States identified in this Complaint perforce would be affected adversely through implantation of their conspiracy.

## VIII. FACTUAL ALLEGATIONS

### A.      Background of the Potash Industry

44.      Potash refers to mineral and chemical salts that contain potassium (chemical symbol K), and a multitude of other elements in various combinations. Potash is mined from naturally occurring ore deposits that were formed when seas and oceans dried. Many of these potash deposits are covered with several thousand feet of earth. Potash is principally used as an agricultural fertilizer because it is a source of water soluble potassium, which is one of three primary plant nutrients required for plant growth

and maturation. Farmers, gardeners, and anyone who uses fertilizers throughout the world use large amounts of potash for root production to help crops fight disease and to enhance crop yields. There is no cost-effective substitute for potash, and potash regardless of the producer is essentially the same.

45. Minerals composing potash, that are naturally occurring include potassium chloride (KCl or muriate of potash (MOP)), potassium-magnesium sulfate (K2SO4·MgSO4 or sulfate of potash magnesia (SOPM)], carbonate of potash (K2CO3), or mixed sodium-potassium nitrate (NaNO3+KNO3 or Chilean saltpeter). Potash can also include man-made compounds. Manufactured potash is one of the following: potassium sulfate (K2SO4 or sulfate of potash (SOP)) or potassium nitrate (KNO3 or saltpeter).

46. The World's potash reserves are confined to relatively few areas, where specific geological events have occurred throughout the world. While most countries consume potash, mostly as fertilizer, there are only 15 countries that produce notable quantities of it. Belarus, Canada, Germany, Israel, Jordan and Russia have about 90% of the global potash capacity within their borders. Over half of the world's global capacity is located in just two regions -- Canada and the former Soviet Union (specifically Russia and Belarus).

47. PCS, Mosaic, Agrium and BPC sell the majority of potash in the United States. The prices are determined by sales prices established by Defendants to its customers in China, India, Brazil and elsewhere.

48. The potash mining industry has very high barriers to entry. A single new mine requires a magnitude in upfront costs, approximately $2.5 billion, and a minimum

five years in development time -- in addition to outlays for infrastructure. Such extremely high barriers are conducive to a conspiracy because they protect existing suppliers from competition and perpetuate the high market concentration.

49.     Potash is a fungible, homogenous commodity product, and one supplier's type is readily substituted for another supplier. As a result, buyers make purchase decisions based largely, if not entirely, on price.

50.     The vast majority of production costs for potash producers are variable, and the variable costs are a high percentage of production costs. This reduces the pressure to run at full capacity and may allow a cartel to artificially boost prices with greater success than if the large percentage of the costs of production were fixed.

51.     Fertilizers, that include potash, are one of the most significant input costs incurred by farmers in food crop production, and any increases in the prices of these inputs may lead to higher prices for commodities, particularly those that require significant quantities of Potassium for growth and production.

**B.     Oligopolistic Nature of the Potash Industry**

52.     During the Class Period, the potash industry has been dominated by relatively few companies that market, sell, and distribute potash throughout the United States and/or the Indirect Purchaser States. Indeed, one analyst has observed that "the global trade in potash is even more concentrated than OPEC for oil." Another industry analyst referred to the small group of producers as the "Organization of Potash Exporting Countries."

53.     As of 2008, three Canadian producers (PCS, Mosaic and Agrium), and three former Soviet Union producers (Uralkali, Belaruskali and Silvinit) accounted for approximately 71% of the World's potash market.

54.     PCS is the largest potash supplier in the world, supplying nearly one-third of the world's potash. It also holds significant interests in a number of smaller potash suppliers throughout the world, including the following:

a.      a 32% interest in Sociedad Quimica y Minera de Chile ("SQM"), a potash supplier located in Chile, which supplies about 1 million tons of potash per year; and

b.      a 20% interest in Sinofert Holdings Limited, the largest potash distributor in China. Since 2005, PCS has been the exclusive overseas marketer for Intrepid potash, the largest potash producer in the United States.

c.      a 26% interest (and the right to nominate key financial, production and marketing personnel) in Arab Potash Company, a potash producer headquartered in Jordan, which in 2007 produced approximately 2 million tons of potash;

d.      a 9% interest in Israel Chemicals Ltd ("ICL"), which in 2005 produced 5 million tons of potash;

55.     Agrium and Mosaic are Canada's other major potash suppliers.  Along with PCS, these three potash suppliers are equal shareholders in Canpotex Ltd. ("Canpotex"), which acts as a unified sales, marketing and distribution company for these companies' potash supplies throughout the world – except in Canada and the United States. Each company has an equal voting interest in Canpotex, and each company has agreed that it will not independently make offshore sales (with the exception of sales into the United States).

56.     Canpotex potash sales are allocated among the producers based on production capacity of each shareholder. If a shareholder cannot satisfy demand for potash by Canpotex, the remaining shareholders are entitled to satisfy demand pro rata based on their allotted production capacity. In 2007, PCS supplied 55% of Canpotex's requirements, Mosaic supplied 37.5% and Agrium supplied 7.5%. Through PCS, Agrium, and Mosaic's participation in Canpotex, the companies have ready access to sensitive information about production capacity and pricing.

57.     Canpotex was initially formed to coordinate sales of potash produced in Canada, but it has entered into cooperative marketing agreements with producers from the former Soviet Union. For example, in January 2000, Canpotex agreed to form a joint marketing agreement with Uralkali. Under that agreement, Canpotex agreed to market Uralkali potash outside North America and Europe beginning in 2001.

58.     Producers from the former Soviet Union have also consolidated sales and marketing of their potash supplies with a single entity, the BPC. It was formed in 2005, as a joint venture between Uralkali and Belaruskali. BPC jointly markets and sells their potash throughout the world, including the United States. Uralkali and Belaruskali, BPC supplies 34% of the world's exports of potash.

59.     Silvinit, which supplies potash through the International Potash Company, is aligned with the other producers of potash in the former Soviet Union. Silvinit has been in active negotiations to join BPC, raising the prospect of further consolidation of the potash industry. Silvinit and Uralkali share common ownership by Dmitry Rybolovlev, who owns at least 66% of the stock of Uralkali and about 20% of the voting shares of Silvinit.

60.     The long-standing joint ventures in the potash industry have given these, in name only, competitors a continuous opportunity to discuss pricing, capacity utilization, and other important prospective market information. The mutually beneficial nature of the business relations between Defendants not only provided the opportunity to conspire, but it also created a financial incentive to do so.

## C.     Cooperation Among Competitors in the Potash Industry

61.     The potash industry is marked by a high degree of cooperation among supposed competitors. In addition to these formal business relationships, Defendants have fostered a striking degree of cooperation through reciprocal visits to their production facilities, participation in trade associations and attendance at industry conferences. The major potash suppliers have joint ventures or overlapping ownership interests that involve competitors in the potash market.

62.     Representatives of Defendant companies have routinely held meetings during the Class Period as part of an "exchange program of mutual visits." The exchange of visits, according to Defendants' representatives, "promote[d] the discussion of current issues affecting the potash industry and the sharing of experience."

63.     During one such visit, on October 11, 2005, senior executives of Defendants met in the former Soviet Union and discussed, among other things, highly sensitive production plans of at least one of the world's largest potash suppliers. This meeting was attended by William Doyle, President and CEO of PCS; Michael Wilson, President and CEO of Canpotex; James T. Thompson, Executive Vice President of the Mosaic Company; and Vladislov Baumgertner, General Director, President and CEO of Uralkali, as well as representatives of Belaruskali and Silvinit.  Shortly following the

meeting in November and December 2005 PCS and Mosaic announced production shutdowns at certain mines. The two partners in BPC also reduced production in January 2006 and IPC shut down mines later in the second quarter of 2006.

64. A year later, in July 2006, as part of the same "exchange program," a "delegation of Uralkali management" visited Mosaic Company in Canada. Mosaic's Executive Vice President, James Thompson, participated in the visit with the companies from the former Soviet Union. During the visit the delegation learned about the Mosaic "management structure" and toured potash mining operations of the company, including its most up to date mining technologies. The Uralkali visitors noted the "friendly attitude of the hosts" and exclaimed "[w]e were shown everything we wanted to see."

65. Petr Kondrashev, Director General of Silvinit, acknowledged in a 2005 interview published in *The Chemical Journal*, which covers the potash industry, that the company has "old and friendly connections with potassium manufacturers from Belarus and [that] we still are pretty good partners." He added that "[q]uite often we have visiting groups from Belaruskali" and that representatives of Silvinit also visit the Belarus producer.

66. Defendants have conducted numerous such visits during the Class Period, and these visits have provided opportunities to conspire and exchange highly sensitive competitive information. In the absence of an agreement among these supposed competitors, it would have been contrary to the independent economic self-interest of each to allow its competitors access to such sensitive competitive information.

**D.     Trade Associations To Facilitate The Conspiracy**

20

67.     Plaintiffs are informed and believe that Defendants' collusive activities have been furthered by trade associations and trade events that provided opportunities to conspire and share information.

68.     Defendants are all members of International Fertilizer Industry Association ("IFIA"), which sponsors annual conferences that are attended by senior officials of Defendants. At the IFIA meetings representatives of the manufacturers conferred about the potash market and "market tendencies."  In May 2007, representatives of PCS, Mosaic, Agrium, Belaruskali, Canpotex, BPC and others attended the 75th annual IFIA conference in Istanbul, Turkey.  During this May 2007 IFA conference, the major potash manufacturers announced an additional price increase on their potash products.

69.     At the 2006 Fertilizer Outlook and Technology Conference, held in Arlington, Virginia on November 6-8, 2006, Michael R. Rahm, Mosaic Vice President, Market & Economic Analysis presented an analysis of the potash industry. Representatives of at least one other Defendant attended the same conference. Defendants took part and are members of the Fertilizer Institute which sponsors, jointly with the Fertilizer Industry Round Table, an annual conference titled the "Fertilizer Outlook and Technology Conference." The conference is geared towards industry members, financial analysts, business consultants, trade press representatives and government economists.

**E.      Reductions in Output Capacity by Defendants**

70.     Defendants implemented their conspiracy which resulted in higher prices in the potash market, at least in part, through coordinated restrictions in potash

production. These capacity reductions would be against the economic interest of any individual defendant in the absence of agreement amongst Defendants.

71.    Defendants negotiate purchase contracts of potash throughout the world. Agreements made with buyers in India and China are typically made first and the prices established in those markets directly influence prices in other major markets.

72.    In late 2005 and early 2006, while potash demand globally was declining, several defendants reduced potash production to fix and maintain the price of potash. PCS announced in November 2005 the shutdown of two mines from December 11, 2005 through January 7, 2006 for inventory control purposes according to the company. PCS also shutdown another mine at Rocanville in January and February 2006. Over one million tons of potash was removed from the market as a result of these suspensions of production. Mosaic also announced reductions in output at several North American locations in November and December 2005. This reduction further removed several thousand tons of potash from the market.

73.    During 2005, potash demand in Brazil decreased by approximately 20%. Defendants collectively agreed to cut export sales to Brazil as well during 2005 and 2006. Defendants from the former Soviet Union and Canada agreed to cut their exports to Brazil by nearly the same 20%.

74.    The Defendants continued reducing potash supply in 2006. In early 2006, PCS cut production, through mine shutdowns, approximately 50% from the first quarter of the prior year. In January 2006 the two partners in BPC also reduced potash supply. Uralkali shut down its potash production, Belaruskali cut exports by 50 percent, and IPC announced that Silvinit would shut down its mines as well.

75. Collectively, the former Soviet Union Defendants removed over a half a million tons of potash from the market during early 2006. Other potash suppliers commended the action of the Defendants noting that in the past the Soviet Union Defendants had undermined efforts to control prices by flooding the market during low demand periods.

76. In early 2006, during difficult negotiations over potash prices, Canpotex and BPC jointly limited production in an effort to compel Chinese buyers (the largest consumers in the world) to accept a price increase that would eliminate their "discount" and set a benchmark for other buyers around the world. The Chairman of Uralkali explained the action as follows: "here the point is not to supply [potash] to them with USD 30-40 discount, as earlier, but to adjust the prices to the level of the neighbor Asian consumers. Therefore we will never ship anything there, until we get a contract reasonable from our point of view."

77. Consistent with the agreement, the leading suppliers of potash around the world jointly limited production to bring the Chinese consumers of potash in line with consumers in other countries, including the United States. Uralkali reduced its utilization rate during the first half of 2006 to 68% and the PCS reduced utilization to about 60%. Though the production reduction of Uralkali and PCS reduced their sales of potash by 23%, and 20%, respectively from the prior year, this behavior served to discontinue the "discount" to China prior to the negotiations and instead led to a price increase for potash sales in China and, shortly thereafter, throughout the world.

78. In a December 2007 report, an industry analyst explained the episode as follows: The decline in 2006 production (-23% Y/Y) was mostly caused by the voluntary

decision of Uralkali to reduce operating rates as price negotiations with China were delayed by several months. This was an industry-wide issue, as evidenced by Potash Corp.'s similar 20% decline in production. This behavior served to limit the decline in prices that China's hard line negotiations would have caused.

79.     Commenting on potash pricing in 2006, a Russian securities brokerage found "no fundamental factors to explain [the] decline of supply by potash producers" and viewed "simultaneous reduction of production capacities by companies in different parts of the world as motivated by their common wish to hold prices at the current high level . . . (or even to push prices higher)." The brokerage added that "consumers have no alternatives to potash or means to store it as a guard against future higher prices."

80.     Defendants jointly restricted supply in 2007 in order to impose price increases in the potash market. On or about October 25, 2007 Silvinit announced that it might have to suspend shipments of potash from one of its mines due to the presence of a sinkhole caused by mine flooding.

81.     Within a day, PCS, Uralkali, Agrium and BPC, all purportedly competitors of Silvinit, announced that they would suspend sales of their own potash because of the suspension of sales by Silvinit.  Significantly, the announcement of PCS's suspension of sales was made, not by PCS, but by its supposed competitor, Uralkali. Uralkali also declared that "these decisions could have an upward impact on potash prices, including in those markets where Uralkali's potash is sold."

82.     On November 6, 2007, Silvinit resumed sales of potash. Within a day after Silvinit announced the resumption of its potash sales, Uralkali announced that BPC would also resume sales of Uralkali potash after the 12 day stoppage. Uralkali refused to

explain the reason for resuming sales; however, a BPC official told a reporter the decision had been made "after studying the market."

83.     On November 7, 2007, PCS and Agrium announced that they would also resume potash sales.

84.     Shortly after these announcements that the major suppliers of potash were resuming sales, potash prices increased to "record highs on fears of a global shortage."

85.     Suspension of sales by competitors of Silvinit absent an agreement among Defendants  to fix, raise and/or maintain prices of potash does not make economic sense for each individual defendant.  In a competitive market Silvinit's competitors would have increased production to take advantage of the reduced capacity of Silvinit and increased sales rather than reducing production which decreased sales volume.

86.     In May 2008 Silvinit disclosed that an expanding sinkhole threatened its supply of potash again and suggested that it might shut down production for two or three weeks.  A spokesman for the company stated that "the situation is keeping us in suspense, but we are sure a crisis can be averted."  Within two weeks, the company announced that the sinkhole had stopped growing and "the situation can in no way get worse."

87.     Shortly after the disclosure of the threatened shutdown, prices for potash increased dramatically. On July 8, 2008, PCS announced that prices of potash to the United States would increase by $250 per ton, an increase of 48 percent.   Shortly thereafter, Canpotex announced a spot price of $1000 per ton and BPC sold potash to certain U.S. customers at the same price.

88.     In November and December 2008, Uralkali, PCS, and Agrium all announced production decreases resulting in several million tons of production decreases

for 2009. Uralkali cited a decrease in the sales of potash fertilizers in the global market while Agrium cited a buildup in inventories as the reason for the production decreases. One analyst stated that PCS and Agrium's production decreases were "an attempt to support pricing and demonstrate discipline."

89. PCS's CFO Brownlee in late 2008 when potash spot prices were near $1000 per ton commended the Belarusian Defendants for "tremendous discipline . . . in terms of managing supply in the marketplace." In the same month he also explained why potash prices had not fallen in line with other fertilizer prices by stating that "[A] big part of the story that is here is that you're just seeing a lot of good discipline by all the producers right now in the marketplace, whether they're cutting back production or building some inventory."

90. During the Class Period, potash suppliers repeatedly attributed dramatic prices increases to a "tight supply/demand balance" when in fact a number of Defendants had excess potash capacity. These statements were a pretext to conceal Defendants' conspiracy to restrict supply and fix prices of potash.

91. Throughout the Class Period, PCS repeatedly asserted that it had excess potash capacity. In 2004, PCS announced to analysts in Toronto, Canada that it intended to increase the utilization of its Saskatchewan mines from 58% to 65%. Throughout the Class Period, PCS seldom exceeded that utilization rate. In fact PCS only had a utilization rate between 54 and 69% throughout the Class period. PCS could have raised their utilization rate if they had wanted to increase production of potash.

92. Likewise, in a December 2007 presentation to investors, Uralkali claimed that it had the "ability to add significant capacity on the cheapest basis vs. global peers."

Also in 2007, BPC Director Vladimir Nikolaenko stated that if customer needs could not be filled by a particular supplier, "missing volumes can be purchased from other producers." Moreover, the CEO of Mosaic, Jim Prokopanko, describing the potash market in 2008 explained that "the rally [in agriculture] is fundamentally different because it is being driven by demand, *not by supply shortages*." (emphasis added).

93.     In January 2008, Mosaic released a report titled: "Why are Potash Supplies so Tight?" in which it explained that "[a]lthough all of the Canadian producers have expanded capacity, some projects have not started up on time and others have not operated as planned." The report falsely attributed the problem to "production hiccups" and increasing demand in world markets. As one economist noted in a May 2008 *Wall Street Journal* article, "[t]here's not really a supply issue at the moment."

94.     Despite assertions of a current and future "tight supply/demand balance," the Food and Agriculture Organization of the United Nations estimates, based on 2007 data, that "[g]lobal potash supplies are expected to keep well ahead of total demand with the surplus increasing from 5.7 to 6.7 million tonnes at an annual growth rate of 3%" through 2012. *Current World Fertilizer Trends and Outlook to 2011/2012*, Food and Agricultural Organization of the United Nations, Rome 2008, pg. 17.

95.     Notwithstanding their excess capacity, Defendants jointly coordinated to restrict this capacity to increase prices for potash throughout United States, and/or the Indirect Purchaser States, and/or Consumer Fraud States, and/or Common Law unjust enrichment States. In the absence of an agreement among these supposed competitors, the capacity output restriction would have been contrary to the independent economic self-interest of each producer.

96.     An October 2, 2008 story in the Minneapolis Star Tribune by Chris Serres went further: "In the eyes of many farmers and agriculture experts, fertilizer prices have seemed to defy the normal laws of economics." Serres reported that while prices have skyrocketed, Mosaic announced it has an over-supply of phosphate and potash and is cutting production.   Bob Zelanka, of the Minnesota Grain and Feed Association, told the Star Tribune, "It certainly does have the feel like they're controlling the supply to drive up the price."

97.     Recent price increases all along the food chain are drawing the attention of regulators. According to the Wall Street Journal's John Wilke, the U.S. Justice Department confirmed it has opened investigations into price fixing in the tomato, egg and citrus-fruit industries, and "federal agencies are pursuing criminal or civil inquiries in markets including fertilizer, cheese and milk."

98.     The article *The Potential of Potash* by Jackie Steinitz, Resource Investor Jun 24, 2008 states "**After 15 or so flat years, potash prices began to rise in 2004.** Since last year they have been rocketing; the Vancouver price, which averaged $183/tonne in May 2007, was $302/tonne at the beginning of 2008, $525/tonne by May 2008 and it is still climbing." Emphasis added. This is an unprecedented event in the price of potash and was the intent and effect of the conspiracy alleged herein.

99.     Also according to *A Potash bubble?* by David Akin on April 25, 2008 which states in part "First, there's plenty of potash - nearly 300 years of known reserves at current consumption rates, according to the International Fertilizer Association.

Second, you could hardly have found a worse investment in modern times - according to the US Geological Survey, real potash prices have fallen 95% from their record (peace-

time) peak in 1919 through the recent trough in 2003. Third, the current combined market cap of the three large North American producers (POT, AGU and the US' Mosaic) is bigger than the value of the all of the potash ever sold in the history of the world (or, at least, in the roughly 100 years of available records)." See http://davidakin.blogware.com/blog/_archives/2008/4/25/3660127.html. Thus until 2003, the potash industry was not worth very much, and overnight potash became a market sensation, quadrupling in a short period of time. It is highly improbable that the price of potash started to uncontrollably rise based on the innocent market conditions. In reality the prices rose from the alleged collusion and price fixing that is alleged in the complaint.

## F. Defendants Secretly Collude on Potash Prices

100. Plaintiffs allege that in order to control and maintain the profitability of potash, Defendants conspired to fix, raise, maintain, and stabilize the price at which potash was sold in the United States, and/or the Indirect Purchaser States, the Consumer Protection states and/or the unjust enrichment common law States, and restrict the production of potash to maintain a supply imbalance and therefore maintain potash at artificially inflated and anticompetitive levels.

101. Defendants publicly signaled their willingness to avoid price competition. For example, Uralkali admitted in 2006 that it sought to "ensure success of a 'price over volume' strategy" that would "[a]chieve long-term price stability." An industry analyst explained in 2007 that Uralkali "intends to follow a price over volume strategy whereby it will reduce its utilization rate from time to time to match potential declines in demand."

102. Dmitry Rybolovlev, majority owner of Uralkali, and part owner of Silvinit, publicly acknowledged in an interview in April 2006 that "an acceptable price

level is more important than expansion of market share and production." He added that "[w]e won't start a universal war in order to reduce prices. . . ."

103. In a presentation to investors, representatives of Uralkali extolled BPC's role as an "effective pricing tool" in the potash industry. A BPC official, noting the company had invited the Russian producer, Silvinit, to join the joint venture, explained that "[w]e would not like to compete with Russian companies in the potash market, that is why we offered Silvinit [an opportunity] to join the BPC on equal terms with everyone."

104. BPC has acknowledged the purpose of this proposed consolidation is to enhance its market power. As one of its officials recently admitted, "[w]e will be the strongest and most powerful company that will set to a great degree the rules of the game in the world's potash market, which means billions of dollars."

105. BPC's intention to set the "rules of the game" includes cooperation with Canadian producers. According to a presentation made by Uralkali to company analysts, the "[t]wo major export associations [Canpotex and BPC] ensure [a] stable pricing environment" for potash.  An outside analyst reached the exact same conclusion, explaining that "BPC and Canpotex have a dominant role in setting annual prices with large potash customers such as China, India and Brazil."

106. In 2007, after obtaining significant price increases for potash sales in 2007, Vladimir Nikolaenko, BPC's Director General, claimed that that "the company is not only an efficient pursuer of its shareholders' interests, but is actually *a leader to create an acceptable world market price condition* for all manufacturers of potash fertilizers." (Emphasis added.)

107.    Defendants' collusion is evidenced by unusual price movements in the potash market during the Class Period. Spot prices for potash have risen exponentially during the last five years, with North American prices for potash rising approximately 60% in 2004-2005, and essentially doubling in 2007 and early 2008. While historically, throughout the 1990's the potash industry was characterized by stable pricing.  During the Class Period this stability has given way to a remarkable run-up in potash prices to unprecedented levels. Such dramatic price increases are inconsistent and at variance with legitimate market forces and economic trends in this market. These price increases are not commensurate with producers' costs of production or other input costs during the Class Period.

108.    In the most recent years (during the class period) the prices for potash have risen in an unprecedented way from the historical norms of the potash industry.

109.    Defendants conspired to coordinate potash price increases in order to fix and maintain the price of potash throughout the Class Period in addition to the restricting of supply of potash discussed above.

110.    Defendants negotiate contracts for the sale of potash throughout the world. Contracts with buyers from China, Brazil and India are made first.  The prices established there determine prices charged in the United States.  Prices for contracts with buyers in China, Brazil and India become a basis for the spot market prices.

111.    Canada is the world's largest producer and exporter of potash accounting for nearly a third of total production and 40 percent of world trade.  Nearly half of Canada's exports go to the United States. Purchases in the United States are made from

PCS, Mosaic, Agrium and BPC, mainly at prices set on the spot market, which has increased in tandem with the contract prices in India, China and other spot markets.

112.    Representatives of Uralkali, in a presentation to analysts, set forth each step in the chain of events resulting in increased prices throughout the world and in the United States: "[1] contract settlement in the key markets immediately tied up volumes of potash producers . . . [2] causing demand competition on SPOT markets followed by increase in prices . . . [3] conclusion of Indian contract on the back of the SPOT markets' growth – even less volume is available . . . [4] boom on SPOT market continues stimulating increased Chinese discount and a stronger reason to bring it down in 2008."

113.    Defendants intended and were aware that increases in potash prices internationally due to a global conspiracy would have a direct effect on prices in the United States.

114.    Potash prices had remained stable until 2003 when Defendants began to implement a number of unprecedented parallel prices increases that raised the price of potash to never before seen levels.

115.    In early 2003, IPC announced a price increase of $8 per ton for potash. Within one month, Canpotex also increased prices to Brazil by the same $8 per ton.  By mid-year 2003 all suppliers had also raised prices by the same $8 per ton.

116.    The $8 per ton price increase for potash was also implemented in the U.S. by the predecessor to Mosaic and PCS during the same time period in 2003.

117.    An industry analyst observed at that time that suppliers were successful in raising prices and that production reductions had been used by producers, especially those in Canada, to keep supplies "under control."

118.    In January 2004, several Defendants announced parallel price increases as well.  IPC announced a price increase to Indian buyers and Canpotex to Brazilian customers.  PCS and the predecessor to Mosaic then shortly thereafter announced two separate $5 per ton increases within a five week period.

119.    In May 2004, Canpotex announced a $20 per ton increase for the price of potash to some customers.  PCS and IMC, the predecessor to Mosaic, announced $5 per ton price increases on potash to the United States followed by an additional $15 per ton increase in July 2004.  In September 2004, PCS and IMC again increased potash prices by $10 per ton.

120.    Defendants' price escalation for potash continued throughout 2004.  At a TFI meeting IPC announced that it was seeking a $40 per ton increase from its Chinese customers.  Canadian suppliers stated that they would seek a similar increase but not until Chinese importers had a chance to raise the domestic price for potash.  On November 5, 2004 IPC announced that it had negotiated a price increase of $40 per ton from certain Chinese customers.  PCS and Mosaic announced on the same day that Canpotex had also increased prices to certain Chinese customers by the same amount.  Within a few weeks Uralkali had also announced that it had increased potash prices to certain Chinese customers by virtually the same amount.

121.    In December 2004 PCS announced a price increase to its U.S. customers as well in the amount of $20 per ton.  Mosaic announced the same price increase that was effective at the same time a few weeks later.  PCS announced two additional price increases for its U.S. customers in May 2005 despite estimates that potash demand in Brazil, one of the largest importers of potash, was declining by 44%.

122.     Potash prices remained stable through the first half of 2006 because Defendants were awaiting negotiation outcomes for proposed price increase of potash between them and Chinese customers.  After an agreement was reached for Chinese and Brazilian customers in late 2006 potash prices increased in the U.S. as well.

123.     PCS announced in July 2008 that potash prices would increase by 48%. Within a short time BPC contracted to sell potash to U.S. customers at $1000 per ton.

124.     Defendants' large and historically unprecedented price increases cannot be explained by demand factors.  Demand for potash and other fertilizers began to decline in 2008.  Prices for potash have remained high and have continued to increase while other fertilizer prices have declined.  According to World Bank statistics, average fertilizer price indices rose from 1 to 2.2 and then fell back to 1 in 2008.  At the same time potash price indices started 2008 at 1.0 and rose to 3.5 by the end of 2008.

125.     Between 2007 and early 2008, prices for potash in North America essentially doubled (100%). According to data from the United States Department of Agriculture, the increase in potash prices far exceeded increases in the price of seeds (30%), livestock (27%), and *even fuels* (43%). As one Goldman Sachs analyst recently commented, potash producers are simply able to "*raise prices at will*." (Emphasis added.)

126.     As a result of dramatic price increases, several Defendants have posted similarly dramatically increased income. For example, PSC posted first quarter 2008 income figures that were triple the year-earlier figure. Mosaic's earnings for the first quarter 2008 were up more than 10-fold from a year earlier.

**G.     Effects of Defendants' Antitrust Violations**

127.    Defendants' combination, collusion, and conspiracy have had the following effects, among others:

a.    Prices for potash and potash containing products sold by Defendants has been raised, fixed, maintained and stabilized at artificially high and noncompetitive levels throughout the United States;

b.    Price competition in the sale of potash by Defendants and their co-conspirators has been restrained, suppressed and eliminated throughout the United States;

c.    Indirect purchasers of potash from Defendants have been deprived of the benefit of free and open competition in the purchase of potash.

128.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and other members of the Class of indirect purchasers have been injured in their business and property by paying more for potash or potash containing products, than they otherwise would have paid in the absence of Defendants' unlawful conduct.

## COUNT I

## VIOLATION OF SECTION 1 OF THE SHERMAN ANTITRUST ACT AND SECTION 16 OF THE CLAYTON ACT

129.    Plaintiffs incorporate and re-allege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

130.    Beginning at a time presently unknown to Plaintiffs, but at least as early as July 1, 2003, the exact dates being unknown to Plaintiffs, Defendants and their co-conspirators entered into and engaged in a continuing agreement, understanding, contract, combination, and conspiracy in restraint of trade to artificially raise, fix, maintain, and/or stabilize prices for potash products in the United States in violation of the Section 1 of the Sherman Act and Section 16 of the Clayton Act.

131.     The contract, combination, or conspiracy alleged in this Complaint has resulted in an agreement or concerted action among the Defendants and their co-conspirators, whereby, as a result of such actions, the prices charged for potash products were fixed, maintained, stabilized and/or standardized at artificially high, non-competitive levels throughout the United States, and price competition in the sale of potash products has been restrained, suppressed, and/or eliminated in the United States. Those who purchased potash products indirectly from Defendants and their co-conspirators thus have been deprived of the benefits of free and open competition. This alleged contract, combination, or conspiracy is a *per se* violation of federal antitrust laws and, at a minimum, is an unreasonable and unlawful restraint of trade.

132.     Plaintiffs and the Class have been injured and will continue to be injured in their business and property by paying more for potash products purchased indirectly from Defendants and their co-conspirators than they would have paid and will pay absent the combination and conspiracy. Plaintiffs and the Class accordingly are entitled to an injunction against Defendants, preventing and restraining the violations alleged in this Complaint.

## COUNT II

### Violation of State Antitrust and Unfair Competition Laws

133.     Plaintiffs incorporate and re-allege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

134.     Defendant's intentional and purposeful anticompetitive acts that are described above, including but not limited to collusion to limit production, to set prices

and the actual act of price fixing caused and was intended to cause Plaintiff to pay supra-competitive prices for potash products in the Indirect Purchaser States.

135.  Defendants' monopolistic and anticompetitive acts as described above are in violation of the following state antitrust statutes:

136.  Defendants have violated Arizona Revised Statutes §44-1403.

137.  Defendants have violated California Business & Professions Code §16700, *et. seq.*

138.  Defendants have violated District of Columbia Code § 28-4503.

139.  Defendants have violated Iowa Code §553.5.

140.  Defendants have violated Kansas Statutes §50-101.

141.  Defendants have violated Maine Revised Statutes, Title 10 § 1102.

142.  Defendants have violated Michigan Compiled Laws §445.773.

143.  Defendants have violated Minnesota Statutes § 325D.52.

144.  Defendants have violated Mississippi Code §75-21-1, *et seq.*

145.  Defendants have violated Nebraska Revised Statutes §59-801, *et seq.*

146.  Defendants have violated Nevada Revised Statutes §598A.060.

147.  Defendants have violated New Jersey Statutes §56:9-4.

148.  Defendants have violated New Mexico Statutes §57-1-2.

149.  Defendants have violated New York General Business Law §340, *et. seq.*

150.  Defendants have violated North Carolina General Statutes §75-2.1.

151.  Defendants have violated North Dakota Century Code §51-08.1-03.

152.  Defendants have violated South Dakota Codified Laws §37-1-3.2.

153.  Defendants have violated Tennessee Code §47-25-101, *et. seq.*

154.    Defendants have violated Vermont Statutes, Title 9, §453.

155.    Defendants have violated West Virginia Code §47-18-4.

156.    Defendants have violated Wisconsin Statutes §133.03.

157.    Class members in each of the States listed above paid supra-competitive, artificially inflated prices for potash products. As a direct and proximate result of Defendants unlawful conduct, such members of the Class have been injured in their business and property in that they paid more for potash products than they otherwise would have paid absent Defendants' unlawful conduct.

158.    As a result of Defendants' violations of the statutes set forth above, Plaintiffs and the Class seek actual damages for their injuries caused by such violations in an amount to be determined at trial. Plaintiff and the Class seek treble damages (where allowed by Statute) pursuant to the Indirect Purchaser States antitrust laws as stated above.

159.    Defendants' willful and unlawful conduct allow Plaintiff and the Class to seek attorneys' fees in the Indirect Purchaser States where they allowed by law. Plaintiff and the Class seek attorneys' fees where they are allowed by law.

## COUNT III

### Violation of State Consumer Protection and Unfair Competition Laws

160.    Plaintiffs incorporate and re-allege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

161.    Defendants engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices, or conduct that is immoral, unethical, oppressive, or conduct causing substantial injury to consumers. More particularly,

Defendants' deceptive practices as alleged herein include, but is not limited to, collusion between Defendants in restricting production, setting prices, and actual price fixing with the intended purpose to maintain supra-competitive pricing in the potash products market. Defendants' deceptive and anti-competitive conduct resulted in higher consumer prices for potash containing products because of supra-competitive pricing by Defendants.

162.     Defendants have engaged in unfair competition or unconscionable, deceptive, or fraudulent acts or practices, or conduct that is immoral, unethical, oppressive, or conduct causing substantial injury to consumers, in violation acts as described above, in violation the following State consumer protection and unfair competition laws:

163.     Defendants have violated Alaska Statutes §45.50.471, *et seq.*

164.     Defendants have violated Arkansas Code §4-88-101, *et seq.*

165.     Defendants have violated California Business & Professions Code §17200, *et. seq.*

166.     Defendants have violated District of Columbia Code §28-3901.

167.     Defendants have violated Florida Statutes §501.201.

168.     Defendants have violated Idaho Code §48-601.

169.     Defendants have violated Kansas Stat. §50-623 *et seq.*

170.     Defendants have violated Maine Revised Statutes, Title 5 §207, *et seq.* Specifically, Maine consumers indirectly purchased potash products primarily for personal, family, or household purposes.

39

171.     Defendants have violated Massachusetts General Laws, Chapter 93A, §1 *et seq.*

172.     Defendants have violated Missouri Merchandising Practices Act, Vernon's Mo. Stat. §407.010 *et seq.*

173.     Defendants have violated Montana Code §30-14-101, *et seq.*

174.     Defendants have violated Nebraska Revised Statutes §59-1601, *et seq.*

175.     Defendants have violated Nevada Revised Statutes §598.0903, *et seq.*

176.     Defendants have violated New Hampshire Revised Statutes §358-A:1, *et seq.*

177.     Defendants have violated New Mexico Statutes §57-12-1, *et. seq.*, specifically by engaging both in unfair and deceptive trade practices and unconscionable trade practices.

178.     Defendants have violated New York Gen. Bus. Law §349 *et seq.* Specifically: (a) Defendants engaged in commerce in New York; (b) Defendants and their co-conspirators secretly agreed to raise prices for potash products sold to New York consumers by direct agreement and through artificial supply restraints on the entire potash market; (c) New York consumers were targets of the conspiracy; (d) The secret agreements were not known to New York consumers; (e) Defendants: (i) made public statements about the prices of potash products that Defendants knew, or should have known, would be seen by New York consumers; (ii) such statements either omitted material information that rendered the statements made materially misleading or affirmatively misrepresented the real cause of price increases for potash products; and (iii) Defendants alone possessed material information that was relevant to New York

consumers, but failed or refused to provide such information; (f) Due to Defendants' unlawful trade practices in the State of New York, there was a broad affect on New York consumer Class members who indirectly purchased potash products such that New York consumer Class members have been injured because they paid more for potash products than they would have paid absent Defendants' unlawful trade practices, acts, and conduct; (g) Due to Defendants' unlawful trade practices in the State of New York, New York consumer Class members who indirectly purchased potash products were misled to believe that they were paying a fair price for potash products, or that the price increases for potash were imposed for valid business reasons. Similarly situated New York consumers potentially were affected by Defendants' unlawful conduct; (h) Defendants knew, or should have known, that their unlawful trade practices with respect to pricing potash products would have an effect on New York consumers that was not limited to Defendants' direct customers; (i) Defendants knew, or should have known, that their unlawful trade practices with respect to pricing potash products would have a broad affect causing New York consumer Class members who indirectly purchased potash to be injured by paying more for potash products than they would have paid absent Defendants' unlawful trade practices and acts; and (j) Defendants' consumer-oriented violations adversely affected the public interest in the State of New York.

179.    Defendants have violated North Carolina General Statutes §75-1.1, *et. seq.*

180.    Defendants have violated the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. §201-1 *et seq.* Specifically: (a) Defendants engaged in commerce in Pennsylvania; (b) As alleged herein, Defendants engaged in acts or practices that were unfair or deceptive to natural persons creating a likelihood of

confusion or misunderstanding on the part of Plaintiffs and the Class; (c) As alleged herein, Defendants used methods, acts, or practices that mislead or deceive members of the public in a material respect about the true reasons for the price of potash products; (d) Pennsylvania consumers purchased potash products primarily for personal, family, or household purposes; (e) The price of potash products was artificially inflated due to Defendants' price-fixing practices described above; (f) Pennsylvania consumers reasonably believed they were purchasing potash products at a fair and competitive price, and reasonably relied on their respective purchase prices being established honestly by the free market, but were deceived by the artificially inflated price of the potash products they purchased; and (g) Pennsylvania consumers were injured by Defendants' unlawful acts and conduct.

181.    Defendants have violated Rhode Island Gen. Laws §6-13.1-1 *et seq*. Specifically: (a) Defendants engaged in commerce in Rhode Island; (b) Defendants and their co-conspirators unscrupulously and secretly agreed to raise prices for potash products by direct agreement on prices Defendants charged Defendants' customers located in Rhode Island and through artificial supply restraints on the entire potash market; (c) These secret agreements were not known to Rhode Island natural persons who indirectly purchased potash products primarily for personal, family, or household purposes; (d)(i) Defendants made public statements that Defendants knew, or should have, known, would be seen by Rhode Island natural persons who indirectly purchased potash products primarily for personal, family, or household purposes; (ii) such statements created a likelihood of confusion or misunderstanding with respect to the real reasons that the price of potash products were rising; and (iii) such statements either

omitted material information that rendered such statements materially misleading and confusing, or affirmatively deceived Rhode Island consumers about the real cause of price increases for potash products; (e) Because of Defendants' unlawful and unscrupulous trade practices in Rhode Island, natural persons in Rhode Island who indirectly purchased potash products primarily for personal, family, or household purposes were misled or deceived to believe that they were paying a fair price for potash products or the price increases for potash products were imposed for valid business reasons; (f) Natural persons who indirectly purchased potash products primarily for personal, Family, and/or household purposes have been injured because they paid more for potash products than they would have paid absent Defendants' unlawful and unscrupulous trade practices and acts; (g) Defendants knew, or should have known, that their unscrupulous and unlawful trade practices with respect to pricing potash products would have an effect on Rhode Island natural persons who indirectly purchased potash products primarily for personal, family, or household purposes, and not solely on Defendants' direct customers; (h) Defendants knew, or should have known, that their violations with respect to pricing potash products would have a broad affect, causing Rhode Island natural persons who indirectly purchased potash products primarily for personal, family, or household purposes to be injured by paying more for potash products than they would have paid absent Defendants' unlawful trade practices and acts; and (i) Defendants' violations described above adversely affected public policy in Rhode Island.

182.    Defendants have violated Utah Code §13-11-1, *et. seq.*

183.    Defendants have violated Vermont Statutes, Title 9, §2451, *et. seq.*

184.    Defendants have violated West Virginia Code §46A-6-101, *et seq.*

43

185.     Defendants have violated Wisconsin Stat. §100.20, *et seq*.

186.     Class members in the States listed above paid supra-competitive, artificially inflated prices for potash products. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and the members of the Class have been injured in their business and property in that they paid more for potash products than they otherwise would have paid absent Defendants' unlawful conduct.

187.     As a result of Defendants' violations of the laws listed above, Plaintiffs and Class members in the States listed above are entitled to equitable relief, including restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefits that may have been obtained by Defendants as a result of such business practices, including compensable and such other damages in all States allowed by law.

188.     Additionally, Plaintiffs and the Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial.

189.     Defendants' willful and unlawful conduct allow Plaintiffs and the Class to recover attorneys' fees in the Consumer Fraud States where they are allowed by law. Therefore, Plaintiffs and the Class seek attorneys' fees where they are allowed by law.

## COUNT IV

### Unjust Enrichment and Disgorgement of Profits

190.     Plaintiffs incorporate and re-allege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

191.     Defendants have been unjustly enriched through overpayments by Plaintiffs and the Class and the resulting profits reaped by Defendants as a direct result of such overpayments. Plaintiffs' and the Class' detriment and Defendants' unjust

enrichment were related to and flowed from the wrongful conduct alleged herein, including, without limitation, Defendants' unlawful and anti-competitive acts described above for the purchase price of potash products.

192.     Under common law principles of unjust enrichment, Defendants should not be permitted to retain the benefits conferred through over payments by Plaintiffs and Class members. Plaintiffs and the Class accordingly are entitled to disgorgement of all profits resulting from such overpayments and establishment of a constructive trust from which Plaintiffs and Class members may seek restitution.

193.     Plaintiffs and the Class base their claims for unjust enrichment and disgorgement of profits under common law principles of unjust enrichment recognized in each of the 50 States, excluding Ohio and Indiana, and including Puerto Rico and District of Columbia.

194.     Plaintiffs and the Class have no adequate remedy at law to seek restitution under common law principles of unjust enrichment in the jurisdictions identified in paragraph 170, *supra*.

## COUNT V

### Common Law Restraint of Trade for Class Members For State of New York only

195.     Plaintiff re-alleges and incorporates by reference all of the allegations of this Complaint with the same force and effect as if fully restated herein.

196.     Defendants have a vast majority of worldwide and New York market share of patents and amount of sales for potash products.

197.     Defendants have maintained their monopoly in the State of New York over the potash containing products market through a series of purposeful and intentional acts since at least January 1, 2003.

198.     These intentional acts included but are not limited to artificially fixing, raising, maintaining, and stabilizing the prices paid by purchasers of potash products and the prices paid by potash products resellers.

199.     The intentional and unlawful acts of Defendants were designed to and actually caused Defendants to artificially fix, raise, maintain, and stabilize prices of potash products within the State of New York.

200.     As proximately and directly caused by Defendants' intentional and unlawful acts to restrain trade in the potash containing products markets, Plaintiff had to pay supra-competitive prices for potash products, when it purchased from Retailers or from resellers.

201.     Plaintiffs and the Class seek actual damages in an amount to be determined at trial for injuries suffered as a result of the allegations stated herein.

## X. DAMAGES

202.     During the Class Period, Plaintiffs and the Class purchased potash products indirectly from Defendants, or their subsidiaries, agents, and/or affiliates, and, by reason of the antitrust and other violations herein alleged, paid more for potash products than they would have paid in the absence of such antitrust violations. As a result, Plaintiffs and the Class have sustained damages to their business and property in an amount to be determined at trial.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff and the Class request as follows:

(a)     That this Court declare, adjudge, and decree this action to be a proper Class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the Class defined herein, including Rule 23(a), (b)(2), and (b)(3);

(b)     That this Court declare, adjudge, and decree that Defendants have committed violations of the Sherman Antitrust Act and the Clayton Act as alleged herein;

(c)     That this Court declare, adjudge, and decree that Defendants have committed violations of State antitrust, consumer protection and/or unfair competition laws alleged herein;

(d)     That this Court declare, adjudge, and decree that Defendants have committed violations of New York common law restraint of trade alleged herein;

(e)     That this Court award Plaintiffs and the Class their actual damages for Defendants' restraint of trade or commerce pursuant to New York common law, in an amount to be determined at trial;

(f)     That this Court award Plaintiffs and the Class treble damages for Defendants' violation of Indirect Purchaser States' antitrust laws (where allowed by Statute) in an amount to be determined at trial;

(g)     That this Court award Plaintiffs and the Class their actual damages and/or all other available monetary and equitable remedies for Defendants' violation of Consumer Fraud Statutes, in an amount to be determined at trial;

(h)     That this Court grant Plaintiffs and the Class their costs of this suit, including reasonable attorneys' fees as provided by law;

(i)     That this Court award Plaintiffs and the Class restitution, including disgorgement of profits obtained by Defendants as a result of their acts of unjust enrichment, including the return of overpayments made by them for Defendants' potash products;

(j)     That this Court award Plaintiffs and the Class any penalties, punitive or exemplary damages, and/or full consideration, where the laws of the respective States identified in this Complaint so permit;

(k)     That Defendants, their affiliates, successors, transferees, assignees, and the officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act in their behalf, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination alleged in this Complaint, or from entering into any other conspiracy alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

(l)     That Plaintiffs and the Class be awarded pre- and post-judgment interest, and that such interest be awarded at the highest legal rate from and after the date of service of the first-filed Complaint in this action; and

(m)     That Plaintiffs and the Class have such other, further, and different relief as the case may require and the Court may deem just and proper in the circumstances.

48

## JURY TRIAL DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand

a trial by jury for all issues so triable.

DATED: April 3, 2009

Respectfully submitted,

Plaintiffs

By: /s/*Marvin A. Miller*

Christopher Lovell (CL-2595)
Keith Essenmacher
Craig Essenmacher
LOVELL STEWART HALEBIAN LLP
61 Broadway, Suite 501
New York, NY 10006
(212) 608-1900

Marvin A. Miller
Matthew E. Van Tine
MILLER LAW LLC
115 S. LaSalle Street, Suite 2910,
Chicago, IL 60603
(312) 332-3400

*Co-Lead Counsel for Indirect Purchasers*

Paul F. Novak
Elizabeth McKenna
MILBERG LLP
One Pennsylvania Plaza
New York, NY 10119-0165
(212) 946-9431

Steven Maher
THE MAHER LAW FIRM PA
631 W. Morse Blvd
Winter Park, Fl 32789
(407) 839-0866

Thomas P. Cartmell
Eric D. Barton
Gerald B. Taylor
TylerW.Hudson
WAGSTAFF & CARTMELL LLP
4740 Grand Avenue, Suite 300
Kansas City, MO 64112
Tel. (816) 701-1100
Fax (816) 531-2372

*Other Counsel*

## **CERTIFICATE OF SERVICE BY ELECTRONIC MEANS**

I, Marvin A. Miller, one of the attorneys for plaintiffs, hereby certify that on April 3, 2009, service of the foregoing ***Indirect Purchasers' Amended Consolidated Class Action Complaint,*** was accomplished pursuant to ECF as to Filing Users and I shall comply with LR 5.5 as to any party who is not a Filing User or represented by a Filing User.

 */s/    Marvin A. Miller*
Marvin A. Miller