# EXHIBIT 10

Локридж
Гриндал
Науен
Пи.Л.Л.Пи.

_____

Адвокаты

*www.locklaw.com*

МИННЕАПОЛИС
Офис 2200
100 Вашингтон Авенью Юг
Миннеаполис, Миннесота 55401-2197
Т 612.339.6900
Ф 612.339.0981

ВАШИНГТОН ДиСи
Офис 210
415 Вторая улица Северо-Восток
Вашингтон, округ Колумбия
20002-4900
Т 202.544.9840
Ф 202.544.9850

**В. Джозеф Брукнер**
Телефон: 612-339-6900
wjbruckner@locklaw.com ОТВЕТ
ВЫСЫЛАЙТЕ НА МИННЕАПОЛИС

27 мая 2009 г.

ЗАО «Международная калийная компания»
Россия
Москва, 119034,
Пожарский пер., д.12, офис 64

**ПО ЭЛ. ПОЧТЕ: ipc@ipcmos.com**
**ПО ФАКСУ: 7-495-258-61-72/91**
**ПО КУРЬЕРСКОЙ ПОЧТЕ:**
**Федеральный Экспресс Интернешнл**

Re:  *В деле об Антимонопольном Судопроизводстве касающемся Калийных Удобрений (II)* Гражданское Дело № 1:08-cv-06910

Уважаемые Дамы и Господа:

В соответствии с приказом Суда от 23 апреля, 2009, копия которого прилагается, с этим письмом вам вручены переводы на русский Судебной Повестки о Вызове в Суд, Консолидированной Жалобы/Коллективного Искового Заявления Класса Покупателей-Потребителей и Консолидированной Жалобы с Поправками/Коллективного Искового Заявления Класса Непосредственных Покупателей-Потребителей в выше-указанном судебном процессе.

По Федеральным Правилам Гражданского Процессуального Права Соединённых Штатов, вы обязаны представить ваши возражения или иным образом ответить на более недавнюю Консолидированную Жалобу с Поправками, которая является действенной жалобой, представленной для рассмотрения Судом, в течение 20 (двадцати) дней с момента получения этой жалобы.

Пожалуйста выходите на связь напрямую или через своих юристов, если у Вас есть какие-либо вопросы.

С уважением,
ЛОКРИДЖ ГРИНДАЛ НАУЕН ПиЛЛПи
-подпись-
В. Джозеф Брукнер

ПИРСОН, САЙМОН, ВОРСОУ И ПЕННИ, ЛЛПи
-подпись-
Джонатан М. Уоткинс

С приложениями

403109.4

Дело № 1:08-cv-06910          Документ 64     Подан 23/04/2009          стр. 1 из 1

## ОКРУЖНОЙ СУД СОЕДИНЁННЫХ ШТАТОВ АМЕРИКИ
## СЕВЕРНЫЙ РАЙОН ШТАТА ИЛЛИНОЙС –
### CM/ECF LIVE (Управ. Делами/Эл. Реестр Дел Доступный через Интернет) Верс. 3.2.2
### Восточное Отделение

Антимонопольное Судопроизводство По Делу о
Калийных Удобрениях (№ II), и др.

                                        Истец,

Агриум Инк., и др.

_____ Ответчик.

НОМЕР ДЕЛА: 1:08-CV-6910
Почтенный Судья Кастильо

### УВЕДОМЛЕНИЕ О РЕГИСТРАЦИИ НОВОГО РЕШЕНИЯ

Регистарция этого решения в реестре была сделана Клерком в четверг, 23 апреля 2009 г.:

Запись в протоколе Почётного Рубена Кастильо: Совещание суда о статусе дела состоялось
23 апреля 2009 г., продолжение которого было назначено на 2 сентября 2009 г. в 9 часов утра.
Слушание по ходатайству состоялось 23 апреля 2009 г. Ходатайство некоторых из
ответчиков приостановить расследование [25] удовлетворено. Расследование доказательств
приостановлено до тех пор, пока не будет дозволено решением суда. Ходатайство истцов о
разрешении вручения судебной повестки иностранным ответчикам альтернативными
методами [40] удовлетворено. Присоединение Вторичных Покупателей Калийных
Удобрений к ходатайству об альтернативных способах вручения повестки иностранным
ответчикам [52] удовлетворено. Прошение Истцов о сохранении и защите от уничтожения
документов, информации и других вещественных доказательств [30], поданного в деле под
номером 08 C 5192, удовлетворено. Сторонам приказано представить форму судебного
решения о хранении вещественных доказательств не позднее 29 апреля 2009 г. Ходатайства
Ответчиков об отклонении жалобы истцов/закрытии дела должны быть поданы не позднее15
июня 2009 г. Истцы обязаны представить свои возражения не позднее 27 июля 2009 г.
Объяснения Ответчиков в опровержение возражений Истцов должны быть поданы суду не
позднее 17 августа 2009 г. Суд вынесет решение по почте. Почтовые уведомления (рао,)

**ВНИМАНИЕ:** Данное уведомление направляется в соответствии со Статьёй 77(d)
Федеральных Правил Гражданского Судопроизводства или Статьёй 49 (с) Федеральных
Правил Уголовного Судопроизводства. Это уведомление было составлено с помощью
CM/ECF, автоматизированной системы управления делами, используемой для регистрации
решений в реестре гражданских и уголовных дел этого Округа. Если к этому уведомлению
прилагается решение суда или другой документ, пожалуйста обратитесь к этому документу за
дополнительной информацией. По вопросам о назначенных событиях, практики подачи
ходатайств или касающихся другой информции, пожалуйста посетите наш веб-сайт на
**www.ilnd.uscourts.gov**.

АО 440 (Rev. 05/00) Судебная Повестка по Гражданскому Делу

# ОКРУЖНОЙ СУД СОЕДИННЁНЫХ ШТАТОВ АМЕРИКИ

## СЕВЕРНЫЙ РАЙОН ШТАТА ИЛЛИНОЙС

| | |
|---|---|
| **Истцы:**<br>Юридические лица Gage's Fertilizer & Grain, Inc. (Гейджз Фёртилайзер и Грэйн Инк.) и Kraft Chemical Company (Крафт Кемикал Компани), представляющие свои интересы, а также интересы группы предприятий, оказавшихся в аналогичной ситуации.<br><br>**Ответчики:**<br>Agrium Inc., Agrium U.S. Inc. (Агриум Инк., Агриум Корпорация США), Mosaic Company, Mosaic Crop Nutrition L.L.C. (Мозаик Компания, ООО «Мозаик Кроп Нутришн»), Potash Corporation of Saskatchewan Inc. (Калиевая Корпорация Саскачевана Инк.), PCS Sales (USA), Inc., (ПиСиЭс Сейлс США Инк.), ОАО «Уралкалий», РУП «ПО Беларуськалий», РУП «ПО Белорусская калийная компания», BPC Chicago L.L.C., (ООО «БКК Чикаго»), ОАО «Сильвинит», и ЗАО «Международная Калиевая Компания». | **СУДЕБНАЯ ПОВЕСТКА ПО ГРАЖДАНСКОМУ ДЕЛУ**<br><br><br>MDL Docket No. 1996<br><br>НОМЕР ДЕЛА 08-CV-5192<br>(консолидировано с Делом 08-CV-5635)<br><br>Судья Кастильо<br><br>Магистрат-Судья Кейс |

КОМУ: (Имя и адрес Ответчика)

ЗАО «Международная калийная компания»
Представительство ЗАО «МКК» в Республике Беларусь, г. Минск
Республика Беларусь
г. Минск, 220013,
ул. Я. Коласа, д. 21, офис 12

**ВАС ВЫЗЫВАЮТ В СУД** и вы обязаны вручить АДВОКАТУ ИСТЦА на имя и адрес:

Брюс Л. Саймон
Джонатан М. Уоткинс
ТОО «Пирсон, Симон, Варшау & Пенни»
США, 94104 г. Сан-Франциско, штат Калифорния
Ул. Монтгомери д. 44 (офис 1430)

ответ на Исковое Заявление, которое было Вам вручено вместе с этой Повесткой, в течение 20 дней после вручения этих документов, не считая дня вручения. Если вы этого не сделаете, решение по умолчанию будет принято против Вас, в соответсвии с требованиями заявленными в Исковом Заявлении. Вы также обязаны подать Ответ Клерку в Суд в течение разумного периода времени после вручения его Истцу. *[Примечание: Когда при печати появляется окно диалога, обязательно снимите отметку с выбором аннотации.]*

МАЙКЛ В. ДОББИНС, КЛЕРК                                             12 МАЙ 2009 г.
\Подпись и Штамп\

_____                                    _____
Заместитель Клерка                                                     Дата

AO 440 (Rev. 05/00) Судебная Повестка по Гражданскому Делу

---

### СВИДЕТЕЛЬСТВО О ВРУЧЕНИИ СУДЕБНЫХ ДОКУМЕНТОВ

| | |
|---|---|
| Вручение Судебной Повестки по Гражданскому Делу и Искового Заявления было осуществлено мной[1] | ДАТА |
| ИМЯ ОТВЕТСВЕННОГО ЛИЦА (печатным шрифтом) | СЛУЖЕБНОЕ ПОЛОЖЕНИЕ |

*Отметьте один из следующих способов вручения судебных документов:*

☐ Путём доставки Ответчику, который принял их добровольно.  Место вручения: _____
_____

☐ Путём доставки на место проживания Ответчика и вручения лицу, совершеннолетнего возраста проживающего по адресу Ответчика.  Имя лица, которому были вручены Судебная Повестка по Гражданскому Делу и Исковое Заявление: _____

_____

☐ Документы не были вручены по следующим причинам: _____
_____
_____

☐ Другие (укажите): _____
_____
_____

---

### ТРЕБОВАНИЕ ОБ ОПЛАТЕ ЗА УСЛУГИ

| Место Доставки | Услуги | Всего |
|---|---|---|
| | | |

---

### ДЕКЛАРАЦИЯ ОТВЕТСТВЕННОГО ЛИЦА

Я заявляю, под страхом наказания за лжесвидетельство по законам Соединенных Штатов Америки о том, что выше-указанная информация, содержащаяся в Свидетельстве о Вручении Судебных Документов и в Требовании об Оплате за Услуги, является достоверной и точной.

Подпись_____   Дата_____

Адрес Ответственного Лица_____

---

[1]О том, кто и в каком порядке имеет право вручать судебные документы, см. Статью № 4 Федеральных Правил Гражданского Производства.

## ОКРУЖНОЙ СУД СОЕДИНЁННЫХ ШТАТОВ АМЕРИКИ
## СЕВЕРНЫЙ РАЙОН ШТАТА ИЛЛИНОЙС

| | |
|---|---|
| АНТИМОНОПОЛЬНОЕ СУДОПРОИЗВОДСТВО ПО ДЕЛУ О КАЛИЙНЫХ УДОБРЕНИЯХ (II) | MDL Docket No. 1996 |
| | НОМЕР ДЕЛА 08-CV-6910 |
| ЭТОТ ДОКУМЕНТ КАСАЕТСЯ ВСЕХ СУДЕБНЫХ ДЕЛ, ВОЗБУЖДЁННЫХ НЕПОСРЕДСТВЕННЫМИ ПОКУПАТЕЛЯМИ-ПОТРЕБИТЕЛЯМИ | Судья Кастильо |
| | Магистрат-Судья Кейс |
| | С ЗАПРОСОМ НА СУД ПРИСЯЖНЫХ ЗАСЕДАТЕЛЕЙ |

## КОНСОЛИДИРОВАННАЯ ЖАЛОБА С ПОПРАВКАМИ И КОЛЛЕКТИВНОЕ ИСКОВОЕ ЗАЯВЛЕНИЕ КЛАССА НЕПОСРЕДСТВЕННЫХ ПОКУПАТЕЛЕЙ-ПОТРЕБИТЕЛЕЙ

### I.     ПРЕДИСЛОВИЕ

1.     Истцы приносят данную Жалобу в качестве физических и юридических лиц и в качестве представителей коллектива («Коллектив»), состоящего из юридических лиц, которые являются покупателями калийных удобрений или поташа в Соединённых Штатах Америки напрямую от одного или нескольких названных Ответчиков в период с 1 Июля 2003 года по настоящее время («Исковой Срок Жалобы Коллектива»). Этот Коллективный Иск консолидирует отдельные общенациональные иски различных групп непосредственных покупателей-потребителей калийных удобрений в этом судебном округе, и выдвигает требования о возмещении тройных убытков и судебном запрете, а также оплату за адвокатские услуги в соответствие с антимонопольным законодательством Соединённых Штатов.

2.     Поташ, или калийные удобрения, являются ключевыми сельскохозяйственными удобрениями, которые используются фермерами во всём

мире когда необходимо уберечь урожай от болезней и повысить объём урожая. Ответчики являются лидирующими производителями калийных удобрений в мире и в общем объёме получили более чем два миллиарда долларов США валовой прибыли в 2007 году. Концентрация предприятий в промышленности калийных удобрений является довольно высокой, с несколькими крупными производителями бывшего Советского Союза и Канады, осуществляющими контроль над долей, превышающей две трети всех поставок калийных удобрений на мировом рынке. Чрезвычайно высокие расходы для открытия разработки калийных удобрений, которые, как ответчики признают, составляют более двух миллиардов долларов, делают практически невозможным вступление новых конкурентов на рынок.

3.      В 1990-х годах производители калийных удобрений в особенности те, которые находятся на территории бывшего Советского Союза, увеличили производство калийных удобрений на мировом рынке, в результате чего цены на калийные удобрения, и соответственно прибыль прозводителей, значительно снизились. Истцы имеют основания утверждать, что для того, чтобы сохранить стабильность цен и увеличить прибыльность, Ответчики продавали миллионы тон калийных удобрений в Соединённые Штаты Америки, договорившись и объединив свои усилия, с целью искусственного создания, поднятия и поддержания высоких цен на калийные удобрения, поставляемые в Соединённые Штаты Америки. Для осуществления этого сговора, Ответчики обменивались деликатной и непубличной информацией о ценах, мощностях и объёмах производства и спроса; договаривались о разделе рынков, покупателей и объёмах распродаж; и координировали решения об объёмах и ограничениях на производство. Истцы проинформированы и у них есть основания полагать, что Ответчики обманным путём скрывали своё антиконкурентное поведение от Истцов и членов Коллектива для осуществления своего заговора.

4.      В результате незаконных актов Ответчиков, Истцы и другис члены Коллектива истцов были вынуждены платить искусственно завышенные цены на калийные удобрения в течение Искового Срока Жалобы Коллектива, нежели цены, которые бы существовали при конкуренции и свободном рынке.

5.      Истцы и члены Искового Коллектива приносят этот Иск, чтобы получить возмещение за убытки понесённые в результате действий Ответчиков и просят взыскать с Ответчиков в свою пользу возмещение ущерба, включая тройные убытки, стоимость судопроизводства и соразмерный гонорар за адвокатские услуги, потребовавшиеся в результате нарушения Ответчиками Статьи № 1 Закона Шермана (15 U.S.C. § 1).

## II.      ЮРИСДИКЦИЯ И ПОДСУДНОСТЬ

6.      Суд этого округа имеют юрисдикцию над данным Исковым Заявлением   в соответствии с 28 U.S.C. §§ 1331 и 1337(a) и в соответсвии со Статьями 4 и 6 Акта Клейтона, 15 U.S.C. §§ 15(a) and 26.

7.      Подсудность в этом округе является надлежащей, поскольку в соответсвии с 15 U.S.C. §§ 15 и 22, 28 U.S.C. § 1391(b) и (c), хотя бы один из Ответчиков проживает в этом округе, имеет лицензию на право заниматься коммерческой деятельностью, или занимается коммерческой деятельностью в этом округе, и поскольку значительная доля всего объёма международной торговли и коммерции, являющейся предметом этого Иска, происходила на территории этого округа.

8.      Этот Суд наделён юрисдикцией для разрешения данного спора в отношении каждого из Ответчиков, поскольку каждый из них: (a) заключал коммерческие сделки в США; (б) производил, продавал, перевозил; и/или (в) был вовлечён в антимонопльный заговор, имеющий своей целью прямой, предвидимый

и намеренный ущерб и убытки коммерческим отношениям и собственности лиц, проживающих и занимающихся бизнесом в США, включая этот Округ.

### III.     СТОРОНЫ

#### A.     ИСТЦЫ

9.     Истец Гейджз Фёртилайзер и Грейн, Инк (Gage's Fertilizer & Grain, Inc.) является корпорацией штата Миссури с управляющим центром, расположенным в Станберри, штат Миссури.   На протяжении Искового Срока Жалобы Коллектива эта корпорация закупала калийные удобрения напрямую у одного или нескольких Ответчиков и понесла убытки в результате нарушений антимонопольного занодательсвта, как утверждается в данной Жалобе.

10.     Истец Крафт Кемикал Компани (Kraft Chemical Company) является корпорацией штат Иллинойс с управляющим центром, расположенным в Мерлоуз Парк, штата Иллинойс.   На протяжении Искового Срока Жалобы Коллектива, эта корпорация закупала калийные удобрения прямо от одного или нескольких Ответчиков и понесла убытки в результате нарушений антимонопольного занодательсвта, как утверждается в данной Жалобе.

11.     Истец Минн-Кем, Инк является корпорацией штата Миннесота с управляющим центром, расположенным в Санборн, штат Миннесота.   На протяжении Искового Срока Жалобы Коллектива, эта корпорация закупала калийные удобрения прямо от одного или нескольких Ответчиков и понесла убытки в результате нарушений антимонопольного законодательства, как утверждается в данной Жалобе.

12.     Истец Шэннон Д. Флинн является резидентом Милтон, штат Флориды. На протяжении Искового Срока Жалобы Коллектива, Флинн закупала калийные удобрения прямо от одного или нескольких Ответчиков и понесла убытки в

результате нарушений антимонопольного законодательства, как утверждается в данной Жалобе.

13.    Истец Вэстсайд Форестри Сёрвисис, Инк, занимающейся бизнесом под именем Сигничур Лон Кез, является корпорацией штата Мичиган с управляющим центром, расположенным в Нови, штат Мичиган.  На протяжении Искового Срока Жалобы Коллектива, эта корпорация закупала калийные удобрения прямо от одного или нескольких Отвстчиков и понесла убытки в результате нарушений антимонопольного законодательства, как утверждается в данной Жалобе.

14.    Истец Томасвилль Фид Энд Сид, Инк является корпорацией штата Алабамы с управляющим центром, расположенным в Томасвилль, штат Алабама. На протяжении Искового Срока Жалобы Коллектива, эта корпорация закупала калийные удобрения прямо от одного или нескольких Ответчиков и понесла убытки в результате нарушений антимонопольного законодательства, как утверждается в данной Жалобе.

### B.    ОТВЕТЧИКИ

#### Агриум (Agrium)

15.    Ответчик Агриум Инк – это Канадская корпорация с управляющим центром, расположенным в Калгари, Канада.  В 2007 году Агриум являлся третьим крупнейшим Канадским производителем калийных удобрений с прозводсвтенной мощностью в 2,1 миллион тон и с производительностью в 1.7 миллион тон. На протяжении Искового Срока Жалобы Коллектива, Агриум продавал и являлся дистрибьютером калийных удобрений на территории США, напрямую или через свои филиалы.

16.    Агриум США Инк является корпорацией штата Колорадо и дочерней компанией, полностью принадлежащей Агриум, с управляющим центром расположенным в Денвере, Колорадо.  На протяжении Искового Срока Жалобы

Коллектива, Агриум U.S. Inc. продавал и являлся дистрибьютером калийных удобрений на территории США, напрямую или через свои филиалы.

17.     В этом документе Ответчики Агриум Inc. и Агриум США Инк. совместно обозначены как «Агриум».

**Мозаик (Mosaic)**

18.     Ответчик Мозаик Компани – это корпорация с управляющим центром, расположенным в Плимут, Миннесота.  Мозаик Компани была учреждена в январе 2004 года, когда Каргилл Инкорпорэйтид выкупил IMC Global Inc. («АйЭмСи Глоубал Инк») и осуществил слияние бизнеса со своей дочерней компанией, Каргилл Кроп Нутришн.   Мозаик является вторым крупнейшим мировым производителем по объёму производства и поставляет приблизительно половину своих калийных удобрений в Северную Америку, где эта компания занимает лидирующую по размеру долю рынка производителей калийных удобрений.  На протяжении искового срока Жалобы Коллектива, Мозаик продавал и являлся дистрибьютером калийных удобрений на территории США напрямую или через свои филиалы.

19.     Ответчик ООО «Мозаик Кроп Нутришн» или Мозаик Кроп Нутришн ЛЛСи является компанией с ограниченной ответственностью, учереждённой в штате Миннесота, с управляющим центром, расположенным в Риверью, Флорида. Мозаик Кроп Нутришн ЛЛСи является дочерней компанией полностью принадлежащей Мозаик Компани.   На протяжении Искового Срока Жалобы Коллектива, Мозаик Кроп Нутришн ЛЛСи продавал и являлся дистрибьютером калийных удобрений на территории США напрямую или через свои филиалы.

20.     В этом документе Ответчики Мозаик Компани и Мозаик Кроп Нутришн ЛЛСи совместно обозначены как «Мозаик».

**ПиСиЭс (PCS или Potash Corporation of Saskatchewan Inc.)**

21.    Ответчик  Поташ Корпорайшн ов Саскачеван Инк («Поташ Корп») —
это Канадская корпорация с управляющим центром, расположенным в Саскачеване,
Канада.  Поташ Корп является одним из крупнейших мировых производителей по
объёма производства, с доходами от продаж по всему миру в размере $3.858
миллиардов в 2008 году.  На протяжении Искового Срока Жалобы Коллектива,
Поташ Корп продавал и являлся дистрибьютером калийных удобрений на
территории США напрямую или через свои филиалы.

22.    Ответчик ПиСиЭс Сейлс США Инк (PCS Sales (USA), Inc.) («ПиСиЭс
Сейлс» или «PCS Sales») является компанией штата Дславэр с управляющим
центром, расположенным в Нортбрук, Иллинойс.   ПиСиЭс Сейлс является
дочерней компанией, полностью принадлежащей Поташ Корп.   На протяжении
Искового Срока Жалобы Коллектива, ПиСиЭс Сейлс продавал и являлся
дистрибьютером калийных удобрений на территории США напрямую или через
свои филиалы.

23.    В этом документе, Ответчики Поташ Корп. и ПиСиЭс Сейлс
совместно обозначены как «ПиСиЭс».

**ОАО «Уралкалий»**

24.    Ответчик ОАО «Уралкалий» является акционерным обществом, с
управляющим центром, расположенным в Москве, Россия.  Уралкалий является
пятым из самых крупнейших производителей калийных удобрений в мире и в 2007
году произвёл 5.1 миллион тон калийных удобрений, заработав $887 миллион
долларов с продаж. С апреля 2005 года, Уралкалий владеет половиной всех акций в
Белорусской калийной компании, совместном предприятии с Ответчиком РУП «ПО
Бсларуськалий», через которое Уралкалий рекламирует и распродаёт калийные
удобрения. На протяжении Искового Срока Жалобы Коллектива, Уралкалий
продавал и являлся дистрибьютером калийных удобрений на территории США
напрямую или через свои филиалы.

### РУП «ПО Беларуськалий»

25. Ответчик РУП «ПО Беларуськалий» является коммерческой организацией, учереждённой по законам Республики Беларусь, с управляющим центром, расположенным в Солигорске, Республике Беларусь. На долю Беларуськалия приходится почти 18% всего мирового рынка удобрений. С апреля 2005 года Беларуськалий является владельцем 50% в Белорусской калийной компании, через которую Беларуськалий рекламирует, продаёт и распространяет калийные удобрения. На протяжении Искового Срока Жалобы Коллектива Беларуськалий продавал и являлся дистрибьютером калийных удобрений на территории США напрямую или через свои филиалы.

### ЗАО «Белорусская калийная компания»/(«БКК»)

26. Ответчик ЗАО «Белорусская калийная компания» («БКК») является совместным предприятием Уралкалия и Беларуськалия, с управляющим центром, расположенным в Минске, Республике Беларусь. Учереждённый в апреле 2005 года, БКК является эксклюзивным дистрибьютором калийных удобрений, производимых Уралкалием и Беларуськалием по всему миру. В 2006 году на долю БКК пришлось приблизительно 34% всего мирового объёма экспорта калийных удобрений, а в 2008 году, продажи БКК в Соединённых Штатах составили 4% от общего объёма продаж этой компании. На протяжении Искового Срока Жалобы Коллектива БКК продавал и являлся дистрибьютером калийных удобрений на территории США напрямую или через свои филиалы.

27. Ответчик БиПиСи Чикаго ЛЛСи является обществом с ограниченной ответственностью, учереждённым в штате Иллинойс, с управляющим центром, расположенным в Баффало Гроув, Иллинойс. Основанное в 2007 году, БиПиСи Чикаго ЛЛСи является дочерней компанией, полностью принадлежащей БКК. На протяжении Искового Срока Жалобы Коллектива, БиПиСи Чикаго ЛЛСи продавало

и являлось дистрибьютером калийных удобрений на территории США напрямую или через свои филиалы.

28.     В этом документе Ответчики Белорусская калийная компания и БиПиСи Чикаго ЛЛСи совместно обозначены как «БКК».

**ОАО «Сильвинит»**

29.     Ответчик ОАО «Сильвинит» является акционерным обществом с управляющим центром, расположенным в Соликамске, Россия. В 2007 году Сильвинит контролировал 12% экспорта на мировом рынке и 7% мирового объёма производства на калийные удобрения. В 2008 году Сильвинит произвёл примерно 3,05 миллион тонн калийных удобрений и экспортировал 2,54 миллион тонн. В 2006 году Сильвинит объявил о реализации калийных удобрений на сумму в $672 миллионов. На протяжении Искового Срока Жалобы Коллектива Сильвинит продавал и являлся дистрибьютером калийных удобрений на территории США напрямую или через свои филиалы.

**ЗАО «Международная Калийная Компания» («МКК»)**

30.     Ответчик ЗАО «Международная Калийная Компания» («МКК») является российским акционерным обществом, с управляющим центром расположенным в Москве, Россия. На МКК, являющемся эксклюзивным дистрибьютором калийных удобрений, произведённых компанией Сильвинит, приходится приблизительно 14% мирового объёма экспорта калийных удобрений. На протяжении Искового Срока Жалобы Коллектива МКК, эксклюзивный дистрибьютор калийных удобрений, производимых Сильвинитом, продавал и являлся дистрибьютером калийных удобрений на территории США напрямую или через свои филиалы.

**IV.     ПРЕДСТАВИТЕЛИ И СТОРОНЫ-СОУЧАСТНИКИ**

31.     Кэнпотекс Лтд является Канадской корпорацией со штаб-квартирой в Сингапуре и офисами в Гонконге, Токио, Ванкувере и Саскатуне. Кэнпотекс принадлежит в равных долях Ответчикам ПиСиЭс, Агриум и Мозаик и осуществляет операции как единая компания по продажам, маркетингу и распространению поставок калийных удобрений для этих компаний по всему миру, за исключением Канады и Соединённых Штатов Америки. На протяжении Искового Срока Жалобы Коллектива, Кэнпотекс участвовал в нарушениях, перечисленных в этой жалобе, выполнял действия и делал заявления свидетельствующие об этих нарушениях.

32.     Иные юридические лица, не названные в качестве ответчиков, участвовали в нарушениях, предъявленных в этом Иске, выполняя действия и делая заявления, противоречащие закону. Соответственно, в дальнейшем, Истцы имеют право добавить эти лица в качестве Отвечиков по этому Коллективному Исковому Заявлению.

33.     Действия Ответчиков, которые являются предметом данного разбирательства выполнялись каждым из соучастников, были полностью под контролем и с разрешения каждого из соучастников, или были выполнены по приказу членов правления, представителей, сотрудников и других агентов каждого из соучастников, как деятельность под управлением и под контролем этих лиц.

34.     Ответчики также несут юридичексую ответственность за действия компаний, приобретённых ими с целью осуществления заговора.

## V.     ОСНОВАНИЯ ДЛЯ КОЛЛЕКТИВНОГО ИСКА

35.     Истцы подают данный Коллективный Иск как юридические лица и как представители Коллектива в соответсвии с Федеральным Законом о Гражданском Процессе, Статьей 23(a), (b)(2) и (b)(3), состоящего из следующих лиц:

Все физические и юридические лица, которые являлись покупателями калийных удобрений в Соединённых Штатах напрямую от одного или нескольких Ответчиков в период между 1 июля, 2003 и по настоящее время.   Не входят в состав этого Коллектива Ответчики и их материнские компании, дочерние компании и филиалы, а также государственные предприятия, и судьи, которые назначены рассматривать любой из аспектов этого Иска.

36.     Истцы не имеют точных данных о том, сколько лиц входят в состав представляемого Коллектива в связи с тем, что эта информация находится под исключительным контролем Ответчиков.  Истцы полагают, что, судя по характеру торговых и коммерческих отношений, являющихся предметом разбирательства, они могут насчитать тысячи членов Коллектива, которые населяют территориию Соединнёных Штатов, поэтому попытки определить каждое лицо попадающее под определение Коллектива невозможно.

37.     Истцы являются членами Коллектива.  Требования Истцов представляют типичные требованиями Коллектива, потому что Истцы являются покупателями напрямую от Ответчиков калийных удобрений и потому, что Истцы и все члены Коллектива пострадали в результате одного и того же неправомерного поведения Ответчиков и их заговорщиков, как утверждается в данном Иске, и их претензии имеют все характеристики, присущие претензиям Коллектива.

38.     В производстве этого Коллективного Иска, требуется разрешить целый ряд фактических и правовых вопросов, общих для всех членов искового коллектива и возникших в результате антикокурентных действий Ответчиков, включая, но не ограничиваясь следующим перечнем:

    a.     На самом ли деле Ответчики были вовлечены с общий сговор с целью искусственно создать, поднять, удерживать и зафиксировать цены на калийные удобрения, импортируемые в США;

    b.      На самом ли деле Ответчики были вовлечены с общий сговор с целью ограничить выпуск калийных удобрений импортируемых в США;

    c.      На самом ли деле Ответчики делились конфиденциальной информацией, разделяли сферы влияния на рынках и разделяли покупателей или клиентов, ограничивали выпуск калийных удобрений, импортируемых в США, и совершали другие неправомерные действия для осуществления сговора о ценообразовании;

    d.      На самом ли деле действия Ответчиков привели к исскуственно созданному повышению цен до монопольного уровня на калийные удобрения, импортируемые в США;

    e.      На самом ли деле Истцы и другие члены Коллектива понесли материальный ущерб в результате действий Ответчиков, и, если это так, какова мера этого ущерба для того, чтобы компенисировать убытки всех членов Коллектива;

    f.      На самом ли деле Истцы и другие члены Коллектива имеют право требовть судебный запрет на неправомерные действия Ответчиков, и, если это так, каким должно быть содержание и рамки этого судебного запрета.

39.      Эти и другие фактические и правовые вопросы пресущи всем членам Коллектива и преобладают над теми юридическими вопросами, которые пресущи только отдельным членам Коллектива, включая фактические и правовые вопросы в отношении юридической ответсвенности и размера убытков.

40.      Истцы готовы представлять интересы Коллектива справедливо и компетентно, потому что Истцы являются непосредственными покупателями-потребителями калийных удобрениий и у них нет конфликта с другими членами Коллектива.  Более того, Истцы наняли компетентных юристов, имеющих опыт работы с антимнопольным правом, коллективными исками и  другими сложными коммерческими делами.

41.    Ответчики действовали на основаниях, которые имеют отношение ко всем членам Коллектива, таким образом делая судебный запрет приемлемым вариантом разрешения этого Иска в отношении всего Коллектива.

42.    Этот Коллективный Иск является наилучшим способом из имеющихся альтернатив справедливого и разумного разрешения данного юридического спора. Разрешение спора путём подачи Коллективного Иска позволит большему числу лиц, находящихся в одинаковых обстоятельствах, эффективно найти правовое решение на их общие претензии в одном судебном процессе, таким образом избежав двойных расходов времени и ресурсов. Разрешение спора путём Коллективного Иска также позволяет избежать повторяемых судебных процессов. Разрешение спора путём Коллективного Иска позволит в том числе удовлетворить жалобы членов Коллектива с относительно небольшим размером ущерба, которые иначе не смогли позволить бы себе участие в подобном судебном процессе по антимонопольному законодательству так, как оно представлено в данном Иске. Каких-либо проблем относительно реализации данного Искового Заявления не предвидится.

43.    Не предвидится также каких-либо проблем с определением членов Коллектива, поскольку данные об этих лицах находятся в документах Ответчиков и их задействованных ими сторон.

44.    Разрешение этого спора в индивидуальном порядке отдельными членами Коллектива нежелательно, потому что это наверняка повлечёт риск противоречащих решений и появления несовместимых прецедентов, влияющих на поведение Ответчиков.

## VI.    ТОРГОВЛЯ И КОММЕРЦИЯ

45.    На протяжении Искового Срока Жалобы Коллектива каждый из Ответчиков напрямую или через свои дочерние компании и филиалы, продавал

калийные удобрения в США через систематические и постоянные поставки, международные и внутриштатные перевозки, включая и поставки внутри настоящего Судебного Округа.

46.     На протяжении Искового Срока Жалобы Коллектива, Ответчики совместно контролировали большую долю производства калийных удобрений на международном рынке и рынке США.

47.     Коммерческая деятельность Ответчиков оказала значительное влияние на торговлю и коммерцию в США и привела к материальному ущербу, признаваемому антимонопольным законодательством США.

## VII.    ОСНОВАНИЯ ДЛЯ ИСКА

### A.    ПРОИЗВОДСТВО КАЛИЙНЫХ УДОБРЕНИЙ

48.     Поташ – это название минеральной и химической соли, содержащей калий.  Поташ или калийные удобрения добываются из природных рудниковых залежей, сформировавшихся в результате испарения и исчезновения морей или океанов, и многие их которых в настоящее время находятся в сотнях метров под землёй.  Калийные удобрения в основном используются как сельскохозяйственное удобрение и как источник растворимого калия, который является одним из трёх основных компонентов, требующихся для роста и питания растений.  Фермеры по всему миру используют калийные удобрения в больших количествах для того, чтобы помочь урожаю противостоять заболеваниям и повысить урожайность. Калийные удобрения также используются в промышленности при производстве или никелировке металла, а также  при производстве стекла, керамики, жидкого мыла и добавок к животному корму.   У калия, как сельскохозяйственного удобрения, нет более дешёвого заменителя.

49.     Удобрения, включая калийные удобрения, являются критически важными составляющими компонентами в производстве урожая.  Ограничения в

выпуске калийных удобрений, как утверждается в этом Иске, являются причиной уменьшения урожая и, в конечном счёте, повышению цен на продукты питания, в особенности на те продукты, которые требуют значительного использования калия для их производства.

50.     Все мировые залежи калийных удобрений сосредоточены в всего лишь в нескольких регионах.   Хотя в целом около 150 стран потребляют калийные удобрения, главном образом как удобрение, только 15 стран являются производителями, способными поставлять значительные объёмы этого вещества. В пределах Беларусии, Канады, Германии, Израиля, Иордана и Росиии содержится примерно 90% мировых залежей калийных удобрений. Более половины мирового содержания калия находится в лишь двух местах – в Канаде и в бывшем Советском Союзе (в особенности России и Беларусии).   Самые большие залежи калийных удобрений находятся в Саскачеване, Канаде.  Более чем 50% калийных удобрений из Саскачеваны экспортируются на международные рынки.

51.     Соединённые Штаты Америки и Китай являются самыми крупными потребителями калийных удобрений. В 2008 году в США было потреблено около 6,2 миллион тонн калийных удобрений, 5,3 миллион из которых были импортированы из-за пределов Соединённых Штатов. На долю Северной Америки приходится 17.1% от всего мирового потребления калийных удобрений. В 2007 году 344,000 тонн калийных удобрений, произведённых в России, было экспортировано в Соединённые Штаты Америки.

52.     Канада является крупнейшим в мире производителем и экспортёром калийных удобрений, на долю которого приходится почти одна треть от общего объёма производства и 40% мировой торговли.   Почти половина экспорта из Канады направляется в Соединённые Штаты, что составляет примерно 70% годового потребления калийных удобрений в США. Подавляющее большинство продаж калийных удобрений в США производится ПиСиЭс, Мозаик, Агриум и

БКК по ценам, которые устанавливаются в соответствии с критериями, созданными Ответчиками на основании продаж потребителям в Китае, Индии, Бразилии и других странах.

53.     Калийные удобрения являются однородным продуктом, так что калийные удобрения произведенные одним из поставщиков не отличаются по качеству от калийных удобрений поставляемых другими производителями.     В результате, покупатели калийных удобрений принимают решения о покупке, главным образом, исходя из цены.

54.     Поскольку себестоимость калийных удобрений является относительно небольшой по сравнению со всей стоимостью производства урожая и поскольку не существует равных заминителей этого продукта, спрос на калийные удобрения является неэластичным.     В Соединённых Штатах увеличение цен на калийные удобрения в размере $100 за тонну добавляет всего лишь $0.03 к общей стоимости производства одного бушеля кукурузы. Таким образом, с повышением цен на калийные удобрения, покупатели склонны продолжать покупать за более высокие цены, а не сокращать объём своих покупок, в результате чего ограничение поставок с помощью картелей становится привлекательным для производителей.

55.     Большая часть затрат на производство калийных удобрений не постоянна.     При остальных равных условиях, когда переменные издержки составляют высокий процент от всех расходов производства, у производителей нет стимулов для эксплуатации предприятий на полную мощность, и это позволяет картелю производителей искусственно завышать цены с большим успехом, нежели в ситуациях, когда постоянные расходы являются основным компонентом издержек производства.

56.     Начать производство калийных удобрений нелегко из-за очень высоких барьеров, препятствующих вступлению в эту промышленность новых предприятий. К примеру, для открытия одной новой разработки требуется примерно $2,5

Дело № 1:08-cv-06910      Документ 51      Подан 03/04/2009      стр. 17 из 53

миллиарда или более только как изначальное вложение; пять или семь лет на развитие; и доболнительные издержки, связанные со строительством дорог и остальной инфраструктуры. Эти барьеры являются предпосылкой для сговора поскольку они защищают существующих производителей от затрат, связанных с конкуренцией и приводят к выской концентрации производителей на рынке калийных удобрений.

**B.     ВЫСОКАЯ КОНЦЕНТРАЦИЯ ПРОИЗВОДИТЕЛЕЙ НА РЫНКЕ КАЛИЙНЫХ УДОБРЕНИЙ**

57.     Всего несколько компаний, рекламириующих, продающих и поставляющих калийные удобрения, доминируют в промышленности калийных удобрений в мире и в Соединённых Штатах. По состоянию на 2008, на долю трёх производителей с рудниками расположенными в Канаде (ПиСиЭс, Мозаки и Агриум), а также трёх производителей из бывшего Советского Союза (Уралкалий, Беларуськалий и Сильвинит), приходится примерно 71% всего рынка на калийные удобрения. На протяжение Искового Срока Жалобы Коллектива, рыночная доля этих предприятий не изменились в какой-либо значительной мере.

58.     Один из аналитиков даже отмечал, что производство калийных удобрений в мире является еще более сконцентрированным, чем нефтянной рынок, контролируемый ОПЕК или Организацией Наций Экспортёров Нефти. Ещё один аналитик этой промышленности ссылался на эту небольшую группу производителей как «Организацию Наций Экспортёров Поташа».

59.     Уэйн Браунли, финансовый директор Ответчика ПиСиЭс, заявлял: «Самой привлекательной чертой в бизнесе калийных удобрений является то, что это олигополия; там мало производителей.... там нет большой конкуренции и там мало государственного вмешательства».

60.     На протяжении Искового Срока Жалобы Коллектива наблюдалась значительная степень консолидации предприятий в калийной промышленности.

61.   Начиная с 2003, ПиСиЭс начала приобретать значительные доли участия и пакеты акций в различных мелких производителях калийных удобрений по всему миру. В октябре 2003 года, ПиСиЭс объявила о том, что она приобрела 26% пакета акций в Арабской калийной компании («АКК»), производственная мощность которой составляет 2 миллиона тонн калийных удобрений.  Как второй по размеру акционер в АКК, ПиСиЭс имеет право назначить кадры на ключевые финансовые, производственные и маркетинговые должности в управлении АКК, и ПиСиЭс назначила четырёх ключевых сотрудников для работы в АКК, включая генерального директора этой компании.

62.   В декабре 2004 года, ПиСиЭс приобрела около 25% от общего числа акций Общества Куимика и Минера де-Чили («ОКМ»), поставщика калийных удобрений в Чили, который поставляет около 1 миллиона тонн калийных удобрений в год.

63.   ПиСиЭс также пробрела 9%-долю участия в Израиль Кемиклз Лтд («ИКЛ»), компании, на долю которой во время Искового Срока Жалобы Коллектива пришлось приблизительно 11% мирового производства калийных удобрений.

64.   Приблизительно в феврале 2004 года АйЭмСи Глоубал Инк и Каргилл Интернешнл заявили о своём соглашении о слиянии этих компаний и создании на их основе Ответчика Мозаик.

65.   В марте 2004 года Миссисипи Кемикл Компани объявила о продаже компании Интерпид Майнинг ЛЛСи своих двух дочерних компаний (Миссисипи Поташ Инк и Эдди Поташ Инк), которая объединила эти две компании, создав Итерпид Поташ Инк, крупнейшего производителя калийных удобрений в Соединённых Штатах. С 2005 года ПиСиЭс стала эксклюзивным представителем-продавцом для Итерпид Поташ Инк зарубежом.

66.   Этот значительный уровень консолидации способствовал возможности Ответчиков осуществить их заговор.

### C.   ВЫСОКИЙ УРОВЕНЬ СОТРУДНИЧЕСВТА НА РЫНКЕ ПРОИЗВОДИТЕЛЕЙ КАЛИЙНЫХ УДОБРЕНИЙ

67.    Характерной чертой промышленности калийных удобрений является высокий уровень взаимодействия между предполагаемыми конкурентами.  Как отмечалось выше, основные производители калийных удобрений владеют совместными предприятиями и разделяют интересы собственников среди конкурентов на рынке калийных удобрений.  Помимо этих официальных деловых отношсний Ответчики создали поразительную культуру сотрудничества путём взаимных посещений предприятий друг друга, участия в торговых ассоциациях и поездок на промышленные конференции.

68.    ПиСиЭс, Агриум и Мозаик являются равноправными акционерами с одинаковым количеством акций в Кэнпотекс.  Каждая компания имеет равное право голосования в Кэнпотекс как акционер через своего представителя в совете директоров Кэнпотекс, и каждая из этих компаний заключила соглашение, что не будет независимо участвовать в международной торговле (за исключением торговли в США).

69.    Коммерческис    сделки    по    продаже    калийных    удобрений, осуществляемые Кэнпотекс, распределены между производителями на основании объёма производства каждого акционера.     Если акционер не в состоянии удовлетворить спрос на Поташ требуемый Кэнпотекс, остальные акционеры имеют право восполнить неудовлетворённый спрос пропорционально производственному объему их предприятий.    В 2007 году, ПиСиЭс поставил 55% всей продукции, затребованной Кэнпотекс;  Мозаик поставил 37.5%;  и Агриум – оставшуюся долю. Благодаря участию этих компаний в Кэнпотекс, у ПиСиЭс, Агриум и Мозаик есть доступ к конфиденциальной информации об объёмах производства и ценах.

70.    Изначально, Кэнпотекс    был    сформирован    для    того,    чтобы распродавать калийные удобрения, производимые в Канаде, но на настоящий

момент Кэнпотекс заключил по крайней мере одно соглашение по сотрудничеству о распродаже калийных удобрений с производителями из бывшего Советского Союза. Например, в январе 2000 года Кэнпотекс согласился вступить в совместное соглашение по распродаже с Уралкалием. Кэнпотекс согласился рекламировать и распродавать калийные удобрения Уралкалия за пределами Северной Америки и Европы, начиная с 2001 года. Кроме того, Кэнпотекс и МКК участвовали, по крайней мере до конца 2003 года, в рамках совместного предприятия в Малайзии под названием "Болк Лоджистик" созданного в целях совместного маркетинга и для уведомления своих покупателей от росте цен.

71.    Как и Канадские производители, производители из бывшего Советского Союза консолидировали распродажу и маркетинг их поставок калийных удобрений в одном предприятии, БКК. Основанное в 2005 году как совместное предприятие между Уралкалием и Беларуськалием, БКК совместно рекламирует и распродаёт калийные удобрения, производимые этими Отвеетчиками предприятиями по всему миру, включая США. Совместные поставки калийных удобрений от Уралкалия и Беларуськалия через БКК составляют 34% всего мирого экспорта калийных удобрений.

72.    Сильвинит, поставляющий калийные удобрения через МКК имеет связи с другими производителями калийных удобрений в бывшем Советском Союзе. Дмитрий Рыболовлев владеет акциями в Сильвините и Уралкалии, по крайней мере 66% в Уралкалии и около 20% акций с правом голосования в Сильвините. Сильвинит активно участвовал в переговорах по вступлению в БКК, тем самым далее способствуя консолидации на рынке калийных удобрений.

73.    Рыболовлев признался в истинной антиконкурентной мотивации по созданию этих совместных предприятий, объяснив что «совместная деятельность позволяет [производителям калийных удобрений] избежать ненужной конкуренции».

74.     Согласно репортажам новостей, представители компаний Ответчиков систематично встречались на протяжении Искового Срока Жалобы Коллектива по «программе взаимного обмена визитами». Согласно представителям Ответчиков, обмен визитами «способств[овал] обсуждению текущих вопросов, касающихся промышленности калийных удобрений и обмену опытом».

75.     Во время одного из этих визитов, 11 октября 2005 года, старший руководитель Ответчиков посетил Уралкалий в бывшем Советском Союзе  и обсуждал, среди других тем, что считается очень деликатной, информацию о производственных планах по крайней мере одного из самых крупных мировых производителей калийных удобрений.  На этой встрече присутствовали Уильям Дойл, президент и председатель правления Поташ Корп (Potash Corp.); Майкл Уилсон, президент и председатель правления Кэнпотекс; Джеймс Томпсон, вице президент Мозаик Компани;  Владислав Баумгертнер, генеральный директор, президент и председатель правления Уралкалий; а также другие представители Беларуськалия и Сильвинита.

76.     В июле 2006 года, в составе «программы взаимного обмена визитами», делегация руководителей Уралкалия посетила Мозаик Компани в Канаде.   Джеймс Томпсон, вице-президент Мозаик Компани, также участвовал во встрече с компаниями из бывшего Советского Союза. Во время этой встречи делегация была ознакомлена с управленческой структурой Мозаика и посетила рудники компании, включая обзор её самых современных технологий.  Посетители из Уралкалия отмечали «дружеское отношение хозяев» и восхищались тем, что «нам показали всё, что мы хотели увидеть».

77.     Пётр Кондрашёв, генеральный директор Сильвинита, признал в интервью в 2005 году, опубликованном в Кемикл Джорнал, посвященному промышленности калийных удобрений, что компания имеет «старые и дружеские отношения с производителями калия из Беларуси и что мы остаёмся довольно

хорошими партнёрами».    Он добавил, что представители Сильвинита и Беларуськалия очень часто посещают предприятия друг друга.

78.    Ответчики проводили целый ряд таких обменных визитов на протяжении Искового Срока Жалобы Коллектива, и эти встречи предоставили ряд возможностей для заговора и обмена конфиденциальной и деликатной информацией, касающейся конкуренции.   Даже в отсутствие заговора между этими полагаемыми конкурентами, это было бы противно интересам каждого из них - предоставлять конкурентам доступ к такой конфиденциальной и деликатной информации.

79.    Повышенный уровень сотрудничества между Ответчиками и их вовлечение в долгосрочные совместные начинания предоставили этим конкурентам среду для обсуждения цен, объёмов производства и другой важной рыночной информации.   Взаимовыгодный характер этих коммерческих отношений между Ответчиками не только предоставил возможность для сговора, но и материльную выгоду как стимул для его осуществления.

**D.    Использование Торговых Ассоциациая и Торговых Мероприятий с Целью Осуществления Сговора**

80.    Есть основания полагать, что заговорческая деятельность Ответчиков была осуществлена при помощи торговых ассоциаций и мероприятий, во время которых была возможность сговориться и обмениваться информацией.

81.    Ответчики являются членами Международной Ассоциацией Отрасли Удобрений («МАОУ»), которая спонсирует сжегодные конференции, посещаемые старшими руководителями Ответчиков.   Ответчики регулярно посещали эти конфенции МАОУ, как место для переговоров о ценах на продажу калийных удобрений своим клиентам по всему миру.

82.    В мае 2007 года представители ПиСиЭс, Мозаика, Агриума, Бсларуськалия, Кэнпотекс, БКК и других компаний посетили 75-ую ежегодную

МАОУ конференцию в Истанбуле, Турции. Во время встреч МАОУ, представителя производителей совещались по поводу состояния отрасли и «рыночных тенденций». Более того, во время майской МАОУ конференции 2007 года, крупные производители калийных удобрений сделали объявление о повышении цен на их продукцию.

83.    Помимо членства в МАОУ, Ответчики также являются членами Института Удобрений («ТиЭфАй» или «TFI») и регулярно посещали конференции TFI как место для переговоров о ценах на продажу калийных удобрений своим клиентам по всему миру.

84.    Во время TFI-конференции в 2003 году в Бостоне, Массачусетс, компания Кэнпотекс провела переговоры со своими клиентами о продаже калийных удобрений во второй половине 2003 года. Во время TFI-конференции в 2004 году, МКК встретились с китайскими заказчиками с целью проведения переговоров о ценах для продажи калийных удобрений в Китае.

85.    TFI или Институт Удобрений, наряду с Круглым Столом Института Удобрений, спонсирует ежегодные конференции под названием «Конференция Обзора Удобрений и Технологий». Эти конференции ориентированы на представителей отрасли, а также финансовых аналитиков, бизнесс-консультантов, членов отраслевой прессы и государсвенных экономистов.

86.    Во время Конференции по Обзору Удобрений и Технологий в Арлингтоне, Вирждинии, с 6-го по 7-ое ноября 2006 года, Майкл Рам, вице-президент Мозаик Company, Рыночный и Экономический Анализ, выступил с презентацией по поводу отрасли. Представители по крайней мере одного из Ответчков присутствовали на этой конференции.

**Е.    СОГЛАСОВАННЫЕ ДЕЙСТВИЯ ОТВЕТЧИКОВ ПО УМЕНЬШЕНИЮ ПРОИЗОДИТЕЛЬНОЙ ЁМКОСТИ**

87.    Отчасти, Ответчики выполняли свой сговор путём скоординированных действий по ограничению выпуска калийных удобрений, привёдших к увеличению цен на рынке калийных удобрений.    При отсутствии соглашения между этими предполагаемыми конкурентами, эти ограничения были бы во вред независимым экономическим интересам этих отдельных производителей.

88.    Например, с падением мирового спроса на калийные удобрения во второй половине 2005 года, Ответчики совместно ограничили производство калийных удобрений с целью установления, поддержания и стабилизации цен на калийные удобрения, за которые эти калийные удобрения и были проданы.    В ноябре 2005 года ПиСиЭс объявила, что она закроет два из своих рудников в период с 11 декабря 2005 года по 7 января 2006 года для проверки интвентаря, таким образом удалив примерно от 250,000 до 300,000 тонн калийных удобрений с продажи на рынке.    ПиСиЭс также объявила 22 декабря 2005 года, что компания закрывает свой рудник в Роканвилле в январе и начале февраля 2006 года. Эти остановки привели к удалению 1,34 миллион тонн калийных удобрений с продажи на рынке.

89.    В то же время, Мозаик объявил временное сокращение производства на ряде своих североамериканских месторождений, которые были запланированы в ноябре и декабре 2005 года.    Сокращение производства Мозаик привело к сокращению в 200,000 тонн на рынке калийных удобрений.

90.    Также, Ответчики согласились на совместное сокращение продаж международным клиентам. В Бразилии, где спрос на калийные удобрения сократился на 20.9% в 2005 году, Ответчики из Канады и из бывшего Советского Союза согласились на почти идентичное пропорциональное сокращение своего экспорта в эту страну. Производители из бывшего Советского Союза сократили

свой совокупный экспорт в Бразилию на 20.9%, в то время как производители из Канады также сократили свой совокупный экспорта почти точно такой же процент.

91.      Совместное      снижение      объёмов      производства      Ответчиками продолжалось и в 2006 году. В течение первого квартала 2006 года, компания ПиСиЭс пошла на 32-х недельное закрытие рудников в ответ на снижение спроса, что привело к сокращению производства компании за один квартал до 1,3 миллион тонн по сравнению с 2,4 миллион тонн в первом квартале предыдущего года.

92.      Приблизительно в январе 2006 года два партнёра БКК также объявили о мерах по корректировке поставок. Уралкалий немедленно приостановил производство калийных удобрений, тем самым устранив примерно 200,000 тонн продукции. Беларуськалий немедленно сократил экспорт на 50 процентов, тем самым устранив примерно 250,000 тонн калийных удобрений с рынка. Вдобавок, МКК объявил, что Сильвинит также закроет свои рудники, тем самым устранив примерно 100,000 тонн во втором квартале 2006 года.

93.      В совокупности Ответчики из бывшего Советского Союза удалили примерно 500,000 тонн калийных удобрений с рынка только в апреле 2006 года. Другие поставщики приветствовали «дисциплинированность» производителей из стран бывшего Советского Союза, отмечая, что много лет назад, когда спрос на калийные удобрения сократился, те же самые производители стремились сохранить объём несмотря на падение цен, таким образом насыщая рынок избыточными поставками.

94.      В течение 2006 года, во время трудных переговоров по поводу цен на калийные удобрения, Кэнпотекс и БКК (и их члены) совместно ограничили производство, для того чтобы принудить китайских покупателей (самых многочисленных покупателей в мире) согласиться на повышение цены, которое аннулировало «скидку» и установило отметку для остальных покупателей во всём мире. Председатель Уралкалия объяснил это действие следующим образом: «у нас

нет цели прекратить им поставку калийных удобрений со скидкой в 30-40 американских долларов, как раньше, а только привести эти цены до уровня их соседних потребителей из Азии.  Поэтому мы прекратим все поставки туда, пока мы не договоримся о соглашении с разумными,  с нашей точки зрения, ценами».

95.      В соответствии с их усилиями устранить скидку китайцам и увеличить цены для потребителей в Китае, лидирующие поставщики калийных удобрений в мире  совместно  ограничили  поставки  калийных  удобрений  китайским потребителям.  Уралкалий снизил уровень производства в первой половине 2006 года до 68%, и ПиСиЭс снизила свой уровень производства до 60%.  Через сокращение производства, Уралкалий и ПиСиЭс снизили их уровень продаж на 23% и 20% по сравнению с предыдущим годом, и это поведение привело к удалению «скидки» в Китае, которая существовала до этих переговоров.  Действия Ответчиков привели к росту цен на калийные удобрения в Китае и, в скором времени, как Ответчики и полагали, к росту цен на этот продукт во всём мире, включая Соединённые Штаты.

96.      В декабрьском докладе 2007 года, один из аналитиков отрасли дал следующее оценку этому эпизоду: «Спад производства в 2006 году на 23% за один год был главным образом вызван добровольным решением Уралкалия сократить уровень объёмов производства в результате задержек в переговорах с Китаем на несколько месяцев.  Это была всеотраслевая проблема, как видно из сходного сокращения в производстве на 20% компанией Поташ Корп.  Это поведение помогло остановить падение в ценах, которое иначе произошло бы в результате неуступчивых переговоров с Китаем.»

97.      Давая комментарий по поводу цен на калийные удобрения в 2006 году, российская брокерская фирма отметила «отсутствие внутренних причин для объяснения сокращения поставок производителями калийных удобрений» и то, что «одновременное  уменьшение  мощности  производства  компаниями  в  разных

уголках мира скорее всего объясняется их общим желанием удерживать цены на существующем уровне ... (или даже их повысить»).   Брокерская фирма также добавила, что у покупателей нет возможности заменить калийные удобрения  на сходный продукт и нет возможности хранить калийные удобрения, чтобы избежать будущего повышения цен».

98.    Совместными усилиями Ответчики ограничили прозводство калийных удобрений в 2007 году, чтобы повысить рыночные цены на калийные удобрения. Примерно 25го октября 2007 года Сильвинит объявил, что может временно прекратить поставки калийных удобрений из-за аварии или провала почвы, вызванного наводнением одного из рудников.

99.    Через день после этого объявления, сделанного Сильвинием, ПиСиЭс, Уралкалий, Агриум и БКК – все якобы предполагаемые конкуренты – объявили, что они тоже собираются прекратить продажу в связи с прекращением продаж Сильвинитом.    Объявление БКК о прекращении поставок было сделано Уралкалием, конкурентом этой компании, заявившим, что «эти решения могут повлиять на рост цен, включая те рынки, где продаются калийные удобрения Уралкалия».

100.   На Международной Ассоциации Предприятий по Производству Удобрений в Ванкувере, Канада, в конце октября 2007 года, в ответ на вопрос о последствиях закрытия рудника Сильвинита, Президент ПиСиЭс и Главный Исполнительный Директор Дойл ответил: «в попытках понять цены и их поведение, хочу сказать вам следующее: «будьте готовы ко всему и пристегните ремни», поскольку это будет иметь существенное влияние на ценообразование».

101.   Спустя приблизительно 12 дней после изначального заявления о закрытии 6-го ноября 2007 года, Сильвинит объявил, что собирается возобновить поставки калийных удобрений, поскольку образовавшийся карьер не углубляется, как было изначально предположено.   Опять-таки, через день после заявления

Сильвинитом о возобновлении поставок, Уралкалий объявил, что БКК также возобновит поставки калийных удобрений после 12-ти дневного перерывва. Уралкалий не дал никаких причин объясняющих эти действия;  тем не менее, представитель БКК ответил журналисту, что решение было сделано после «изучения рынка».  7-го ноября 2007 года, ПиСиЭс и Агриум также объявили о возобновлнеии поставок калийных удобрений.

102.    Вскоре после объявлений, о том что крупные представители калийных удобрений возобновили поставки, цены на калийные удобрения возросли до «рекордно высоких уровней в связи с опасениями о глобальной нехватке».

103.    Совместное приостановление продаж ПиСиЭс, Уралкалием, Агриумом и БКК во время закрытия рудника Сильвинитом, их предполагаемым конкурентом, не имеет никакого смысла с экономической точки зрения при отсутствии картели. Если бы на рынке действительно была конкуренция, у Ответчиков был бы стимул к увеличению, а не приостановлению, производства для того, чтобы воспользоваться сокращением производства их конкурентом и, таким образом, получить дополнительную долю рынка.

104.    Не прошло и года как Ответчики совместно приостановили поставку калийных удобрений из-за образовавшегося провала у родника Сильвинита, когда в мае 2008 года Сильвинит объявил, что ещё один из таких провалов угрожает поставке калийных удобрений, и спрогонозировал, что может быть необходимо приостановить производство на две или три недели.  Представитель компании заявил, что «ситуация заставляет нас выжидать, но мы надеемся, что кризис будет предотвваращён».  Через две недели, компания объявила, что провал в почве стабилизировался и «ситуация не при каких обстоятельствах не ухудшится».

105.    Несмотря ни на что, вскоре после объявления о возможности закрытия, цены на калийных удобрения опять значительно подскачили.  8-го июля 2008 года ПиСиЭс объявила, что ожидается увеличение цен на калийные удобрения

в Соединённых Штатах на $250 долларов за тонну, рост на 48% по сравнению с предыдущими ценами.

106.    Вскоре после этого, Кэнпотекс объявил спотовую цену $1,000 за тонну, начиная с четвертого квартала 2008 года, и БКК заключил контракт на продажу 30,000 тонн калийных удобрений покупателям в США по цене $1,000 за тонну, с началом поставок в августе 2008 года.

107.    1 ноября 2008, года когда цены на калийные удобрения стали превышать $1,000 за тонну, Уралкалий объявил, что собирается сократить производство калийных удобрений, якобы в связи с нынешним сокращением спроса на калийные удобрения на мировом рынке. В декабре 2008 года, ПиСиЭс и Агриум также объявили о сокращении производства. В частности, ПиСиЭс сократила своё производство калийных удобрений на два миллиона тонн за первый квартал 2009 года, что составило около 15% от прогнозируемых объёмов производства этой компании в 2009 году. Агриум объявил, что сократит производство на своих северо-американских заводах в связи с так называемым избытком уже произведенной продукции на складах. Аналитик прокомментировал, что    производственные сокращения ПиСиЭс и Агриум являются «попыткой поддержать ценообразование и продемонстрировать дисциплинированность».

108.    В декабре 2008 года, когда цены на калийные удобрения возросли более чем $1,000 за тонну, финансовый директор ПиСиЭс, Браунли, высоко оценил белорусских Ответчиков по поводу их «замечательной дисциплинированности . . . с точки зрения управления поставками на рынке». По другому поводу, но в тот же самый месяц, Браунли прокомментировал, почему цены на калийные удобрения не снизились соразмерно с ценами на другие удобрения: «Значительный фактор в этом событии заключается в том, что вы просто видите много хорошей дисциплины со стороны всех производителей сейчас на рынке, независимо от того, сокращают ли они производство или накопляют товарный запас».

### F.      ПОВЕДЕНИЕ ОТВЕТЧИКОВ В ОТНОШЕНИИ ЦЕН

109.    В дополнение к ограничениям производства и поставки продукции, указанных выше, Ответчики сговорились координировать цены на калийные удобрения и рост цет с целью поднять, установить, поддерживать, а также зафиксировать цены, по которым калийные удобрения поставляются в США на искусственно завышененных и антиконкурентных уровнях.

110.    Существование сговора Ответчиков становится ясным в свете необычных колебаний цен на рынке калийных удобрений.  На протяжении 1990-х годов      калийная      промышленность      характеризовалась      стабильным ценообразованием, но в течение Искового Срока Жалобы Коллектива эта стабильность уступила место значительными взлётам цен на калийные удобрения до беспрецедентных уровней.

111.    Ответчики ведут переговоры о долгосрочных контрактах на закупку калийных удобрений в мире.  Соглашения с покупателями в Бразилии, Индии и Китае, как правило, заключаются в первую очередь, и цены, установленные на этих рынках, затем непосредственно влияют на цены на других крупных рынках.  После того, как Ответчики установили эти цены, они используют их для определения цен на калийные удобрения в других крупных рынках, включая Соединённые Штаты. Цены за картельные долгосрочные контракты становятся ориентирами для продаж на спотовом рынке, которые, как правило, выше, чем по срочным контрактам.

112.    Ответчики знали и намеревались, что их глобальный сговор будет непосредственно оказывать влияние на цены на калийные удобрения в США, а также на мировых рынках в целом.  Цены, что Ответчики установили для продажи покупателям за рубежом непосредственно влияют на цены, которые приходится платить потребителям калийных удобрений  в Соединённые Штатах.  В течение Искового Срока Жалобы Коллектива Ответчики учередили несколько повышений цен, что привело к беспрецедентному росту цен на калийные удобрения.

Дело № 1:08-cv-06910     Документ 51     Подан 03/04/2009     стр. 31 из 53

113. Следующая диаграмма демонстрирует резкий скачок цен на калий во время Искового Срока Жалобы Коллектива, по сравнению с предыдущими ценами:



114. Цены на калийные удобрения, которые представлены Грин Маркетс, как отражено на графике 1, являются ориентиром цен в промышленности: цены Саскачевана и Карлсбада, поскольку они являются рудниками производителей; Ванкувера, поскольку он является центром большого объёма контрактных цен на экспортные рынки; и Среднего Запада и западной часть США, поскольку в этих регионах достаточно складских помещений для обеспечения местного сельского хозяйства.

115. Все цены выражены в долларах США за тонну. Ванкуверская цена – это цена долгосрочного контракта цена, достигнутая путём периодических переговоров между производителями и покупателями экспорта, зачастую за объём

продукции в размере 1 миллион тонн и более. Цены Среднего Запада, Карлсбада и Саскачеван являются споговыми ценами, а цены Западного региона США – это цены включая стоимость доставки.

116.  Как показано выше на графике, после продолжительного периода стабильности на калийном рынке, начиная с 2003 года, Ответчики приступили к ряду параллельных завышений цен, которые резко повысили цены на калийные удобрения в период Искового Срока Жалобы Коллектива.

117.  В начале 2003 года МКК объявила, что собирается повысить свои цены на калий на восемь долларов за тонну.  В течение месяца Кэнпотекс объявил, что будет стремиться к практически идентичному повышению в цене для продаж в Бразилии.  К середине 2003 года все поставщики в Бразилию заявили, что они смогли достигнуть роста цены на восемь долларов за тонну.

118.  Кроме того, в марте 2003 г. АйЭмСи Глоубал Инк (предшественник Мозаик) объявил рост цен на ту же сумму для своих продаж в Соединённые Штаты, тем самым повышая цену своего стандартного красного хлористого калия (фоб рудник Саскачеван) от $81 до $89 за тонну и цену других продуктов на соответствующую сумму.    ПиСиЭс также заявила, что будет стремиться к повышению цен на восемь долларов за тонну.

119.  Аналитик промышленности отмечал, что поставщики стали открыто озвучивать их решимость поднять цены на большинстве рынков, и что они это успешно делают. Примечательно, что тот же аналитик отметил, что сокращение производства было использовано производителями, особенно в Канаде, чтобы держать поставщиков «под контролем».

120.  После успешного введения роста цен на рынке, Ответчики приступили к ещё одному раунду повышений, начиная с января 2004 года.  Кэнпотекс объявил первоначальный рост цены покупателям в Бразилии, и МКК объявила увеличение цен покупателям в Индии. Вскоре после этих объявлений, ПиСиЭс объявила два

пяти-долларовых увеличения цены за тонну в течение пяти-недельного периода. АйЭмСи Глобал Инк также объявила два отдельных пяти-долларовых увеличения цены за тонну.   К февралю 2004 года, как ПиСиЭс так и АйЭмСи Глобал Инк установили цены для стандартного и гранулированного хлористого калия на $108 и $110 за тонну (фоб рудник Саскачеван) для их клиентов в США.

121.   В мае 2004 года Ответчики снова ввели раунд синхронных повышений цен.   Первоначально Кэнпотекс объявил о повышение цены на $20 за тонну некоторым из своих клиентов. Вскоре, два крупных поставщика в США, ПиСиЭс и АйЭмСи Глобал Инк, объявили о повышении на пять долларов за тонну (вступающим в силу немедленно), которое предшествовало ещё одному увеличению на $15 за тонну в начале июля 2004 года. Таким образом, к маю 2004 года ПиСиЭс и АйЭмСи Глобал Инк установили цены на стандартный и гранулированный хлористый калий (фоб рудник Саскачеван) в размерах $113 и $118 за тонну, соответственно.    Было также запланировано увеличить цены Ответчиков до $128 и $133 за тонну стандартного и гранулированного хлористого калия (фоб рудник Саскачеван) 19-го июля, 2004.

122.   К концу 2004 года, Ответчики начали навязывать дополнительное повышение цен. В сентябре 2004 компания АйЭмСи Глобал Инк лидировала с 10-ти долларовым повышением в цене, и ПиСиЭс вскоре последовала примеру с собственным увеличением цены на такую же сумму.

123.   Ответчики продолжали повышать цены для клиентов по всему миру. На TFI конференции в сентябре 2004 года, МКК объявила в ходе встреч с клиентами из Китая, что компания добивается от них увеличения цены примерно на 40 долларов за тонну. Канадские поставщики объявили о том, что они будут стремиться к аналогичному росту цен, однако, что серьёзные переговоры по поводу цен не будет происходить по крайней мере до середины октября, чтобы импортёры из Китая имели возможность повысить цены на их внутреннем рынке.

124.  5 ноября 2004 года, МКК подтвердила, что ей удалось договориться о повышение цены на $40 и $43 за метрическую тонну за красный и белый стандартный хлористый калий, соответственно, для некоторых клиентов в Китае. ПиСиЭс и Мозаик (в прошлом АйЭмСи Глоубал Инк) объявили о том, что в тот же день как и Кэнпотекс, они заключили соглашение о продаже калийных удобрений некоторым китайским заказчикам за ту же цену.  В течение недели Уралкалий объявил о своём собственном соглашение на продажу по той же цене, за исключением того, что он продал свой белый стандартный хлористый калий за $43,50 за метрическую тонну.

125.  К декабрю ПиСиЭс объявила, что собирается повысить цены для потребителей в США на дополнительные $20 за тонну в начале февраля 2005 года. Мозаик объявил два недели позже, что тоже увеличит свои цены на практически идентичные суммы в феврале 2005 года. В следствие, цены на стандартный и гранулированный хлористый калий (фоб рудник Саскачеван) должны были вырасти до $158 и $163, соответственно, в начале 2005 года.

126.  В мае 2005 года, ПиСиЭс объявила ещё два дополнительных повышения цен для покупателей в США с 1 июня 2005 года и с 1 сентября 2005 года, в результате чего цены на стандартный и гранулированный хлористый калий (фоб рудник Саскачеван) выросли до $178 и $183, соответственно. ПиСиЭс объявила этот рост цен несмотря на прогноз о массовом 44% сокращении объёма покупок потребителями в Бразилии, стране, которая являлась одним из крупнейших импортёров калийных удобрений в мире.

127.  В течение большей части 2006 года, рост цен был простановлен, поскольку покупатели ожидали итогов переговоров о предлагаемом увеличении цен с потребителями в Китае. После того как калийные производители достигли договоренность об увеличении цен с потребителями в Китае в конце июля 2006

года, и позже в Бразилии  2006 году, цены на калийные удобрения в США сразу выросли, в соответствии с намерениями и планом Ответчиков.

128.  8 июля 2008, ПиСиЭс объявила о том, что цены на калийные удобрения в США возрастут до $250 за тонну, что означает увеличение на 48 процентов по сравнению с предыдущей ценой. Вскоре после этого, БКК заключил контракт на поставку 30,000 тонн калийных удобрений в США покупателям по цене $1,000 за тонну, с поставками начиная с августа 2008 года.

129.  Цены на калийный удобрения выросли экспоненциально за последние пять  лет,  с  Северо-Американскими  ценами  на  калийные  удобрения увеличившимися примерно на 60% в 2004-2005 годах, и, по сути, возросшими в два раза в 2007 году и в начале 2008 года. Это увеличение произошло синхронно в период Срока Исковой Жалобы Коллектива и оно не соразмерно с  издержками производства или иными затратами в период Исковой Жалобы Коллектива. Такое резкое и необычное поведение цен является непоследовательным и в противоречии с законами рыночных сил и экономических тенденций на этом рынке.

130.  Резкое  повышение  цен  Ответчиков  не  может  быть  объяснено факторами спроса. После 2008 года, спрос на калий (и другие удобрения) начал падать.  В то время как цены на другие удобрения начали резко снижаться в конце 2008 и начале 2009 года, цены на калийные удобрения остались устойчиво высоким и, по сути, продолжали расти.

**G.     У Ответчиков Имелись Избыточные Мощности**

131.  В период Срока Исковой Жалобы Коллектива, поставщики калийных удобрений неоднократно приписывали резкий рост цен на «нерегулярные поставки/недостаток спроса», когда на самом деле у нескольких ответчиков присутствовала избыточная мощность производства.    Заявления поставщиков калийных удобрений об превышении предложения над спросом стали предлогом

для сокрытия Ответчиками их заговора с целью ограничить поставки и зафиксировать цены на калийные удобрения.

132.  На протяжении Периода Исковой Жалобы Коллектива, в то время как поставщики калийных удобрений неоднократно жаловались на отсутствие поставок, у ПиСиЭс имелся избыточный объём произведённой продукции. В 2004 году ПиСиЭс объявила аналитикам в Торонто, Канаде о том, что компания намерена увеличить использование своих рудников в Саскачевне с 58% до 65%, частично перейдя на систему работы в четыре смены на рудниках Ланиган и Аллан. С 2004 г. по настоящее время ПиСиЭс редко превышала свой коэффициент производственных мощностей, хотя компания могла бы легко это сделать, если бы только захотела.

133.  Как изображено на таблице ниже, ПиСиЭс, крупнейший в мире поставщик, осуществляла свои операции при следующих низких показателях производственных мощностей (производство хлористого калия в процентах по отношению к мощности) в период с 2003 и 2008 годы:

| YEAR | UTILIZATION RATE |
|------|------------------|
| 2003 | 58% |
| 2004 | 65% |
| 2005 | 68% |
| 2006 | 54% |
| 2007 | 69% |
| 2008 | 66% |

134.  Аналогичным образом, другие Ответчики также располагали избыточными мощностями в отрасли. В декабре 2007 года во время презентации для инвесторов Уралкалий утверждал, что у него имеется «возможность добавить значительный объём производства на дешёвой основе по сравнению с его глобального конкрептами». В 2007 интервью директор БКК, Владимир Николаенко, заявил, что если производитель калийных удобрений был не в

состоянии выполнить заказ клиента, «недостающего объём можно всегда приобрести у других производителей». В заключение, исполнительный директор Мозаик, Джим Прокопанко, при описании рынка калийных удобрений в 2008 году, пояснил, что «конкуренция [в сельском хозяйстве] коренным образом отличается от других отраслей, поскольку она в настоящее время определяется спросом, *а не дефицитом поставок*». (выделено автором).

135.    В январе 2008 года, Мозаик опубликовал доклад под названием, «Почему Не Хватает Поставок Поташа», в котором компания объяснила, что «хотя все канадские производители увеличили мощность производства, некоторые из проектов не были запущены вовремя и другие не были задействованы согласно плану». Доклад неаккуратно приписал проблему «производственным неполадкам» и повышенному спросу на мировом рынке.   На деле, сельскохозяйственные экономисты считают, что ссылки Ответчиков на объём производства, как истинную причину недавнего повышения цен, ошибочными, потому что, как отметил один из экономистов в статье опубликованной в статье Уолл Стрит в 2008 году, «в реальности нет проблемы с производством в настоящее время».

**H.    ОТВЕТЧИКИ ОБОЗНАЧИЛИ СВОЮ ГОТОВНОСТЬ ИЗБЕГАТЬ ЦЕНОВУЮ КОНКУРЕНЦИЮ**

136.    Ответчики, являющиеся преполагаемыми конкурентами на рынке калийных удобрений, публично демонстрировали свою готовность всеми способами избегать ценовую конкуренцию.   Например, в 2006 году Уралкалий признал, что имеет целью «обеспечить успех стратегии предпочитающей цену-вместо-объёма», которая будет «способствовать долгосрочной стабильности цен».

137.    Один из аналитиков отрасли в 2007 году подтвердил, что Уралкалий «намерен преследовать ценовую стратегию, в соответствии с которой предприятие периодически будет снижать уровень производительности, в соответствии с ожидаемым снижением спроса».

138.    Дмитрий Рыболовлев, владелец большинства акций Уралкалия и один из собсвтенников Сильвинита, публично признал в интервью в апреле 2006 года, что «приемлемый уровень цен является более важным, чем расширение рыночной доли и производства».  Он добавил, что «мы не собираемся начинать мировую войну в целях снижения цен . . .».

139.    Ответчики не раз признавались, что их совместные предприятия способствуют стабильности цен на рынке калийных удобрений.  В презентации для инвесторов,  представители Уралкалия высского оценивали роль БКК как «эффективного инструмента ценообразования» в калийной промышленности. Руководитель БКК, отметив, что компания пригласила российского производителя Сильвинит вступить в совместнос предприятие, пояснил, что «нам не хотелось бы конкурировать с российскими компаниями на рынке калийных удобрений, вот почему мы предложили Сильвинит [возможность] присоединиться к БКК на равных условиях со всеми».

140.    БКК подтвердил, что цель предлагаемой консолидации состоит в том, чтобы расширить своё влиянис и силу на мировом рынке. Как признался недавно один из руководителей, «мы будем сильнейшей и наиболее мощной компанией, которая будет в значительной степени устанавливать правила игры на мировом рынке калийных удобрений, а это означает миллиарды долларов».

141.    Намерение БКК установливать «правила игры» включает в себя сотрудничество    с    канадскими    производителями.    Согласно    презентации, поготовленной Уралкалием для аналитиков этой компании «два основных экспортных объединения [Кэнпотекс и БКК] обеспечивают стабильность цен на рынке» калийных удобрений.

142.    Один из внешних аналитиков пришёл к тому же самому выводу, объяснив, что «БКК и Кэнпотекс занимают доминирующую роль в установлении

ежегодных цен с крупными потребителями калийных удобрений, таких как Китай, Индия и Бразилия».

143.   В 2007 году после достижения значительного повышения цен на калийные удобрения, Владимир Николаенко, Генеральный Директор БКК, заявил, что «компания является не только эффективным исполнителем интересов её акционеров, но на самом деле является *лидером по созданию приемлемых условий на мировом рынке цен для всех производителей калийных удобрений*». (выделено автором).

### I.   Влияние Поведения Ответчиков на Цены в США

144.   Ответчики знали и планировали, что их глобальный сговор непосредственно окажет влияние на цены на калийные удобрения, существующие на мировых рынках и в Соединенных Штатах. В декабре 2007 года, представители Уралкалия в презентации для аналитиков изложили каждый шаг в цепи событий, вызвавших повышение цен во всем мире и в Соединённых Штатах: «[1] контрактные договоры на ключевых рынках задействовали значительные объёмы производства калийных удобрений . . . [2] что привело к повышенным конкуренции и спросу на спотовых рынках, а затем и к росту цен . . . [3] завершение контракта с Индией во время роста на спотовых рынках привело к тому, что ещё меньше объёма осталось в наличии . . . [4] бум на спотовом рынке продолжал стимулировать рост китайского скидки и дал дополнительные основания для ликвидации этой скидки в 2008 году».

145.   Из-за глобального характера калийного рынка, действия Ответчиков в других странах непосредственно влияют на калийный рынок в Соединённых Штатах.   Канада является крупнейшим производителем и экспортёром калийных удобрений в мире, на долю которой приходится почти треть общего объёма производства и 40 процентов объёма мировой торговли.   Почти половина

401203.2

Канадского калия экспортируется в Соединённые Штаты. Подавляющее большинство калийных продаж в Соединённых Штатах производятся ПиСиЭс, Мозаик, Агриум и ББК по ценам, которые устанавливаются в соответствии с отметками, установленными Ответчиками на основе продаж в Индию, Китай и другие страны.

146. Глобальные цены установливают ориентир для отечественных калийных цен. По словам одного аналитика, «барьеры, которые существовали в прошлом между внутренними и международными ценами, теперь исчезли. Мы в настоящее время являемся участниками глобального рынка удобрений».

147. По данным министерства сельского хозяйства Соединённых Штатов рост цен на калийные удобрения намного превысил рост цен на семена (30%), скот (27%), и *даже топливо* (43%). Как недавно отметил один из аналитиков Голдман Сакс (Goldman Sachs), производители калийных удобрений в состоянии просто поднять цены, «как им это захочется».

148. Совместные усилия и заговор Ответчиков чрезвычайно выгодны для них. В результате резкого повышения цен несколько Ответчиков получили значительно выросший доход. Например, в первом квартале 2008 года показатели доходов ПиСиЭс были в три раза раза выше показатей по сравнению с предыдущим годом. Доходы Мозаик за первый квартал 2008 года увеличились более чем в 10 раз по сравнению с предыдущим годом.

## VIII.   ПОСЛЕДСТВИЯ НАРУШЕНИЯ АНТИМОНОПОЛЬНОГО ЗАКОНОДАТЕЛЬСТВА ОТВЕТЧИКАМИ

149. Совместные действия и заговор Ответчиков привели к следующим последствиям, среди прочего:

    a.    ценовая конкуренция в продаже калийных удобрений Ответчиками и их заговорщиками была ограничена, подавлена и ликвидирована на всей территории Соединённых Штатов;

    b.    цены на калийные удобрения были подняты, зафиксированны, и стабилизированы на искусственно высоком и антиконкурентном уровне на всей территории Соединённых Штатов; а также

    c.    покупатели-потребители калийных удобрений от Ответчиков были лишены преимуществ свободной и открытой конкуренции па рынке калийных удобрений.

150.    Как прямой и непосредственной результат незаконного и противоправного поведения Ответчиков, Истцы и другие члены Искогово Коллектива понесли убытки в их бизнесе и имущественном положении, потому что они были вынуждены платить больше за калийные удобрения, чем они бы платили, если бы Ответчики не были вовлечны в противоправное поведение.

## IX.    МОШЕННИЧЕСКАЯ ДЕЯТЕЛЬНОСТЬ

151.    На протяжении ряда лет, у Истцов не было прямого или косвенного доступа к данным, содержащим факты, лежащие в основе этого Иска. У Истцов и членов Коллективного Иска не было оснований, при разумной осмотрительности, подозревать о существовании заговора, лежащего в основе этой жалобы, о котором они узнали только незадолго до подачи этого Иска. Ответчики участвовали в тайном сговоре и держали информацию, которая могла бы дать Истцам или членам Искового Коллектива основания для расследования вопроса о том, существует ли заговор с целью зафиксировать цены на калийные удобрения, в строгом секрете.

152.    Поскольку соглашение и сговор Ответчиков содержался в тайне, Истцы или члены Искового Коллектива нс были осведомлены о предполагаемом незаконном поведении Ответчиков и не подозревали, что они платят искусственно высокие цены на калийные удобрения.

153.    Действия Ответчиков, являющиеся основанием для этого Иска, в том числе и акты осуществлённые в целях заговора, были специально сокрыты Ответчиками и выполнены так, что их было трудно обнаружить.

154. По самой своей природе, заговор Ответчиков по установлению цен был изначально секретным.

155. Мошеннические действия и заговор, как утверждается в этом Иске, были сокрыты Ответчиками посредством различных средств и методов, включая тайные встречи, секретные отношения между Ответчиками с использованием телесвязи или личных встреч на заседаниях торговых ассоциации (и в других местах) с тем чтобы избежать письменных докладов и любые другие ссылки о ценах конкурентов на бумаге, а также в сокрытии информации о ценах своих конкурентов от не-заговорщиков (в том числе потребителей).

156. Как утверждается выше, в 2003 году, после нескольких лет стабильных, а иногда и снижающихся цен, цены на калийные удобрения начали резко возрастать. Ответчики ложно приписывали рост цен на растущий спрос и ограниченность предложения. Это был предлог для прикрытия заговора. На самом деле, рост цен являлся результатом сговора между Ответчиками, который содержался в тайне в то время.

157. Истцы имеют основания полагать и утверждать, что предлагаемые объяснения Ответчиков о причинах роста цен на калийные удобрения являются ложными и сделаны с целью сокрытия плана Ответчиков по подрыву конкуренции, как утверждается в данном Иске.

158. В результате мошеннического сокрытия Ответчиками своего заговора, исковой срок давности считается приостановленным в отношении всех требований Истцов и других членов Искового Коллектива, возникших в результате антиконкурентного поведения Ответчиков, лежащего в основе этого Иска.

**X.     ЖАЛОБА О НАРУШЕНИИ ЗАКОНА 15 U.S.C. § 1**

159. Начиная по крайней мере с 1го июля 2003 года (точная дата неизвестна Истцам) Ответчики и их заговорщики начали координацию своей деятельности и

вступили в заговор по неправомерному ограничению торговли и коммерческой деятельности в нарушение статьи № 1 Закона Шермана (15 U.S.C. § 1), целью которого было искусственное снижение или устранение конкуренции на рынке калийных удобрений в Соединённых Штатах.

160.    В частности, Ответчики вступили в заговор для того, чтобы повысить, установить, поддерживать и стабилизировать цены на калийные удобрения, импортируемые в Соединённые Штаты.

161.    В результате противоправного поведения Ответчиков, цены на калийные удобрения в США были подняты, зафиксированны, установлены и стабилизированы на высоком уровне.

162.    Заговор между Ответчиками осуществлялся через долгосрочные соглашения, негласное понимание и согласованные действия между Ответчиками и их заговорщиками.

163.    В целях разработки и осуществления заговора, Ответчики и заговорщики были совместно вовлечены в ряд действий, в том числе:

      a.    участие во встречах и совещаниях для обсуждения цен и объёма поставок калийных удобрений;

      b.    письменный и устный обмен информацей с целью установления цен;

      c.    соглашение по манипулированию ценами и объёмами калийных удобрений, поставляемых во всем мире и в Соединённых Штатах; распределение потребителей этих продуктов таким образом, чтобы лишить их прав на денежное вознаграждение, существующее в условиях свободной и открытой конкуренции;

      d.    публичные объявления о ценах в соответствии с достигнутыми соглашениями;

      e.    продажа калийных удобрений потребителям Соединённых Штатах по монопольным ценам; и

f.    ложные заявления, сделанные для того чтобы отвлечь внимание от истинных причин для роста цен на калийные удобрения.

164.    В результате противоправного поведения Ответчиков, Истцы и другие члены Искового Коллектива понесли материальный ущерб в бизнесе и их имущественном положении, потому что они были вынуждены платить больше за калийные удобрения, чем они бы платили, если бы Ответчики не были вовлечны в противоправное поведение.

## XI.    УЩЕРБ

165.    В течение Искового Срока Жалобы Коллектива, Истцы и другие члены Искового Коллектива приобретали калийных удобрения непосредственно от Ответчиков или их дочерних предприятий, агентов и/или филиалов и, по причине нарушения антимонопольного законодательства, как утверждается в этом Иске, были вынуждены платить больше за калийные удобрения, чем они бы платили в отсутствие таких нарушений. В результате , Истцы и другие члены Искового Коллектива понесли материальный ущерб и убытки в бизнесе и их имущественном положении, точный размер которых будет определён в ходе судебного разбирательства.

## XII.    ПРЕДЪЯВЛЕННЫЕ ТРЕБОВАНИЯ

На основании изложенного Истцы просят суд вынести решение в их пользу и в пользу всех членов Искового Коллектива, включая следующие положения:

A.    В процессуальном порядке этот Иск правильно принесён и должен рассматриваться как Коллективный Иск, с Истцами выступающими в роли назначенных представителей Коллектива и с адвокатами Истцов, выступающими в роле адвокатов для всего Коллектива;

B.    Ответчики объединили усилия в заговоре, который является нарушением Статьи № 1, Закона Шермана, (15 U.S.C. § 1); Истцы и члены Искового Коллектива понесли материальный ущерб и убытки в бизнесе и имущественном положении  в результате неправомерных действий и нарушений антимонопольного законодательства Ответчиками;

C.   Истцы и члены Искового Коллектива имеют право на возмещение убытков, понесенных ими, как это предусмотрено федеральным антимонопольным законодательством, так что совместное судебное решение в пользу Истцов и членов Искового Коллектива может быть вынесено в отношении всех Ответчиков, совместно и порознь, в трёхкратной сумме убытков Истцов, как полагается в соответствии с законом;

D.   Ответчики и их дочерние предприятия, филиалы, правопреемники, представители и соответствующие должностные лица, руководители, партнёры, агенты и сотрудники этих и всех других лиц, действующих или утверждающих, что действуют от имени Ответчиков, не имеют права в соответствии с этим судебным запретом продолжать и поддерживать их совместный сговор или соглашение как утверждается в этом Иске, в том числе:

(1)   продолжать, поддерживать или возобновлять соглашение, договоренность или заговор, как утверждается в этом Иске, и принимать участие в любом другой сговоре или соглашении, имеющими аналогичные цели или последствия, а также от принятия любого другого плана, программы или договоренности с аналогичной целью или последствиями,

(2)   сообщать, передавать или способствовать передаче информации любому другому лицу, занимающемуся производством, распределением и продажей калийных удобрений, включая информацию о ценах, клиентах, рынках и других условиях продажи этого продукта, за исключением такого обмена информацией, какой необходим в связи с добросовестным исполнением сделок по продаже между участниками таких сообщений.

E.   Истцы и члены Искового Коллектива имеют право на присуждение им до вынесения судебного решения и после вынесения судебного решения процентов, насчитанных на их вознаграждение по самой высокой ставке, дозволенной по закону с момента вручения этого Иска Ответчикам;

F.   Истцы и члены Искового Коллектива имеют право на возмещение всех расходов, потраченных в этом судебном процессе, включая разумные адвокатские гонорары, как это предусмотрено законом, а также

G.   Истцы и члены Искового Коллектива имеют право на иные меры, которые Суд может счесть справедливыми и надлежащими в этом деле.

## XIII.   ЗАПРОС НА СЛУШАНИЕ СУДОМ ПРИСЯЖНЫХ ЗАСЕДАТЕЛЕЙ

В соответствии со Статьёй 38(б), Федеральных Правил Гражданского Процессуального Производства США, Истцы требуют судебного разбирательства с участием присяжных заседателей в отношении всех претензий, заявленных в этом Иске.

Дата: 3 апреля 2009 г.

С уважением,
ЛОКРИДЖ ГРИНДАЛ НАУЕН ПиЛЛПи
\подпись\ В. Джозеф Брукнер

В. Джозеф Брукнер
Ричард А. Локридж
Хайди М. Силтон
Мэтью Р. Сальцведел
100 Вашингтон Авенью Юг
Офис 2200
Миннеаполис, Миннесота 55401
Тел: (612) 339-6900
Факс: (612) 339-0981
Электронная почта: wjbruckner@locklaw.com
ralockridge@locklaw.com
hmsilton@locklaw.com
mrsalzwedel@locklaw.com

ПИРСОН САЙМОН ВАРШОУ И ПЕННИ, ЛЛПи
\подпись\ Брюс Симон

Брюс Л. Саймон
Джонатан М. Уоткинс
44 Монтгомери Улица, Офис 1430
Сан-Франциско, Калифорния 94104
Тел: (415) 433-9000
Факс: (415) 433-9008
Электронная почта: bsimon@pswplaw.com
jwatkins@pswplaw.com
Временный Ведущий Адвокат Истцов
Покупателей-Потребителей

Стивен А. Харт Эсквайр (# 6211008)
СИГАЛ МККЭМБРИДЖ
СИНГЕР И МАХОНИ, ЛТД
233 Южная Уакер Драйв
Сирс-Тауэр Офис 5500
Чикаго, Иллинойс 60606
Телефон: (312) 645-7800
Факс: (312) 645-7711
Электронная почта: shart@smsm.com
Временный Ответственный за
Поддерживание Контактов Адвокат
Истцов Покупателей-Потребителей

Steven A. Hart Esq. (#6211008)
SEGAL McCAMBRIDGE
SINGER & MAHONEY, LTD
233 South Wacker Drive
Sears Tower-Suite 5500
Chicago, Illinois 60606
Telephone: (312)645-7800
Facsimile: (312)645-7711
Email: shart@smsm.com
Direct Purchaser Plaintiffs'
Interim Liaison Counsel


Гэри Л. Спэкс
КАПЛАН ФОКС И КИЛШАЙМЕР ЛЛПИ
423 Сумак Роуд
Хайленд Парк, Иллинойс 60035
Тел: (847) 831-1585
Факс: (847) 831-1580
Электронная почта: gspecks@kaplanfox.com

Gary L. Specks
KAPLAN FOX & KILSHEIMER LLP
423 Sumac Road
Highland Park, IL 60035
Tel: (847) 831-1585
Fax: (847) 831-1580
Email: gspecks@kaplanfox.com


Н. Роберт Каплан
Грегори К. Аренсон
Линда П. Нуссбаум
Сьюзен Р. Швайгер
КАПЛАН ФОКС И КИЛШАЙМЕР ЛЛПИ
805 Третье Авенью, 14ый этаж
Нью Йорк, Нью Йорк 10022
Тел: (212) 687-1980
Факс: (212) 687-7714
Электронная почта: rkaplan@kaplanfox.com
lnussbaum@kaplanfox.com
garenson@kaplanfox.com
sschwaiger@kaplanfox.com

Robert N. Kaplan
Gregory K. Arenson
Linda P. Nussbaum
Susan R. Schwaiger
KAPLAN FOX & KILSHEIMER LLP
805 Third Avenue, 14th Floor
New York, NY 10022
Tel: (212) 687-1980
Fax: (212) 687-7714
Email: rkaplan@kaplanfox.com
lnussbaum@kaplanfox.com
garenson@kaplanfox.com
sschwaiger@kaplanfox.com


Эдмунд В. Сиэрбай
Марк В. Джаковски
МАКДОНАЛЬД ХОПКИНС ЛЛСи
600 Супериоа Авенью Восток, Офис 2100
Кливленд, Огайо 44114
Тел: (216) 348-5400
Факс: (216) 348-5474

Edmund W. Searby
Mark V. Jackowski
McDONALD HOPKINS LLC
600 Superior Avenue East, Suite 2100
Cleveland, OH 44114
Tel: (216) 348-5400
Fax: (216) 348-5474

Электронная почта:
esearby@mcdonaldhopkins.com
mjackowski@mcdonaldhopkins.com

Ричард Л. Коффман
ЮРИДИЧЕСКАЯ ФИРМА КОФФМАНА
505 Орлеан Улица, Офис 505
Бомонт, Техас 77701
Тел: (409) 833-7700
Факс: (866) 835-8250
Электронная почта: rc@cofflaw.com

Джон Л. Джёрниган, III
ДЖЁРНИГАН И МАКМИЛЛАН ПиСи
319 Бслвилл Авеныо
Почтновый ящик 828
Брютон, Алабама 36427
Тел: (251) 809-2981
Факс: (251) 809-2980
Электронная почта:
johnjernigan@bellsouth.net

П. Джон Брэйди
Даниэль D. Оуэн
Кристофер К. Уилсон
ПОЛЗИНЕЛЛИ ШУГХАРДТ ПиСи
Двенадцать Вайндотт Плаца
120 В. 12 улицы
Канзас-Сити, Миссури 64105
Тел: (816) 421-3355
Факс: (816) 374-0509
Электронная почта: jbrady@polsinelli.com
dowen@polsinelli.com
cwilson@poslinelli.com

Бернард Перский
Холлис Л. Сальзман
Джей Л. Хаймс
Келли Сафара Лернер
Уильям V. Рейсс
ЛАБАТОН СУКАРОУФ ЛЛПи
140 Бродвей
Нью Йорк, Нью Йорк10005

Email: esearby@mcdonaldhopkins.com
mjackowski@mcdonaldhopkins.com

Richard L. Coffman
THE COFFMAN LAW FIRM
505 Orleans Street, Suite 505
Beaumont, TX 77701
Tel: (409) 833-7700
Fax: (866) 835-8250
Email: rc@cofflaw.com

John L. Jernigan, III
JERNIGAN & MCMILLAN, P.C.
319 Belleville Avenue
P.O. Box 828
Brewton, AL 36427
Tel: (251) 809-2981
Fax: (251) 809-2980
Email: johnjernigan@bellsouth.net

P. John Brady
Daniel D. Owen
Christopher K. Wilson
POLSINELLI SHUGHART P.C.
Twelve Wyandotte Plaza
120 West 12th Street, Suite 1700
Kansas City, MO 64105
Tel: (816) 421-3355
Fax: (816) 374-0509
Email: jbrady@polsinelli.com
dowen@polsinelli.com
cwilson@poslinelli.com

Bernard Persky
Hollis L. Salzman
Jay L. Himes
Kellie Safar Lerner
William V. Reiss
LABATON SUCHAROW LLP
140 Broadway

Тел: (212) 907-0700
Факс: (212) 818-0477
Электронная почта: bperskey@labaton.com
hsalzman@labaton.com
jhimes@labaton.com
klerner@labaton.com
wreiss@labaton.com

Хаувард J. Седран
Остин В. Коэн
ЛЕВИН, ФИШБЕЙН, СЕДРАН И
БЕРМАН
510 Уоллнат Стрит, Suite 500
Филадельфия, Пенсильвания 19106-3697
Тел: (215) 592-1500
Факс: (215) 592-4663
Электронная почта: hsedran@lfsblaw.com
acohen@lfsblaw.com

Джон Р. Malkinson
MALKINSON И ХАЛПЕРН, ПиСи
223 В. Джексон Буливард, Офис 1010
Чикаго, IL 60606
Телефон: (312) 427-9600
Факс: (312) 427-9629
Электронная почта: mhpc@aol.com

Майкл Дж. Фрид
Стивен А. Каннер
Дуглас А. Миллен
Роберт Дж. Возняк
ФРИД КАННЕР ЛОНДОН
И МИЛЛЕН ЛЛСи
2201 Ваукеган Роуд, Офис 130
Баннокбёрн, Иллинойс 60015
Тел: (224) 632-4500
Факс: (224) 632-4519
Электронная почта: mfreed@fklmlaw.com
skanner@fklmlaw.com
dmillen@fklmlaw.com

New York, NY 10005
Tel: (212) 907-0700
Fax: (212) 818-0477
Email: bperskey@labaton.com
hsalzman@labaton.com
jhimes@labaton.com
klerner@labaton.com
wreiss@labaton.com

Howard J. Sedran
Austin B. Cohen
LEVIN, FISHBEIN, SEDRAN
& BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106-3697
Tel: (215) 592-1500
Fax: (215) 592-4663
Email: hsedran@lfsblaw.com
acohen@lfsblaw.com

John R. Malkinson
MALKINSON & HALPERN, P.C.
223 W. Jackson Blvd, Suite 1010
Chicago, IL 60606
Tel: (312) 427-9600
Fax: (312) 427-9629
Email: mhpc@aol.com

Michael J. Freed
Steven A. Kanner
Douglas A. Millen
Robert J. Wozniak
FREED KANNER LONDON
& MILLEN LLC
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
Tel: (224) 632-4500
Fax: (224) 632-4519
Email: mfreed@fklmlaw.com
skanner@fklmlaw.com
dmillen@fklmlaw.com

rwozniak@fklmlaw.com

rwozniak@fklmlaw.com

Евгений А. Спектор
Джеффри Л. Кодрофф
Джеффри J. Корриган
Джей С. Коэн
Уильям Г. Кальдес
СПЕКТОР, РОУЗМАН КОДРОФФ
И УИЛЛИС, ПиСи.
1818 Маркет Улица, Офис 2500
Филадельфия, Пенсильвания 19103
Тел: (215) 496-0300
Факс: (215) 496-6611
Эл. почта: espector@srkw-law.com
jkodroff@srkw-law.com
jcorrigan@srkw-law.com
jcohen@srkw-law.com
bcaldes@srkw-law.com

Е. Пауэлл Миллер
Марфа J. Олижник
ЮРИДИЧЕСКАЯ ФИРМА МИЛЛЕРА ПС
950 В. Унивёрсити Драйв, Офис 300
Рочестер, Мичиган 48307
Тел: (248) 841-2200
Факс: (248) 652-2852
Эл. почта: pmiller@millerlawpc.com
molijnyk@millerlawpc.com

М. Стивен Дампиэр
ВИКЭРС, РИИС, МЁРРЭЙ
И КУРРЭН, ЛЛСи
Региональный Строительный Банк
Одиннадцатый Этаж
106 Сэйнт Фрэнсис Улица
Мобил, Алабама 36602
Тел: (251) 432-9772
Факс: (251) 432-9781
Эл. почта: sdampier@vickersriis.com

Eugene A. Spector
Jeffrey L. Kodroff
Jeffrey J. Corrigan
Jay S. Cohen
William G. Caldes
SPECTOR, ROSEMAN KODROFF
& WILLIS, PC.
1818 Market Street, Suite 2500
Philadelphia, PA 19103
Tel: (215) 496-0300
Fax: (215) 496-6611
Email: espector@srkw-law.com
jkodroff@srkw-law.com
jcorrigan@srkw-law.com
jcohen@srkw-law.com
bcaldes@srkw-law.com

E. Powell Miller
Martha J. Olijnyk
THE MILLER LAW FIRM, P.C.
950 W. University Dr., Suite 300
Rochester, MI 48307
Tel: (248) 841-2200
Fax: (248) 652-2852
Email: pmiller@millerlawpc.com
molijnyk@millerlawpc.com

M. Stephen Dampier
VICKERS, RIIS, MURRAY
AND CURRAN, L.L.C.
Regions Bank Building
Eleventh Floor
106 St. Francis Street
Mobile, AL 36602
Tel: (251) 432-9772
Fax: (251) 432-9781
Email: sdampier@vickersriis.com

Мануэль Дж. Домингес
БЁРМАН ДэВАЛЕРИО
4280 Профешионал Цснтр Др., Офис 350
Палм Бич Гарденз, Флорида 33410
Тел: (561) 835-9400
Факс: (561) 835-0322
Эл. почта: jdominguez@bermandevalerio.com

Manuel J. Dominguez
BERMAN DeVALERIO
4280 Professional Center Drive, Suite 350
Palm Beach Gardens, FL 33410
Tel: (561) 835-9400
Fax: (561) 835-0322
Email: jdominguez@bermandevalerio.com

АДВОКАТЫ ИСТЦОВ И ЧЛЕНОВ
ИСКОВОГО КОЛЛЕКТИВА

COUNSEL FOR PLAINTIFFS AND THE
PLAINTIFF CLASS

## CERTIFICATE OF TRANSLATION

STATE OF ARIZONA    )
                           )   ss
COUNTY OF MARICOPA  )

      I, Natalia A. Garrett, hereby certify that I am fluent in both languages, Russian and English, and fully competent to render the translation of legal documents from English into Russian. I have translated the foregoing <u>Direct Purchaser Amended Consolidated Class Action Complaint</u> filed in the United States District Court, Northern District of Illinois, Case No. 08-cv-6910, from English into Russian to the best of my skill and ability and certify that my translation is accurate and complete.

Date: 05/07/09           By: _____
                               Natalia A. Garrett, Esq.

      The foregoing instrument was subscribed and sworn to before me this 7th day of May, 2009, by Natalia A. Garrett.

By: _____
   Notary Public

JOAN CARDILLO
Notary Public - Arizona
Maricopa County
My Commission Expires
June 30, 2012

## СЕРТИФИКАТ ПЕРЕВОДА

ШТАТ АРИЗОНА       )
                       )
ОКРУГ МАРИКОПА   )

      Я, Наталия А. Гаррет, настоящим подтверждаю, что я свободно владею обоими языками — русским и английским, и что я компетентна для перевода юридических документов с английского на русский. Я надлежащим образом перевела вышесодержащуюся <u>Консолидированную Жалобу с Поправками и Коллективное Исковое Заявление Класса Покупателей-Потребителей</u> по делу номер 08-cv-6910, находящегося в Окружном суде США, Северном районе Штата Иллинойс с английского на русский и подтверждаю, что мой перевод является точным и завершенным.

Дата: 7 мая 2009 г.        Подпись: _____
                               Наталия А. Гаррет, Юрист

      Настоящий документ подписан Наталией Гаррет в моём присутствии и под присягой 7 мая 2009, о чем свидетельствует моё нотариальное заверение.

Подпись и печать нотариуса

Дело № 1:08-cv-06910     Документ 51     Подан 03/04/2009          стр. 53 из 53

## CERTIFICATE OF ACCURACY OF TRANSLATION

STATE OF ARIZONA          )
                          )          ss
COUNTY OF MARICOPA  )

    I, Anna A. Sokolova, hereby certify that I am fluent in both languages, Russian and English, and fully competent to render the translation of legal documents from English into Russian. I have proofread and verified the translation of the foregoing <u>Direct Purchaser Amended Consolidated Class Action Complaint</u> filed in the United States District Court, Northern District of Illinois, Case No. 08-cv-6910, from English into Russian completed by Natalia A. Garrett, and hereby certify that the translation is true, accurate and complete.

Date: 05/07/09          By: _____
                             Anna A. Sokolova, Esq.


    The foregoing instrument was subscribed and sworn to before me this 7th day of May, 2009, by Anna A. Sokolova.

By: _____
       Notary Public

> JOAN CARDILLO
> Notary Public - Arizona
> Maricopa County
> My Commission Expires
> June 30, 2012

## СЕРТИФИКАТ ТОЧНОСТИ ПЕРЕВОДА

ШТАТ АРИЗОНА          )
                      )
ОКРУГ МАРИКОПА       )

    Я, Анна А. Соколова, настоящим подтверждаю, что я свободно владею обоими языками – русским и английским, и что я компетентна для перевода юридических документов с английского на русский. Я надлежащим образом прочитала и проверила перевод <u>Консолидированной Жалобы с Поправками и Коллективного Искового Заявления Класса Покупателей-Потребителей</u> по делу номер 08-cv-6910, находящегося в Окружном суде США, Северном районе Штата Иллинойс с английского на русский сделанный Наталией А. Гарретт и подтверждаю, что её перевод является точным и завершенным.

Дата: 7 мая 2009 г.          Подпись: _____
                                        Анна А. Соколова, Юрист

    Настоящий документ подписан Анной А. Соколовой в моём присутствии и под присягой 7 мая 2009, о чем свидетельствует моё нотариальное заверение.

Подпись и печать нотариуса

## ОКРУЖНОЙ СУД СОЕДИНЁННЫХ ШТАТОВ АМЕРИКИ
## СЕВЕРНЫЙ РАЙОН ШТАТА ИЛЛИНОЙС

Истцы:

Юридические лица Gage's Fertilizer & Grain, Inc. (Гейджз Фёртилайзер и Грэйн Инк.) и Kraft Chemical Company (Крафт Кемикал Компани), представляющие свои интересы, а также интересы группы предприятий, оказавшихся в аналогичной ситуации.

Ответчики:

Agrium Inc., Agrium U.S. Inc. (Агриум Инк., Агриум Корпорация США), Mosaic Company, Mosaic Crop Nutrition L.L.C. (Мозаик Компания, ООО «Мозаик Кроп Нутришн»), Potash Corporation of Saskatchewan Inc. (Калиевая Корпорация Саскачевана Инк.), PCS Sales (USA), Inc., (ПисиЭс Сейлс США Инк.), ОАО «Уралкалий», РУП «ПО Беларуськалий», ЗАО «Белорусская калийная компания», BPC Chicago L.L.C, (ООО «БКК Чикаго»), ОАО «Сильвинит», и ЗАО «Международная Калиевая Компания».

MDL Docket No. 1996

НОМЕР ДЕЛА 08-CV-5192

**ИСКОВОЕ ЗАЯВЛЕНИЕ**

(консолидировано с Делом 08-CV-5635)

Судья Кастильо

Магистрат-Судья Кейс

**С ЗАПРОСОМ НА СУД ПРИСЯЖНЫХ ЗАСЕДАТЕЛЕЙ**

## КОНСОЛИДИРОВАННАЯ ЖАЛОБА И КОЛЛЕКТИВНОЕ ИСКОВОЕ ЗАЯВЛЕНИЕ КЛАССА ПОКУПАТЕЛЕЙ-ПОТРЕБИТЕЛЕЙ

### I.    ПРЕДИСЛОВИЕ

1.    Истцы приносят данную Жалобу в качестве физических и юридических лиц и в качестве представителей коллектива («Коллектив»), состоящего из юридических лиц, которые являются покупателями калийных

удобрений или поташа в Соединнённых Штатах Америки от одного или нескольких выше названных Ответчиков в период с 1 Июля 2003 года по настоящее время («Исковой Срок Жалобы Коллектива»). Этот Коллективный Иск консолидирует отдельные общенациональные иски различных групп покупателей-потребителей калийных удобрений в этом судебном округе, и выдвигает требования о возмещении тройных убытков и судебный запрет, а также оплату за адвокатские услуги в соответствие с антимонопольным законодательством Соединненых Штатов.

2. Поташ, или калийные удобрения, являются ключевыми сельскохозяйственными удобрениями; Ответчики являются лидирующими производителями калийных удобрений в мире. В 2007 году Ответчики в общем объеме получили более чем Два (2) Миллиарда Долларов США валовой прибыли. С начала течения срока исковой давности по жалобе вышеуказанной группы предприятий - истцов, Ответчики реализовали миллионы тон калийных удобрений в США.

3. В 1990-х годах, производители калийных удобрений, в особенности те, которые находятся на территории бывшего Советского Союза, увеличили производство калийных удобрений на мировом рынке, в результате чего цены на калийные удобрения, и соответственно прибыль прозводителей, значительно снизились. Истцы имеют основания утверждать, что для того, чтобы сохранить стабильность цен и увеличить прибыльность, Ответчики договорились и объединили свои усилия, с целью искусственного создания, поднятия и поддержания высоких цен на калийные удобрения, поставляемые в Соединённые Штаты Америки. Для осуществления этого заговора, Ответчики обменивались деликатной и непубличной информацией о ценах, мощностях и объёмах производства и спроса, договаривались о разделе рынков, покупателей и объёмах

распродаж, и координировали решения об объёмах и ограничениях на производство.

4.     В результане незаконных актов Ответчиков, Истцы и другие члены Коллектива истцов были вынуждены платить искусственно завышенные цены на калийные удобрения в течение Искового Срока Жалобы Коллектива, нежели цены, которые бы существовали при конкуренции и свободном рынке.

## II.     ЮРИСДИКЦИЯ И ПОДСУДНОСТЬ

5.     Истцы просят взыскать с Ответчиков в свою пользу возмещение ущерба, включая тройные убытки, стоимость судопроизводства и соразмерный гонорар за адвокатские услуги, потребовавшиеся в результате нарушения Ответчиками Статьи № 1 Закона Шермана.

6.     Суд этого округа имеют юрисдикцию над данным Исковым Заявлением  в соответствии с 28 U.S.C. §§ 1331 и 1337(a) и в соответсвии со Статьями 4 и 6 Акта Клейтона, 15 U.S.C. §§ 15(a) and 26.

7.     Подсудность в данном судебном округе является надлежащей, поскольку в соответсвии с 15 U.S.C. §§ 15 и 22, 28 U.S.C. § 1391(b) и (c), хотя бы один из Ответчиков проживает в этом судебном округе, имеет лицензию на право заниматься коммерческой деятельностью, или занимается коммерческой деятельностью в этом судебном округе, и поскольку значительная доля всего объёма международной торговли и коммерции, являющейся предметом этого Иска, происходила на территории этого судебного округа.

8.     Этот Суд наделён юрисдикцией для разрешения данного спора в отношении каждого из Ответчиков, поскольку каждый из них:   (а) заключал коммерческие сделки в США;  (б) производил, продавал, перевозил; и/или (в) был вовлечён в антимонопльный заговор, имеющий своей целью прямой, предвидимый

и намеренный ущерб и убытки коммерческим отношениям и собственности лиц, проживающих и занимающихся бизнесом в США, включая этот Округ.

### III.    СТОРОНЫ

#### A.    ИСТЦЫ

9.    Истец Гейджз Фертилайзер и Грейн Инк (Gage's Fertilizer & Grain, Inc.) («Гейджз» или «Gage's») – коммерческое предприятие с управляющим центром, расположенным в Станберри, штата Миссури.  На протяжении Искового Срока Жалобы Коллектива Gage закупал калийные удобрения напрямую у одного или нескольких Ответчиков.

10.    Истец Крафт Кемикал Компани (Kraft Chemical Company) («Крафт» или «Kraft») – корпорация штата Иллинойс с управляющим центром, расположенным в Мерлоуз Парк, штата Иллинойс.  На протяжении Искового Срока Жалобы Коллектива, Крафт закупал калийные удобрения прямо от одного или нескольких Ответчиков.

#### B.    ОТВЕТЧИКИ

##### Агриум (Agrium)

11.    Ответчк Агриум Инк (Agrium Inc.) («Агриум» или «Agrium») – Канадская корпорация с управляющим центром, расположенным в Калгари, Канада.  На протяжении Искового Срока Жалобы Коллектива, Агриум продавал и являлся дистрибьютером калийных удобрений на территории США, напрямую или через свои филиалы.

12.    Агриум США Инк (Agrium U.S. Inc.) является дочерней компанией, полностью принадлежащей Агриум с управляющим центром расположенным в Денвере, Колорадо.  На протяжении Искового Срока Жалобы Коллектива, Агриум U.S. Inc. продавал и являлся дистрибьютером калийных удобрений на территории США, напрямую или через свои филиалы.

13.    В этом документе Ответчики Агриум Inc. и Агриум США Инк. совместно обозначены как «Агриум».

**Мозаик (Mosaic)**

14.    Ответчк Мозаик Компани (Mosaic Company) – корпорация с управляющим центром, расположенным в Плимут, Миннесота.  На протяжении Искового Срока Жалобы Коллектива, Мозаик продавал и являлся дистрибьютером калийных удобрений на территории США напрямую или через свои филиалы.

15.    Ответчк ООО «Мозаик Кроп Нутришн» (Mosaic Crop Nutrition L.L.C.) является компанией с ограниченной ответственностью, с управляющим центром, расположенным в Риверью, Флорида.   Мозаик Кроп Нутришн ЛЛС. является дочерней компанией полностью принадлежащей Mosaic Company.  На протяжении Искового Срока Жалобы Коллектива, Мозаик Кроп Нутришн ЛЛС. продавал и являлся дистрибьютером калийных удобрений на территории США напрямую или через свои филиалы.

16.    В этом документе Ответчики Мозаик Компани и ООО «Мозаик Кроп Нутришн» совместно обозначены как «Мозаик».

**PCS**

17.    Ответчк  Поташ Корпорайшн ов Саскачеван Инк (Potash Corporation of Saskatchewan Inc. («Поташ Корп» или «Potash Corp.») – Канадская корпорация с управляющим центром расположенным, в Саскачеван, Канада.  На протяжении Искового Срока Жалобы Коллектива, Поташ Корп. продавал и являлся дистрибьютером калийных удобрений на территории США напрямую или через свои филиалы.

18.    Ответчк ПисиЭс Сейлс США Инк.  (PCS Sales (USA), Inc.) («ПисиЭс Сейлс» или «PCS Sales») является компанией штата Делавэр, с управляющим центром расположенным, в Нортбрук, Иллинойс.   ПиСиЭс Сейлс является дочерней компанией полностью принадлежащей Поташ Корп.  На протяжении

Искового Срока Жалобы Коллектива, ПиСиЭс Сейлс продавал и являлся дистрибьютером калийных удобрений на территории США напрямую или через свои филиалы.

19.     В этом документе, Ответчики Поташ Корп. и ПиСиЭс Сейлс совместно обозначены как «PCS».

20.     В этом документе, Ответчики Поташ Корп., ПиСиЭс Сейлс, Мозаик и Агриум (Potash PCS, Mosaic и Agrium) совместно обозначены как «Производители Поташа из Саскачевана», потому что каждый из этих Ответчиков управляет местом добычи калийных удобрений в Саскачеване, Канада.

### ОАО «Уралкалий»

21.     Ответчик ОАО «Уралкалий» является акционерным обществом, с управляющим центром, расположенным в Москве, Россия.  С апреля 2005 года, ОАО «Уралкалий» владеет половиной всех акций в РУП «ПО Беларуськалий» Белорусской компании - совместном предприятии, через которое ОАО «Уралкалий» рекламирует и распродаёт калийные удобрения. На протяжении Искового Срока Жалобы Коллектива, ОАО «Уралкалий» продавал и являлся дистрибьютером калийных удобрений на территории США напрямую или через свои филиалы.

### РУП «ПО Беларуськалий»

22.     Ответчик РУП «ПО Беларуськалий» является коммерческой организацией, учережденной по законам Республики Беларусь, с управляющим центром, расположенным в Солигорске, Республике Беларусь.  На протяжении Искового Срока Жалобы Коллектива РУП «ПО Беларуськалий» продавал и являлся дистрибьютером калийных удобрений на территории США напрямую или через свои филиалы.

### ЗАО «Белорусская калийная компания»/(«БКК»)

23.     Ответчик ЗАО «Белорусская калийная компания» («БКК») является совместным предприятием Уралкалия и Беларуськалия, с управляющим центром,

расположенным в Минске, Республике Беларусь. Учережденный в апреле 2005 года, БКК является эксклюзивным дистрибьютором калийных удобрений, производимых Уралкалием и Беларуськалием по всему миру. На протяжении Искового Срока Жалобы Коллектива БКК продавал и являлся дистрибьютером калийных удобрений на территории США напрямую или через свои филиалы.

24.    Ответчик ООО «БКК Чикаго» или БиПиСи Чикаго ЛЛСи («БиПиСи Чикаго ЛЛСи» или BPC Chicago L.L.C.) является обществом с ограниченной ответственностью с управляющим центром, расположенным в Баффало Гроув, Иллинойс.  БиПиСи Чикаго ЛЛСи является дочерней компанией, полностью принадлежащей БКК.    На протяжении Искового Срока Жалобы Коллектива, БиПиСи Чикаго ЛЛСи продавало и являлось дистрибьютером калийных удобрений на территории США напрямую или через свои филиалы.

25.    В этом документе Ответчики «Белорусская калийная компания»  и БиПиСи Чикаго ЛЛСи совместно обозначены как «БКК».

### ОАО «Сильвинит»

26.    Ответчик ОАО «Сильвинит» является акционерным обществом с управляющим центром, расположенным в Соликамске, Россия.  На протяжении Искового   Срока   Жалобы   Коллектива   Сильвинит   продавал   и   являлся дистрибьютером калийных удобрений на территории США напрямую или через свои филиалы.

### ЗАО «Международная Калийная Компания»

27.    Ответчик ЗАО «Международная Калийная Компания» («МКК» или «IPC») является российским акционерным обществом, с управляющим центром расположенным в Москве, Россия.  На протяжении Искового Срока Жалобы Коллектива МКК - эксклюзивный дистрибьютор калийных удобрений, производимых ОАО «Сильвинит», продавал и являлся дистрибьютером калийных удобрений на территории США напрямую или через свои филиалы.

## IV.  ПРЕДСТАВИТЕЛИ И СТОРОНЫ-СОУЧАСТНИКИ

28.    Иные юридические лица, не названные в качестве ответчиков, участвовали в нарушениях, предъявленных в этом Иске, выполняя действия и делая заявления, противоречащие закону. Соответственно, в дальнейшем, Истцы имеют право добавить эти лица в качестве Отвечиков по этому Коллективному Исковому Заявлению.

29.    Имеются основания полагать, что другие поставщики калийных удобрений, условно называемые «Джон Доз» (John Does) в этом деле и пронумерованные от 1 до 10, состоят в заговоре с Ответчиками в их нелегальных действиях по подавлению конкуренции. Эти соучастники и их помощники содействовали, преследовали, участвовали и/или общались с другими лицами по поводу заговора. Эти лица действовали либо намеренно, либо по принуждению в целях незаконного подавления конкуренции.

30.    Действия Ответчиков, которые являются предметом данного разбирательства выполнялись каждым из соучастников, были полностью под контролем и с разрешения каждого из соучастников, или были выполнены по приказу членов правления, представителей, сотрудников и других агентов каждого из соучастников как деятельность под управлением и под контролем этих лиц.

31.    Ответчики также несут юридичексую ответственность за действия компаний, приобретённых ими с целью осуществления заговора.

## V.  ОСНОВАНИЯ ДЛЯ КОЛЛЕКТИВНОГО ИСКА

32.    Истцы подают данный Коллективный Иск как юридические лица и как представители Коллектива в соответсвии с Федеральным Законом о Гражданском Процессе, Статьей 23(a), (b)(2) и (b)(3), состоящего из следующих лиц:

Все физические и юридические лица, которые являлись покупателями калийных удобрений в Соединнённых Штатах напрямую от одного или

нескольких Ответчиков в период между 1 июля, 2003 и по настоящее время.   Не входят в состав этого Коллектива Ответчики и их материнские компании, дочерние компании и филиалы, а также заговорщики, государственные предприятия, и судьи, которые назначены рассматривать любой из аспектов этого Иска.

33.    Истцы не имеют точных данных о том, сколько лиц входят в состав представляемого Коллектива в связи с тем, что эта информация находится под исключительным контролем Ответчиков.  Истцы полагают, что, судя по характеру торговых и коммерческих отношений, ялвяющихся предметом разбирательства, они могут насчитать тысячи членов Коллектива, которые населяют территориию Соединнёных Штатов, поэтому попытки определить каждое лицо попадающее под определение Коллектива невозможно.

34.  Истцы  являются  членами  Коллектива.  Требования  Истцов представляют типичные требованиями Коллектива, потому что Истцы являются непосредсвенными покупателями калийных удобрений и потому, что Истцы и все члены Коллектива пострадали в результате одного и того же неправомерного поведения Ответчиков и их заговорщиков, как утверждается в данном Иске, и их претензии имеют все характеристики, присущие претензиям Коллектива.

35.  В производстве этого Коллективного Иска, требуется разрешить целый ряд фактических и правовых вопросов, возникших в результате антикокурентных действий Ответчиков, включая, но не ограничиваясь следующим переченем:

      a.    На самом ли деле Ответчики были вовлечены с общий заговор с целью   искусственно   создать,   поднять,   удерживать   и зафиксировать цены на калийные удобрения, импортируемые в США;

      b.    На самом ли деле Ответчики были вовлечены с общий заговор с целью ограничить выпуск калийных удобрений импортируемых в США;

      c.    На самом ли деле Ответчики делились конфиденциальной информацией, разделяли сферы влияния на рынках и разделяли

покупателей или клиентов, ограничивали выпуск калийных удобрений, импортируемых в США, и совершали другие неправомерные действия для осуществления заговора о ценообразовании;

d.     На самом ли деле действия Ответчиков привели к исскуственно созданному повышению цен до монопольного уровня на калийные удобрения, импортируемые в США;

e.     На самом ли деле Истцы и другие члены Коллектива понесли материальный ущерб в результате действий Ответчиков, и, если это так, какова мера этого ущерба для того, чтобы компенисировать убытки всех членов Коллектива;

f.     На самом ли деле Истцы и другие члены Коллектива имеют право требовть судебный запрет на неправомерные действия Ответчиков, и, если это так, каким должно быть содержание и рамки этого судебного запрета.

36.     Эти и другие фактические и правовые вопросы пресущи всем членам Коллектива и преобладают над теми юридическими вопросами, которые пресущи только отдельным членам Коллектива, включая фактические и правовые вопросы в отношении юридической ответсвенности и размера убытков.

37.     Истцы готовы представлять интересы Коллектива справедливо и компетентно, потому что Истцы являются покупателями-потребителями калийных удобрениий и у них нет конфликта с другими членами Коллектива.  Более того, Истцы наняли компетентых юристов, имеющих опыт работы с антимнопольным правом, коллектвными исками и другими сложными коммерческими делами.

38.     Ответчики действовали на основаниях, которые имеют отношение ко всем членам Коллектива, таким образом делая судебный запрет приемлемым вариантом разрешения этого Иска в отношении всего Коллектива.

39.     Этот Коллективный Иск является наилучшим способом из имеющихся альтернатив справедливого и разумного разрешения данного юридического спора. Разрешение спора путём подачи Коллективного Иска позволит большему числу

лиц, находящихся в одинаковых обстоятельствах, эффективно найти правовое решение на их общие претензии в одном судебном процессе, таким образом избежав двойных расходов времени и ресурсов. Разрешение спора путём Коллективного Иска также позволяет избежать повторяемых судебных процессов. Разрешение спора путём Коллективного Иска позволит в том числе удовлетворить жалобы членов Коллектива с относительно небольшим размером ущерба, которые иначе не смогли позволить бы себе участие в подобном судебном процессе по антимонопольному законодательству, так, как оно представлено в данном Иске. Не предвидится каких-либо проблем относительно реализации данного Искового Заявления.

40.    Не предвидится никаких проблем с идентификацией членов Коллектива, поскольку данные об этих лицах находятся в бумагах Ответчиков и их заговорщиков.

41.    Разрешение этого спора в индивидуальном порядке отдельными членами Коллектива нежелательно, потому что наверняка повлечёт риск противоречащих решений и принятие несовместимых стандартов для поведения Ответчиков.

## VI.    ТОРГОВЛЯ И КОММЕРЦИЯ

42.    На протяжении Искового Срока Жалобы Коллектива каждый из Ответчиков напрямую или через свои дочерние компании и филиалы, продавал калийные удобрения в США через систематические и постоянные поставки, международные и межштатовые перевозки, включая и поставки через и в этот Судебный Округ.

43.    На протяжении Искового Срока Жалобы Коллектива, Ответчики совместно контролировали большую долю прозводства калийных удобрений на международном рынке и рынке США.

44.     Коммерческая деятельность Ответчиков оказала значительное влияние на торговлю и коммерцию в США и привела к материальному ущербу, признаваемому антимонопольным законодательством США.

## VII.    ОСНОВАНИЯ ДЛЯ ИСКА

### C.    ПРОИЗВОДСТВО КАЛИЙНЫХ УДОБРЕНИЙ

45.     Поташ – это название минеральной и химеческой соли, содержащей калий.  Поташ или калийные удобрения добываются из природных рудниковых залежей, сформировавшихся в результате испарения и исчезновения морей или океанов, и многие их которых в настоящее время находятся в сотнях метров под землёй.  Калийные удобрения в основном используются как сельскохозяйственное удобрение и как источник растворимоего калия, который является одним из трёх основных компонентов, требующихся для роста и питания растений.  Фермеры по всему миру используют калийные удобрения в больших количествах для того, чтобы помочь урожаю противостоять заболеваниям и повысить урожайность. Калийные удобрения также используются в промышленности при производстве или никелировке металла, а также  при производстве стекла, керамики, жидкого мыла и добавок к животному корму.  У калийных удобрений нет дешевого заменителя.

46.     Удобрения, включая калийные удобрения, являются критически важными составляющими компонентами в производстве урожая.  Ограничения в выпуске калийных удобрений, как утверждается в этом Иске, являются причиной уменьшения урожая и, в конечном счёте, повышению цен на продукты питания, в особенности на те продукты, которые требуют значительного использования калия для их производства.

47.     Все мировые залежи калийных удобрений сосредоточены в всего лишь в нескольких регионах.  Хотя в целом около 150 стран потребляют калийные

Дело № 1:08-cv-05192      Документ 60      Подан 13/11/2008      стр. 13 из 38

удобрения, главном образом как удобрение, только 15 стран являются производителями, способными поставлять значительные объёмы этого вещества. В пределах Беларусии, Канады, Германии, Израиля, Иордана и Росиии содержится примерно 90% мировых залежей калийных удобрений. Более половины мирового содержания калийных удобрений находится в лишь двух местах – в Канаде, и в бывшем Советском Союзе (в особенности России и Беларусии). Самые большие залежи калийных удобрений находятся в Саскачеване, Канаде. Более чем 50% калийных удобрений из Саскачеваны экспортируются на международные рынки.

48.     Калийные удобрения являются однородным продуктом, так что калийные удобрения произведенный одним из поставщиков не отличается по качеству от калийных удобрений постваляемых другими производителями. В результате, покупатели калийных удобрений принимаемет решения о покупке главным образом исходя из цены.

49.     Поскольку себестоимоисть калийных удобрений является относительно небольшой по сравнению со всей стоимостью производства урожая и поскольку не существует равных заминителей этого продукта, спрос на калийные удобрения является неэластичным.

50.     Большая часть затрат на производство калийных удобрений не постоянна. В тех случаях, когда переменные издержки составляют высокий процент от всех расходов производства, у производителей нет стимулов для эксплуатации предприятий на полную мощность, и это позволяет картелю производителей искусственно завышать цены с большим успехом, нежели в ситуациях, когда постоянные расходы являются основным компонентом издержек производства .

51.     Начать прозводство калийных удобрений нелегко из-за очень высоких барьеров, препятствующих вступлению в эту промышленность новых предприятий. К примеру, для открытия одной новой разработки требуется примерно $2.5

миллиарда или более. Только как изначальное вложение, пять или семь лет на развитие и добольнительные издержки, связанные со строительством дорог и остальной инфраструктуры. Эти барьеры являются предпосылкой для заговора поскольку они защищают существующих производителей от затрат, связанных с конкуренцией и приводят к выской концентрации производителей на рынке калийных удобрений.

### D. ВЫСОКАЯ КОНЦЕНТРАЦИЯ ПРОИЗВОДИТЕЛЕЙ НА РЫНКЕ КАЛИЙНЫХ УДОБРЕНИЙ

52.     На протяжении Искового Срока Жалобы Коллектива всего несколько компаний, рекламириующих, продающих и поставляющих калийные удобрения, доминировали промышленность калийных удобрений в мире и в Соединённых Штатах. Один из аналитиков даже отмечал, что производство калийных удобрений в мире является еще более сконцентрированным, чем нефтянной рынок, контролируемый ОПЕК или Организацией Наций Экспортёров Нефти. Еще один аналитик этой промышленности ссылался на эту небольшую группу производителей как «Организацию Наций Экспортёров Поташа».

53.     PCS является одним из самых больших производителей калийных удобрений в мире, поставляющим одну треть от всего мирового производства калийных удобрений.  К 2008 году, три производителя с рудниками расположенными в Канаде (PCS, Mosaic, Agrium) и три производителя из бывшего Советского Союза  (ОАО «Уралкалий», РУП «ПО Беларуськалий» и ОАО «Сильвинит») произвели добычу около 71% всей мировой добычи калийных удобрений.  На протяжении Искового Срока Жалобы Коллектива, рыночная доля этих предриятий на мировом рынке не изменилась в какой-либо значительной мере.

54.     Эта концентрация рыночной доли Ответчиков способствовала осуществлению их заговора.

### E.    ВЫСОКИЙ УРОВЕНЬ СОТРУДНИЧЕСВТА НА РЫНКЕ ПРОИЗВОДИТЕЛЕЙ КАЛИЙНЫХ УДОБРЕНИЙ

55.    Характерной чертой промышленности калийных удобрений является высокий уровень взаимодействия между предполагаемыми конкурентами. Основные производители калийных удобрений владеют совместными предприятиями и разделяют интересы собственников среди конкурентов на рынке калийных удобрений. Помимо этих официальных деловых отношений Ответчики создали поразительную культуру сотрудничества путём взаимных посещений предприятий друг друга, участия в торговых ассоциациях и поездок на промышленные конференции.

56.    PCS владеет значительным пакетом акций в ряде малых производителей калийных удобрений по всему миру, включая: (a) 26% (и право назначать на должность ключевых специалистов по финансам, производству и маркетингу) в Arab Potash Company с управляющим центром в Иордании - компании, которая в 2007 году произвела около 2 миллиона тон Поташа; (b) 9% в Israel Chemicals Ltd («ICL»), компании, которая в 2005 году произвела 5 миллионов тон Поташа; (c) 32% в Sociedad Quimica y  Minera de Chile ("SQM") поставщике калийных удобрений в Чили, который, снабжает около 1 миллиона тон Поташа в год; и (d) 20% в Sinofret Holdings Limited - одном из самых крупных поставщиков калийных удобрений в Китае.   С 2005 года, PCS является эксклюзивным международным маркетинговым представителем для Interpid Potash, одного из самых крупных производителей калийных удобрений в США.

57.    PCS, Agrium и Mosaic являются акционерами с одинаковым количеством акций в Canpotex Ltd («Canpotex» или «Кэнпотекс») - компании, которая представляет интересы этих производителей калийных удобрений по продаже, маркетингу и перевозке во всём мире, за исключением Канады и США. Каждая компания имеет равное право голосования в Кэнпотекс как акционер через

своего представителя в совете директров Кэнпотекс, и каждая из этих компаний заключила соглашение, что не будет независимо участвовать в международной торговле (за исключением торговли в США).

58. Коммерческие сделки по продаже калийных удобрений, осуществляемые Кэнпотекс, распределены между производителями на основании объёма производства каждого акционера. Если акционер не в состоянии удовлетворить спрос на Поташ требуемый Кэнпотекс, остальные акционеры имеют право восполнить неудовлетворённый спрос пропорционально произвотсвенной ёмкости их предприятий. В 2007 году, PCS поставил 55% всей продукции, затребованной Кэнпотекс; Mosaic поставил 37.5%; и Agrium – оставшийся баланс. Посредством участия этих компаний в Кэнпотекс, у PCS, Agrium и Mosaic есть доступ к конфиденциальной информации об объемах производства и ценах.

59. Изначально, Кэнпотекс был сформирован для того, чтобы распродавать калийные удобрения, производимые в Канаде, но на настоящий момент Кэнпотекс заключил по крайней мере одно соглашение по сотрудничеству о распродаже калийных удобрений с производителями из бывшего Советского Союза. Например, в январе 2000 года Кэнпотекс согласился вступить в совместное соглашение по распродаже с ОАО «Уралкалий». Кэнпотекс согласился рекламировать и распродавать калийные удобрения Уралкалия за пределами Северной Америки и Европы, начиная с 2001 года.

60. Как и Канадские производители, производители из бывшего Советского Союза консолидировали распродажу и маркетинг их поставок калийных удобрений в одном предприятии, БКК. Основанное в 2005 году как совместное предприятие между Уралкалием и Беларуськалием, БКК совместно рекламирует и распродаёт Поташ, производимый этими предприятиями по всему миру, включая США. Совместные поставки калийных удобрений от Уралкалия и

Беларуськалия через БКК составляют 34% всего мирого экспорта калийных удобрений.

61.    ОАО «Сильвинит», поставляющий калийные удобрения через ЗАО «Международная Калийная Компания», имеет связи с другими производителями калийных удобрений в бывшем Советском Союзе.   Дмитрий Рыболовлев владеет акциями в ОАО «Сильвинит» и ОАО «Уралкалий», по крайней мере   66% в Уралкалии и около 20% акций с правом голосования в Сильвинит.   Сильвинит активно участвовал в переговорах по вступлению в БКК, тем самым далее способствуя консолидации на рынке калийных удобрений.

62.    В одном из интервью в 2006 году, Рыболовлев признался в истинной мотивации по созданию монополий, как объясняющей все эти совместные предприятия.       Он    объяснил,    что    «совместная    деятельность    позволяет [производителям калийных удобрений] избежать ненужной конкуренции».

63.    Согласно репортажам новостей, представители компаний Ответчиков систематично встречались на протяжении Искового Срока Жалобы Коллектива по «программе взаимного обмена визитами».   Согласно представителям Ответчиков, обмен визитами «способств[овал] обсуждению текущих вопросов, касающихся промышленности калийных удобрений и обмену опытом».

64.    Во время одного из этих визитов, 11 октября 2005 года, старший руководитель Ответчиков посетил ОАО «Уралкалий» в бывшем Советском Союзе и обсуждал, среди других тем, что считается очень деликатной, информацию о производственных планах по крайней мере одного из самых крупных мировых производителей калийных удобрений.   На этой встрече присутствовали Уильям Дойл, президент и председатель правления Potash Corp.; Майкл Уилсон, президент и председатель правления Кэнпотекс;  Джеймс Томпсон, вице президент Mosaic Company;     Владислав    Баумгертнер,    генеральный    директор,    президент    и

председатель правления ОАО «Уралкалий»; а также другие представители РУП «ПО Беларуськалий» и ОАО «Сильвинит».

65.    В июле 2006 года, в составе «программы взаимного обмена визитами», делегация руководителей ОАО «Уралкалий» посетила Mosaic в Канаде.    Джеймс Томпсон, вице-президент Mosaic Company, также участвовал во встрече с компаниями из бывшего Советского Союза. Во время этой встречи делегация была ознакомлена с управленческой структурой Mosaic и посетила рудники компании, включая обзор её самых современных технологий.    Посетители из Уралкалия отмечали «дружеское отношение хозяев» и восхищались тем, что «нам показали всё, что мы хотели увидеть».

66.    Пётр Кондрашёв, генеральный директор Сильвинита, признал в интервью в 2005 году, опубликованном в Химическом Журнале, посвященному промышленности калийных удобрений,  что компания имеет «старые и дружеские отношения с производителями калия из Беларуси и что мы остаёмся довольно хорошими партнёрами». Он добавил, что «очень часто мы принимаем навещающие нас группы из Белоруссии» и что представители Сильвинита также часто посещают Белорусского производителя.

67.    Ответчики проводили целый ряд таких обменных визитов на протяжении Искового Срока Жалобы Коллектива, и эти встречи предоставили ряд возможностей для заговора и обмена конфиденциальной и деликатной информацией, касающейся конкуренции. Даже в отсутствие заговора между этими полагаемыми конкурентами, это было бы противно интересам каждого из них - предоставлять конкурентам доступ к такой конфиденциальной и деликатной информации.

68.    Повышенный уровень сотрудничества между Ответчиками и их вовлечение в долгосрочные совместные начинания предоставили этим конкурентам среду для обсуждения цен, объемов производства и другой важной рыночной

информации.   Взаимовыгодный характер этих коммерческих отношений между Ответчиками не только предоставли возможность для заговора, но и материльную выгоду как стимул для его осуществления.

### F.   Использование Торговых Ассоциация и Торговых Мероприятий с Целью Осуществления Заговора

69.   Есть основания полагать, что заговорческая деятельность Ответчиков была осуществлена при помощи торговых ассоциаций и мероприятий, во время которых была возможность сговориться и обмениваться информацией.

70.   Ответчики являются членами Международной Ассоциацией Отрасли Удобрений («IFA»), которая спонсирует ежегодные конференции посещаемые старшими руководителями Ответчиков.   В мае 2007 года представители PCS, Mosaic, Agrium, РУП «ПО Беларуськалий», Кэнпотекс, БКК и другие посетили 75-ую ежегодную IFA конференцию в Истанбуле, Турция.   Во время IFA встреч, представителя производителей совещались по поводу состояния отрасли и «рыночных тенденций».   Более того, во время майской конференции IFA 2007 года , крупные производители калийных удобрений сделали объявление о повышении цен на их продукцию.

71.   Помимо членства в IFA, Ответчики также являются членами Института Удобрений, который наряду с Круглым Столом Института Удобрений, спонсирует ежегодные конференции под названием «Конференция Обзора Удобрений и Технологий».   Конференция разработана для представителей отрасли, а также финансовых аналитиков, бизнесс-консультантов, членов отраслевой прессы и государсвенных экономистов.

72.   Во время Конференции по Обзору Удобрений и Технологий в Арлингтоне, Вирждинии, с 6го по 7ое ноября 2006 года, Майкл Рам, вице-президент Mosaic Company, выступил с презентацией по поводу отрасли.

Представители по крайней мере одного из Ответчков присутствовали на этой конференции.

### G. СОГЛАСОВАННЫЕ ДЕЙСТВИЯ ОТВЕТЧИКОВ ПО УМЕНЬШЕНИЮ ПРОИЗОДИТЕЛЬНОЙ ЁМКОСТИ

73.     Отчасти,     Ответчики     выполняли     свой     заговор     путём скоординированных действий по уменьшению выпуска калийных удобрений, приведших к увеличению цен на рынке калийных удобрений

74.     Ответчики участвовали в переговорах, обсуждая условия контрактов по закупке калийных удобрений по всему миру.   Как правило, соглашения с покупателями из Индии и Китая заключались в первую очередь; цены, установленные на этих рынках, затем напрямую влияли на цены в других крупных рыночных секторах.

75.     В начале 2006 года, во время трудных переговоров по поводу цен на калийные удобрения, Кэнпотекс и БКК (и их члены) совместно ограничили производство, для того чтобы принудить китайских покупателей (самых многочисленных покупателей в мире) согласиться на повышение цены, которое аннулировало «скидку» и установило отметку для остальных покупателей во всём мире.   Председатель ОАО «Уралкалий» объяснил это действие следующим образом: «у нас нет цели прекратить им поставку калийных удобрений со скидкой в 30-40 американских долларов, как раньше, а только привести эти цены до уровня их соседних потребителей из Азии.   Поэтому мы прекратим все поставки туда, пока мы не догоримся о соглашении с разумными,  с нашей точки зрения, ценами».

76.     В соответствии с этим высказыванием, лидирующие производители калийных удобрений в мире совместно ограничили производство калийных удобрений, для того чтобы поднять цены для китайских покупателей калийных удобрений на уровень, существующий для покупателей других стран, включая США.   ОАО «Уралкалий» снизил уровень производства в первой половине 2006

года до 68% и PCS снизило свой уровень производства до 60%. Снижение уровней производства ОАО «Уралкалий» и PCS привело к соответсвенному уменьшению уровня продаж на 23% и 20% по сравнению с предыдущим годом и привело к прекращению «скидки» в Китае, которая существовала до этих переговоров. Увеличение цены на калийные удобрения в Китае в скором времени привело к увеличению мировых цен на этот продукт.

77.   В декабрьском докладе 2007 года, один из аналитиков отрасли дал следующее оценку этому эпизоду: «Спад производства в 2006 году на 23% за один год был главным образом вызван добровольным решением Уралкалия сократить уровень объёмов производства в результате задержек в переговорах с Китаем на несколько месяцев. Это была всеотраслевая проблема, как видно из сходного сокращения в производстве на 20% компанией Potash Corp. Это поведение помогло остановить падение в ценах, которое иначе произошло бы в результате неуступчивых переговоров с Китаем.

78.   Давая комментарий по поводу цен на калийные удобрения в 2006 году, российская брокерская фирма отметила «отсутствие внутренних причин для объяснения сокращения поставок производителями калийных удобрений» и то, что «одновременное уменьшение мощности производства компаниями в разных уголках мира скорее всего объясняется их общим желанием удерживать цены на существующем уровни ... (или даже их повысить)». Брокерская фирма также добавила, что у покупателей нет возможности заменить калийные удобрения на сходный продукт и нет возможности хранить калийные удобрения, чтобы избежать будущего повышения цен».

79.   Совместными усилиями Ответчики ограничили прозводство калийных удобрений в 2007 году, чтобы повысить рыночные цены на калийные удобрения. Примерно 25го октября 2007 года ОАО «Сильвинит» объявил, что может временно

прекратить поставки калийных удобрений из-за аварии или провала почвы вызванного наводнением одного из рудников.

80.     Через день после этого объявления, сделанного ОАО «Сильвинит», PCS, ОАО «Уралкалий», Agrium и БКК – все якобы предполагаемые конкуренты – объявили, что они тоже собираются прекратить продажу в связи с прекращением продаж Сильвинитом.  Объявление БКК о прекращении поставок было сделано ОАО «Уралкалий», конкурентом этой компании, заявившим, что «эти решения могут повлиять на рост цен, включая те рынки, где продаются калийные удобрения Уралкалия».

81.     Спустя приблизительно 12 дней, 6-го ноября 2007 года, Сильвинит объявил, что собирается возобновить поставки калийных удобрений, поскольку образовавшийся карьер не углубляется, как было изначально предположено. Опять-таки, через день после объявления Сильвинитом о возобновлении поставок, ОАО «Уралкалий» объявил, что БКК также возобновит поставки калийных удобрений после 12-ти дневного перерыва.   ОАО «Уралкалий» не дал никаких причин объясняющих эти действия;  тем не менее, представитель БКК ответил журналисту, что решение было сделано после «изучения рынка».

82.     7-го ноября 2007 года, PCS и Agrium также объявили о возобновлнеии поставок калийных удобрений.

83.     Вскоре после объявлений, о том что крупные представители калийных удобрений возобновили поставки, цены на калийные удобрения возросли до «рекордно высоких уровней в связи с опасениями о глобальной нехватке».

84.     Не прошло и года как Ответчики совместно приостановили поставку калийных удобрений из-за образовавшегося провала у родника Сильвинита, когда в мае 2008 года  ОАО «Сильвинит» обьявил, что ещё один из таких провалов угрожает поставке калийных удобрений, и спрогонозировал, что может быть необходимо приостановить производство на две или три недели.  Представитель

компании заявил, что «ситуация заставляет нас выжидать, но мы надеемся, что кризис будет предотваращён». Через две недели, компания объявила, что провал в почве стабилизировался и «ситуация не при каких обстоятельствах не ухудшится».

85.    Вскоре после объявления о возможности закрытия, цены на калийных удобрения опять значительно подскачили. 8-го июля 2008 года PCS объявил, что ожидается увеличение цен на калийные удобрения в Соединённых Штатах на $250 долларов за тонну, рост на 48% по сравнению с предыдущими ценами.

86.    В течение Искового Срока Жалобы Коллектива, производители калийных удобрений регулярно приписывали крутое повышение цен «превышению спроса над предложением», несмотря на неполный объём производства у ряда Ответчиков. Эти заявления использовались как предлог, чтобы отвлечь внимание от заговора Ответчиков по ограничению производства и искусственно зафиксировать цены на калийные удобрения.

87.    В течение Искового Срока Жалобы Коллектива в то время, как производители калийных удобрений высказывали своё сожаление об огранченном производстве, PCS периодически заявлял о том, что эта компания располагает неиспользованной мощностью для производства. Также, в декабре 2007 года во время презентанции инвесторам, ОАО «Уралкалий» заявил, что вполне в состоянии значительно расширить объём производства с наименьшими затратами по сравнению с их зарубежными партнёрами. Более того, Джим Прокопанко, исполнительный директор Mosaic, давая оценку рынка калийных удобрений в 2008 году, объяснил, что «соревнование в сельском хозяйстве отличается тем, что оно зависит от спроса, а не от *нехватки в поставках или предложении»*.

88.    В январе 2008 года, Mosaic опубликовал доклад под названием, «Почему Не Хватает Поставок Поташа», в котором компания объяснила, что «хотя все канадские производители увеличили мощность производства, некоторые из проектов не были запущены вовремя и другие не были задействованы согласно

Дело № 1:08-cv-05192          Документ 60          Подан 13/11/2008          стр. 24 из 38

плану». Доклад неаккуратно приписал проблему «производственным неполадкам» и повышенному спросу на мировом рынке.  На деле, сельскохозяйственные экономисты считают, что ссылки Ответчиков на объём производства, как истинную причину недавнего повышения цен, ошибочными, потому что, как отметил один из экономистов в статье опубликованной в статье Уолл Стрит в 2008 году, «в реальности нет проблемы с производством в настоящее время».

89.    Несмотря на утверждения о настоящем и будущем «превышении спроса над предложением»,  на основании данных 2007 г., Продовольственная и Сельскохозяйственная Организация ООН прогонозирует, что «глобальные поставки калийных удобрений будут обгонять глобальный спрос с излишками превышающими от 5.7 до 6.7 миллион тонн с годовым ростом в 3%» до 2012 года.

90.    В течение Искового Срока Жалобы Коллектива Ответчики совместно скоординировали ограничения поставок калийных удобрений для того, чтобы повысить цену по всему миру и в США.  В отсутствие соглашения между этими предполагаемыми конкурентами, данные ограничения шли бы во вред экономическим интересам отдельных производителей.

### H.    ОТВЕТЧИКИ УЧАСТВОВАЛИ В СГОВОРЕ О ЦЕНАХ НА КАЛИЙНЫЕ УДОБРЕНИЯ

91.    Истцы имеют основания утверждать, что для того, чтобы контролировать и поддерживать выгоду от калийных удобрений, Ответчики сговорились с целью поднять, установить, поддерживать, а также зафиксировать цены, по которым калийные удобрения поставляются в США на искусственно завышененных и антиконкурентных уровнях.

92.    Ответчики, являющиеся препологаемыми конкурентами на рынке калийных удобрений, публично демонстрировали свою готовность всеми способами избежать ценовой конкуренции.  Например, в 2006 году ОАО «Уралкалий» признал, что имеет целью «обеспечить успех стратегии

предпочитающей    цену-вместо-объёма»,    которая    будет    «способствовать
долгосрочной стабильности цен».

93.    Один из аналитиков отрасли в 2007 году подтвердил, что ОАО
«Уралкалий» «намерен преследовать ценовую стратегию, в соответствии с которой
предприятие периодически будет снижать уровень производительности, в
соответствии с ожидаемым снижением спроса».

94.    Дмитрий Рыболовлев, владелец большинства акций ОАО «Уралкалий»
и один из собсвтенников Сильвинита, публично признал в интервью в апреле 2006
года, что «приемлемый уровень цен является более важным, чем расширение
рыночной доли и производства».  Он добавил, что «мы не собираемся начинать
мировую войну в целях снижения цен . . .».

95.    Ответчики не раз признавались, что их совместные предприятия
способствуют стабильности цен на рынке калийных удобрений.  В презентации для
инвесторов, представители Уралкалия выского оценивали роль БКК как
«эффективного инструмента ценообразования» в калийной промышленности.
Руководитель БКК, отметив, что компания пригласила российского производителя
ОАО «Сильвинит» вступить в совместное предприятие, пояснил, что «нам не
хотелось бы конкурировать с российскими компаниями на рынке калийных
удобрений, вот почему мы предложили Сильвинит [возможность] присоединиться к
БКК на равных условиях со всеми».

96.    БКК подтвердил, что цель предлагаемой консолидации состоит в том,
чтобы расширить своё влияние и силу на мировом рынке. Как признался недавно
один из руководителей, «мы будем сильнейшей и наиболее мощной компанией,
которая будет в значительной степени устанавливать правила игры на мировом
рынке калийных удобрений, а это означает миллиарды долларов».

97.    Намерение БКК устанавливать «правила игры» включает в себя
сотрудничество   с   канадскими   производителями.   Согласно   презентации,

поготовленной ОАО «Уралкалий» для аналитиков этой компании «два основных экспортных объединения [Кэнпотекс и БКК] обеспечивают стабильность цен на рынке» калийных удобрений.

98.     Один из внешних аналитиков пришёл к тому же самому выводу, объяснив, что «БКК и Кэнпотекс имеют доминирующую роль в установлении ежегодных цен с крупными потребителями калийных удобрений, таких как Китай, Индия и Бразилия».

99.     В 2007 году после достижения значительного повышения цен на калийные удобрения, Владимир Николаенко, Генеральный Директор БКК, заявил, что «компания является не только эффективным исполнителем интересов её акционеров, но на самом деле является лидером по созданию приемлемых условий на мировом рынке цен для всех производителей калийных удобрений».

100.    Свидетельством сговора Ответчиков является необычное изменение цен на рынке калийных удобрений. На протяжении 90-ых годов промышленность калия характеризовалась стабильным ценообразованием, но в течение Искового Срока Жалобы Коллектива эта стабильность сменилась резкими взлётами цен на калийные удобрения до беспрецедентных уровней. Спотовые цены на калийные удобрения выросли экспотенциально за последние пять лет, с североамериканскими ценами на поташ, выросшими примерно на 60% в 2004-2005 годах, и, по сути, в два раза в 2007 и начале 2008 года. Такой рост цен не соизмерим с производственными издержками или другими затратами во время Искового Срока Жалобы Коллектива. Такое резкое повышение цен не соответствует и противоречит законам рыночных сил и экономическим тенденциям на этом рынке.

101.    Следующая диаграмма демонстрирует резкий скачок цен на калий во время Искового Срока Жалобы Коллектива, по сравнению с предыдущими ценами:

Дело № 1:08-cv-05192        Документ 60      Подан 13/11/2008        стр. 27 из 38



Source: Green Markets and Fertecon

102.    Ответчики знали, что их глобальный заговор непосредственно окажет влияние на цены на калийные удобрения существующие на мировых рынках и в Соединенных Штатах. В декабре 2007 года, представители ОАО «Уралкалий» в презентации для аналитиков изложили каждый шаг в цепи событий, вызвавших повышение цен во всем мире и в Соединённых Штатах: «[1] контрактные договоры на ключевых рынках задействовали значительные объёмы производства калийных удобрений . . . [2] что привело к повышенным конкуренции и спросу на спотовых рынках, а затем и к росту цен . . . [3] завершение контракта с Индией во время роста на спотовых рынках привело к тому, что ещё меньше объёма осталось в наличии . . . [4] бум на спотовом рынке продолжал стимулировать рост китайского скидки и дал дополнительные основания для ликвидации этой скидки в 2008 году».

103.    Из-за глобального характера калийного рынка, действия Ответчиков в других странах непосредственно влияют на калийный рынок в Соединённых Штатах.  Канада является крупнейшим производителем и экспортёром калийных удобрений в мире, на долю которой приходится почти треть общего объёма производства и 40 процентов объёма мировой торговли. Почти половина

Канадского калия экспортируется в Соединённые Штаты. Подавляющее большинство калийных продаж в Соединённых Штатах производятся PCS, Mosaic, Agrium и ББК по ценам, которые устанавливаются в соответствии с отметками, установленными Ответчиками на основе продаж в Индию, Китай и другие страны.

104. Глобальные цены устанавливают ориентир для отечественных калийных цен. По словам одного аналитика, «барьеры, которые существовали в прошлом между внутренними и международными ценами, теперь исчезли. Мы в настоящее время являемся участниками глобального рынка удобрений».

105. По данным министерства сельского хозяйства Соединённых Штатов рост цен на калийные удобрения намного превысил рост цен на семена (30%), скот (27%), и даже топливо (43%). Как недавно отметил один из аналитиков Goldman Sachs, производители калийных удобрений в состоянии просто поднять цены, как им это захочется».

106. Совместные усилия и заговор Ответчиков чрезвычайно выгодны для них. В результате резкого повышения цен несколько Ответчиков получили значительно выросший доход. Например, в первом квартале 2008 года показатели доходов PCS были в три раза раза выше показатей по сравнению с предыдущим годом. Доходы Mosaic за первый квартал 2008 года увеличились более чем в 10 раз по сравнению с предыдущим годом.

## VIII.    ПОСЛЕДСТВИЯ НАРУШЕНИЯ АНТИМОНОПОЛЬНОГО ЗАКОНОДАТЕЛЬСТВА ОТВЕТЧИКАМИ

107. Совместные действия и заговор Ответчиков привели к следующим последствиям, среди прочего:

     a.     ценовая конкуренция в продаже калийных удобрений Ответчиками и их заговорщиками была ограничена, подавлена и ликвидирована на всей территории Соединённых Штатов;

b.    цены на калийные удобрения были подняты, зафиксированны, и стабилизированы на искусственно высоком и антиконкурентном уровне на всей территории Соединённых Штатов; а также

c.    покупатели-потребители калийных удобрений от Ответчиков были лишены преимуществ свободной и открытой конкуренции на рынке калийных удобрений.

108.    Как   прямой   и   непосредственной   результат   незаконного   и противоправного  поведения  Ответчиков,  Истцы  и  другие  члены  Искогово Коллектива понесли убытки в их бизнесе и имущественном положении, потому что они были вынуждены платить больше за калийные удобрения, чем они бы платили, если бы Ответчики не были вовлечены в противоправное поведение.

## IX.    МОШЕННИЧЕСКАЯ ДЕЯТЕЛЬНОСТЬ

109.    На протяжении ряда лет, у Истцов не было прямого или косвенного доступа к данным, содержащим факты, лежащие в основе этого Иска.  У Истцов и членов Коллективного Иска не было оснований, при разумной осмотрительности, подозревать о существовании заговора, лежащего в основе этой жалобы, о котором они узнали только незадолго до подачи этого Иска. Ответчики участвовали в тайном сговоре и держали информацию, которая могла бы  дать Истцам или членам Искового Коллектива основания для расследования вопроса о том, существует ли заговор с целью зафиксировать цены на калийные удобрения, в строгом секрете.

110.    Поскольку соглашение и сговор Ответчиков содержался в тайне, Истцы или члены Искового Коллектива не были осведомлены о предполагаемом незаконном поведении Ответчиков и не подозревали, что они платят искусственно высокие цены на калийные удобрения.

111.    Действия Ответчиков, являющиеся основанием для этого Иска, в том числе и акты осуществлённые в целях заговора, были специально сокрыты Ответчиками и выполнены так, что их было трудно обнаружить.

112. По самой своей природе, заговор Ответчиков по установлению цен был изначально секретным.

113. Мошеннические действия и заговор, как утрреждается в этом Иске, были сокрыты Ответчиками посредством различных средств и методов, включая тайные встречи, секретные отношения между Ответчиками с использованием телесвязи или личных встреч на заседаниях торговых ассоциации (и в других местах) с тем чтобы избежать письменных докладов и любые другие ссылки о ценах конкурентов на бумаге, а также в сокрытии информации о ценах своих конкурентов от не-заговорщиков (в том числе потребителей).

114. Как утверждается выше, в 2003 году, после нескольких лет стабильных, а иногда и снижающихся цен, цены на калийные удобрения начали резко возрастать. Ответчики ложно приписывали рост цен на растущий спрос и ограниченность предложения. Это был предлог для прикрытия заговора. На самом деле, рост цен являлся результатом сговора между Ответчиками, который содержался в тайне в то время.

115. Истцы имеют основания полагать и утверждать, что предлагаемые объяснения Ответчиков о причинах роста цен на калийные удобрения являются ложными и сделаны с целью сокрытия плана Ответчиков по подрыву конкуренции, как утверждается в данном Иске.

116. В результате мошеннического сокрытия Ответчиками своего заговора, исковой срок давности считается приостановленным в отношении всех требований Истцов и других членов Искового Коллектива, возникших в результате антиконкурентного поведения Ответчиков, лежащего в основе этого Иска.

## X.     ЖАЛОБА О НАРУШЕНИИ ЗАКОНА 15 U.S.C. § 1

117. Истцы ссылаются на все выше-изложенные утверждения, как если бы они были в полной мере изложенны в этом разделе.

118.     Начиная по крайней мере с 1го июля 2003 года (точная дата неизвестна Истцам) Ответчики и их заговорщики начали координацию своей деятельности и вступили в заговор по неправомерному ограничению торговли и коммерческой деятельности в нарушение статьи № 1 Закона Шермана (15 U.S.C. § 1), целью которого было искусственное снижение или устранение конкуренции на рынке калийных удобрений в Соединённых Штатах.

119.     В частности, Ответчики вступили в заговор для того,чтобы повысить, установить, поддерживать и стабилизировать цены на калийные удобрения, импортируемые в Соединённые Штаты.

120.     В результате противоправного поведения Ответчиков, цены на калийные удобрения в США были подняты, зафиксированны, установлены и стабилизированы на высоком уровне.

121.     Заговор между Ответчиками осуществлялся через долгосрочные соглашения, негласное понимание и согласованные действия между Ответчиками и их заговорщиками.

122.     В целях разработки и осуществления заговора, Ответчики и заговорщики были совместно вовлечены в ряд действий, в том числе:

     a.    участие во встречах и совещаниях для обсуждения цен и объёма поставок калийных удобрений;

     b.    письменный и устный обмен информацей с целью установления цен;

     c.    соглашение по манипулированию ценами и объёмами калийных удобрений, поставляемых во всем мире и в Соединённых Штатах; распределение потребителей этих продуктов таким образом, чтобы лишить их прав на денежное вознаграждение, существующее в условиях свободной и открытой конкуренции;

     d.    публичные объявления о ценах в соответствии с достигнутыми соглашениями;

e.      продажа калийных удобрений потребителям Соединённых Штатах по монопольным ценам; и

f.      ложные заявления, сделанные для того чтобы отвлечь внимание от истинных причин для роста цен на калийные удобрения.

123.    В результате противоправного поведения Ответчиков, Истцы и другие члены Искового Коллектива понесли материальный ущерб в бизнесе и их имущественном положении, потому что они были вынуждены платить больше за калийные удобрения, чем они бы платили, если бы Ответчики не были вовлечены в противоправное поведение.

## XI.      УЩЕРБ

124.    В течение Искового Срока Жалобы Коллектива, Истцы и другие члены Искового Коллектива приобретали калийных удобрения непосредственно от Ответчиков или их дочерних предприятий, агентов и/или филиалов и, по причине нарушения антимонопольного законодательства, как утверждается в этом Иске, были вынуждены платить больше за калийные удобрения, чем они бы платили в отсутствие таких нарушений. В результате , Истцы и другие члены Искового Коллектива понесли материальный ущерб и убытки в бизнесе и их имущественном положении, точный размер которых будет определён в ходе судебного разбирательства.

## XII.      ЗАЯВЛЕНИЕ ДЛЯ ПОМОЩИ

На основании изложенного Истцы просят суд вынести решение в их пользу и в пользу всех членов Искового Коллектива, включая следующие положения:

A.      В процессуальном порядке этот Иск правильно принесён и должен рассматриваться как Коллективный Иск, с Истцами выступающими в роли назначенных представителей Коллектива и с адвокатами Истцов, выступающими в роле адвокатов для всего Коллектива;

B.   Отвечики объединили усилия в заговоре, который является нарушением Статьи № 1, Закона Шермана, (15 U.S.C. § 1); Истцы и члены Искового Коллектива понесли материальный ущерб и убытки в бизнесе и имущественном положении в результате неправомерных действий и нарушений антимонопольного законодательства Ответчиками;

C.   Истцы и члены Искового Коллектива имеют право на возмещение убытков, понесенных ими, как это предусмотрено федеральным антимонопольным законодательством, так что совместное судебное решение в пользу Истцов и членов Искового Коллектива может быть вынесено в отношении всех Ответчиков в трёхкратной сумме убытков Истцов, как полагается в соответствии с законом;

D.   Ответчики и их дочерние предприятия, филиалы, правопреемники, представители и соответствующие должностные лица, руководители, партнёры, агенты и сотрудники этих и всех других лиц, действующих или утверждающих, что действуют от имени Ответчиков, не имеют права в соответсвтии с этим судебным запретом продолжать и поддерживать их совместный сговор или соглашение как утвреждается в этом Иске, в том числе:

      (1)   продолжать, поддерживать или возобновлять соглашение, договоренность или заговор, как утвреждается в этом Иске, и принимать участие в любом другой сговоре или соглашении, имеющими аналогичные цели или последствия, а также от принятия любого другого плана, программы или договоренности с аналогичной целью или последствиями,

      (2)   сообщать, передавать или способствовать передаче информации любому другому лицу, занимающемуся производством, распределением и продажей калийных удобрений, включая информацию о ценах, клиентах, рынках и других условиях продажи этого продукта, за исключением такого обмена информацией, какой необходим в связи с добросовестным исполнением сделок по продаже между участниками таких сообщений.

E.      Истцы и члены Искового Коллектива имеют право на присуждение им до вынесения судебного решения и после вынесения судебного решения процентов, насчитанных на их вознаграждение по самой высокой ставке, дозволенной по закону с момента вручения этого Иска Ответчикам;

F.      Истцы и члены Искового Коллектива имеют право на возмещение всех расходов, потраченных в этом судебном процессе, включая разумные адвокатские гонорары, как это предусмотрено законом, а также

G.      Истцы и члены Искового Коллектива имеют право на иные меры, которые Суд может счесть справедливыми и надлежащими в этом деле.


## XIII.    ЗАПРОС НА СЛУШАНИЕ СУДОМ ПРИСЯЖНЫХ ЗАСЕДАТЕЛЕЙ

В соответствии со Статьёй 38(б), Федеральных Правил Гражданского Процессуального Производства США, Истцы требуют судебного разбирательства с участием присяжных заседателей в отношении всех претензий, заявленных в этом Иске.

///

///

Дело № 1:08-cv-05192   Документ 60   Подан 13/11/2008   стр. 35 из 38

/подпись / Стивен А. Харт
Стивен А. Харт Эсквайр (# 6211008)
СИГАЛ МККЭМБРИДЖ
СИНГЕР И МАХОНИ, ЛТД
233 Южная Уакер Драйв
Сирс-Тауэр Офис 5500
Чикаго, Иллинойс 60606
Телефон: (312) 645-7800
Факс: (312) 645-7711

Брюс Л. Саймон
Джонатан М. Уоткинс
ПИРСОН СИМОН СОТЕР
ВОРСОУ И ПЕННИ, ТОО
44 Монтгомери Стрит, Офис 1430
Сан-Франциско, Калифорния 94104
Телефон: (415) 433-9000
Факс: (415) 433-9008

П. Джон Брэйди
Даниэль D. Оуэн
ШУГХАРДТ ТОМСОН И КИЛРОЙ
ПиСи
Двенадцать Вайндотт Плаца
120 В. 12 улицы
Канзас-Сити, Миссури 64105
Телефон: (816) 421-3355
Факс: (816) 374-0509

/подпись / Джон Р. Малкинсон
Джон Р. Malkinson
MALKINSON И ХАЛПЕРН, ПиСи
223 В. Джексон Буливард, Офис 1010
Чикаго, IL 60606
Телефон: (312) 427-9600
Факс: (312) 427-9629

Бернард Перский
Холлис Л. Сальзман
Келли Лернер
Уильям В. Рейсс
ЛЭБЭТОН СУКАРОУ ТОО
140 Broadway

s/  Steven A. Hart
Steven A. Hart Esq. (#6211008)
SEGAL McCAMBRIDGE
SINGER & MAHONEY, LTD
233 South Wacker Drive
Sears Tower-Suite 5500
Chicago, Illinois 60606
Telephone: (312)645-7800
Facsimile: (312)645-7711

Bruce L. Simon
Jonathan M. Watkins
PEARSON SIMON SOTER
WARSHAW & PENNY, LLP
44 Montgomery Street, Suite 1430
San Francisco, California 94104
Telephone: (415) 433-9000
Facsimile: (415) 433-9008

P. John Brady
Daniel D. Owen
SHUGHART THOMSON & KILROY
P.C.
Twelve Wyandotte Plaza
120 W. 12th Street
Kansas City, MO 64105
Telephone:  (816) 421-3355
Facsimile:  (816) 374-0509

s/  John R. Malkinson
John R. Malkinson
MALKINSON & HALPERN, P.C.
223 W. Jackson Blvd., Suite 1010
Chicago, IL 60606
Telephone: (312) 427-9600
Facsimile: (312) 427-9629

Bernard Persky
Hollis L. Salzman
Kellie Lerner
William V. Reiss
LABATON SUCHAROW LLP
140 Broadway

35

Нью-Йорк, НЙ 10005
Телефон: (212) 907-0700
Факс: (212) 818-0477

Говард Седран
ЛЕВИН, ФИШБЕЙН, СЕДРАН И
БЕРМАН
510 Уоллнат Стрит, Suite 500
Филадельфия, штат Пенсильвания
19106-3697
Телефон: (215) 592-1500
Факс: (215) 592-4663

Ричард М. Волин
Л. Кендаль Саттерфилд
1050 30 Стрит, Н.В.
Вашингтон, ДиСи 2007
Телефон: (202) 337-8000
Факс: (202) 337-8090
Адвокаты Истцов

New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477

Howard Sedran
LEVIN, FISHBEIN, SEDRAN &
BERMAN
510 Walnut Street, Suite 500
Philadelphia , Pennsylvania 19106-3697
Telephone: (215)592-1500
Facsimile: (215)592-4663

Richard M. Volin
L. Kendall Satterfield
1050 30th Street, N.W.
Washington, D.C. 2007
Telephone: (202) 337-8000
Facsimile: (202) 337-8090

Адвокаты Истцов

Дело № 1:08-cv-05192     Документ 60     Подан 13/11/2008     стр. 37 из 38

## CERTIFICATE OF TRANSLATION

| | | |
|---|---|---|
| STATE OF ARIZONA | ) | |
| | ) | ss |
| COUNTY OF MARICOPA | ) | |

    I, Natalia A. Garrett, hereby certify that I am fluent in both languages, Russian and English, and fully competent to render the translation of legal documents from English into Russian. I have translated the foregoing Complaint filed in the United States District Court, Northern District of Illinois, Case No. 08-cv-5192, from English into Russian to the best of my skill and ability and certify that my translation is accurate and complete.

Date: 02/10/09       By: _____
                               Natalia A. Garrett, Esq.

    The foregoing instrument was subscribed and sworn to before me this 10th day of February, 2009, by Natalia A. Garrett.

By: _____
    Notary Public

> JOAN CARDILLO
> Notary Public - Arizona
> Maricopa County
> My Commission Expires
> June 30, 2012

## СЕРТИФИКАТ ПЕРЕВОДА

| | |
|---|---|
| ШТАТ АРИЗОНА | ) |
| | ) |
| ОКРУГ МАРИКОПА | ) |

    Я, Наталия А. Гарретт, настоящим подтверждаю, что я свободно владею обоими языками – русским и английским, и что я компетентна для перевода юридических документов с английского на русский. Я надлежащим образом перевела настоящее Исковое Заявление по делу номер 08-cv-5192, находящегося в Окружном суде США, Северном районе Штата Иллинойс с английского на русский и подтверждаю, что мой перевод является точным и завершенным.

Дата: 10 февраля 2009 г.      Подпись: _____
                                    Наталия А. Гарретт, Юрист

    Настоящий документ подписан Наталией Гарретт в моём присутствии и под присягой 10 февраля 2009, о чем свидетельствует моё нотариальное заверение.

Подпись и печать нотариуса

Дело № 1:08-cv-05192      Документ 60      Подан 13/11/2008      стр. 38 из 38

## CERTIFICATE OF ACCURACY OF TRANSLATION

STATE OF ARIZONA    )
                           )    ss
COUNTY OF MARICOPA  )

       I, Anna A. Sokolova, hereby certify that I am fluent in both languages, Russian and English, and fully competent to render the translation of legal documents from English into Russian. I have proofread and verified the translation of the foregoing Complaint filed in the United States District Court, Northern District of Illinois, Case No. 08-cv-5192, from English into Russian completed by Natalia A. Garrett, and hereby certify that the translation is true, accurate and complete.

Date: 02/10/09              By: _____
                                Anna A. Sokolova, Esq.

       The foregoing instrument was subscribed and sworn to before me this 10th day of February, 2009, by Anna A. Sokolova.

By: _____
      Notary Public

**JOAN CARDILLO**
**Notary Public - Arizona**
**Maricopa County**
**My Commission Expires**
**June 30, 2012**

## СЕРТИФИКАТ ТОЧНОСТИ ПЕРЕВОДА

ШТАТ АРИЗОНА        )
                     )
ОКРУГ МАРИКОПА    )

       Я, Анна А. Соколова, настоящим подтверждаю, что я свободно владею обоими языками – русским и английским, и что я компетентна для перевода юридических документов с английского на русский. Я надлежащим образом прочитала и проверила перевод Искового Заявления по делу номер 08-cv-5192, находящегося в Окружном суде США, Северном районе Штата Иллинойс с английского на русский сделанный Наталией А. Гарретт и подтверждаю, что её перевод является точным и завершённым.

Дата: 10 февраля 2009 г.        Подпись: _____
                                 Анна А. Соколова, Юрист

       Настоящий документ подписан Анной А. Соколовой в моём присутствии и под присягой 10 февраля 2009, о чем свидетельствует моё нотариальное заверение.

Подпись и печать нотариуса



LOCKRIDGE
GRINDAL
NAUEN
P . L . L . P .
Attorneys at Law

www.locklaw.com

| MINNEAPOLIS | WASHINGTON. D.C. |
|---|---|
| Suite 2200 | Suite 210 |
| 100 Washington Avenue South | 415 Second Street, N.E. |
| Minneapolis, MN 55401-2179 | Washington, DC 20002-4900 |
| T 612.339.6900 | T 202.544.9840 |
| F 612.339.0981 | F 202.544.9850 |

**W. Joseph Bruckner**
Phone: 612-339-6900
wjbruckner@locklaw.com
REPLY TO MINNEAPOLIS

May 27, 2009

**VIA ELECTRONIC MAIL** ipc@ipcmos.com
**VIA FACSIMILE 7-495-258-61-72/91**
**VIA FEDERAL EXPRESS INTERNATIONAL**

JSC International Potash Company
Office 64, 12 Pozharsky Lane
Moscow, 119034
Russia

      Re:    *In re Potash Antitrust Litigation (II)*
           Civil No. 1:08-cv-06910

Dear Sir or Madam:

    Pursuant to the Court's April 23, 2009 Order, a copy of which is attached, enclosed and served on you are Russian translations of the Summons and Direct Purchaser Plaintiffs' Consolidated Class Action Complaint and Amended Consolidated Class Action Complaint in the above-referenced matter.

    You are required by the United States Federal Rules of Civil Procedure to answer or otherwise respond to the later-filed Direct Purchaser Plaintiffs' Consolidated Class Action Complaint, which is the operative complaint currently on file with the Court, within twenty (20) days of receipt of service of this complaint.

    Please contact us, or have your legal counsel contact us, with any questions.

          Very truly yours,

          LOCKRIDGE GRINDAL NAUEN P.L.L.P.

          W. Joseph Bruckner

          PEARSON, SIMON, WARSHAW & PENNY, LLP

          Jonathan M. Watkins

Enclosures

403109.4

# UNITED STATES DISTRICT COURT
## FOR THE Northern District of Illinois – CM/ECF LIVE, Ver 3.2.2
### Eastern Division

Potash Antitrust Litigation (No. II), et al.

Plaintiff,

v.

Case No.: 1:08−cv−06910

Honorable Ruben Castillo

Agrium, Inc., et al.

Defendant.

# NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Thursday, April 23, 2009:

     MINUTE entry before the Honorable Ruben Castillo:Status hearing held on 4/23/2009 and continued to 9/2/2009 at 9:00 a.m. Motion hearing held on 4/23/2009. Motion of certain defendants to stay discovery [25] is granted. All discovery is stayed until further court order. Plaintiffs' motion to allow alternative service on defendants [40] is granted. Indirect Potash Purchasers' joinder to motion for alternative service on foreign defendants [52] is granted. Plaintiffs' motion to preserve and protect documents, data, and other tangible things [30] filed under case number 08 C 5192 is granted. Parties to submit the preservation order to chambers by 4/29/2009. Defendants' motions to dismiss are due on or before 6/15/2009. All plaintiffs to respond on or before 7/27/2009. Defendants' replies will be due on or before 8/17/2009. The Court will rule by mail.Mailed notice(rao, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at *www.ilnd.uscourts.gov*.

AO 440 (Rev. 05/00) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

## SUMMONS IN A CIVIL CASE

Gage's Fertilizer & Grain, Inc., and Kraft Chemical
Company, on behalf of themselves and others
similarly situated,

Plaintiffs,

V.

Agrium Inc., Agrium U.S. Inc., Mosaic Company, Mosaic Crop
Nutrition L.L.C., Potash Corporation of Saskatchewan Inc., PCS
Sales (USA), Inc., JSC Uraskali, RUE PA Belaruskali, RUE PA
Belarusian potash Company, BPC Chicago L.L.C., JSC Silvinit
and JSC International Potash Company.

Defendants.

MDL Docket No. 1996

CASE NUMBER: CASE NO. 08-cv-5192
(Consolidated with 08-cv-5635)

ASSIGNED JUDGE: Judge Castillo

DESIGNATED
MAGISTRATE JUDGE: Magistrate Judge Keys

TO: (Name and address of Defendant)

JSC IPC
IPC Representative in Minsk, Republic of Belarus
Office 12, 21 Yakova Kolasa Street
Minsk, 220013, Republic of Belarus

**YOU ARE HEREBY SUMMONED** and required to serve upon PLAINTIFF'S ATTORNEY (name and address)

Bruce L. Simon
Jonathan M. Watkins
PEARSON SIMON SOTER WARSHAW & PENNY, LLP
44 Montgomery Street, Suite 1430
San Francisco, California 94104

an answer to the complaint which is herewith served upon you, within _____ 20 _____ days after service of this
summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the
relief demanded in the complaint. You must also file your answer with the Clerk of this Court within a reasonable period of time
after service.

NOTE: When the print dialogue
box appears, be sure to uncheck
the Annotations option.

MICHAEL W. DOBBINS, CLERK

(By) DEPUTY CLERK

MAY 1 2 2009

DATE

AO 440 (Rev. 05/00) Summons in a Civil Action

# RETURN OF SERVICE

| Service of the Summons and complaint was made by me[1] | DATE |
|---|---|
| NAME OF SERVER *(PRINT)* | TITLE |

*Check one box below to indicate appropriate method of service*

G  Served personally upon the defendant.  Place where served: _____

_____

G  Left copies thereof at the defendant's dwelling house or usual place of abode with a person of suitable age and discretion then residing therein.

Name of person with whom the summons and complaint were left: _____

G  Returned unexecuted: _____

_____

_____

G  Other (specify): _____

_____

_____

## STATEMENT OF SERVICE FEES

| TRAVEL | SERVICES | TOTAL |
|---|---|---|

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Return of Service and Statement of Service Fees is true and correct.

Executed on _____        _____
                    Date                    *Signature of Server*

_____
*Address of Server*

(1) As to who may serve a summons see Rule 4 of the Federal Rules of Civil Procedure.

AO 440 (Rev. 05/00) Summons in a Civil Action

# UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS

## SUMMONS IN A CIVIL CASE

Gage's Fertilizer & Grain, Inc., and Kraft Chemical
Company, on behalf of themselves and others
similarly situated,

                Plaintiffs,

V.

Agrium Inc., Agrium U.S. Inc., Mosaic Company, Mosaic Crop
Nutrition L.L.C., Potash Corporation of Saskatchewan Inc., PCS
Sales (USA), Inc., JSC Uraskali, RUE PA Belaruskali, RUE PA
Belarusian potash Company, BPC Chicago L.L.C., JSC Silvinit
and JSC International Potash Company.

                Defendants.

MDL Docket No. 1996

CASE NUMBER: CASE NO. 08-cv-5192
(Consolidated with 08-cv-5635)

ASSIGNED JUDGE: Judge Castillo

DESIGNATED
MAGISTRATE JUDGE: Magistrate Judge Keys

TO: (Name and address of Defendant)

JSC IPC
IPC Representative in Minsk, Republic of Belarus
Office 12, 21 Yakova Kolasa Street
Minsk, 220013, Republic of Belarus

**YOU ARE HEREBY SUMMONED** and required to serve upon PLAINTIFF'S ATTORNEY (name and address)

    Bruce L. Simon
    Jonathan M. Watkins
    PEARSON SIMON SOTER WARSHAW & PENNY, LLP
    44 Montgomery Street, Suite 1430
    San Francisco, California 94104

an answer to the complaint which is herewith served upon you, within _____ 20 _____ days after service of this
summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the
relief demanded in the complaint. You must also file your answer with the Clerk of this Court within a reasonable period of time
after service.

        NOTE: When the print dialogue
        box appears, be sure to uncheck
        the Annotations option.

MICHAEL W. DOBBINS, CLERK

DAVID JOZWIAK

(By) DEPUTY CLERK

MAY 1 2 2009

DATE

AO 440 (Rev. 05/00) Summons in a Civil Action

## RETURN OF SERVICE

| | DATE |
|---|---|
| Service of the Summons and complaint was made by me [1] | |

| | TITLE |
|---|---|
| NAME OF SERVER *(PRINT)* | |

*Check one box below to indicate appropriate method of service*

G  Served personally upon the defendant.  Place where served: _____

_____

G  Left copies thereof at the defendant's dwelling house or usual place of abode with a person of suitable age and
discretion then residing therein.

Name of person with whom the summons and complaint were left: _____

G  Returned unexecuted: _____

_____

_____

G  Other (specify): _____

_____

_____

### STATEMENT OF SERVICE FEES

| TRAVEL | SERVICES | TOTAL |
|---|---|---|
| | | |

### DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information
contained in the Return of Service and Statement of Service Fees is true and correct.

Executed on _____        _____
                      Date                              *Signature of Server*

_____
                             *Address of Server*

(1) As to who may serve a summons see Rule 4 of the Federal Rules of Civil Procedure.

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| IN RE: POTASH ANTITRUST LITIGATION (II) | MDL Docket No. 1996 |
| | Civil No. 1:08-cv-6910 |
| THIS DOCUMENT APPLIES TO: | Judge Castillo |
| ALL DIRECT PURCHASERS' ACTIONS | Magistrate Judge Keys |
| | JURY TRIAL DEMANDED |

## DIRECT PURCHASER AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

## I.    INTRODUCTION

1.     Plaintiffs bring this action on behalf of themselves individually and on behalf of a plaintiff class (the "Class") consisting of all persons and entities who purchased potash in the United States directly from one or more named defendants between July 1, 2003 and the present (the "Class Period").  This complaint consolidates in this judicial district separate nationwide class actions brought by direct purchasers of potash, and seeks treble damages and injunctive relief, as well as attorneys' fees and costs, pursuant to the antitrust laws of the United States.

2.      Potash is a key agricultural fertilizer which farmers throughout the world use to help crops fight disease and to enhance crop yields.  Defendants are the leading suppliers of potash in the world and collectively generated well over $2 billion in gross revenue in 2007.  The potash industry is highly concentrated, with a handful of large manufacturers in the former Soviet Union and Canada controlling more than two-thirds of the world's potash supply.  The extraordinary cost of starting a potash mine, which defendants acknowledge is more than $2 billion, makes it virtually impossible for new competitors to enter the market.

401203.2

3.      During the 1990s, potash producers, particularly those located in the former Soviet Union, increased the supply of potash in world markets, resulting in substantial price declines and limiting the profits of producers around the world.  Plaintiffs are informed and believe, and thereon allege, that in order to maintain price stability and increase profitability, defendants sold millions of tons of potash in the United States and conspired and combined to fix, raise, maintain, and stabilize the price at which that potash was sold.  As part of and in furtherance of their conspiracy, defendants exchanged sensitive, non-public information about prices, capacity, sales volumes, and demand; allocated market shares, customers, and volumes to be sold; and coordinated on output, including the limitation of production.  Plaintiffs are informed and believe that defendants fraudulently concealed their anticompetitive conduct from plaintiffs and the Class in furtherance of the conspiracy.

4.      As a result of defendants' unlawful conduct, plaintiffs and the other members of the Class paid artificially inflated prices for potash during the Class Period.  Such prices exceeded the amount they would have paid if the price for potash had been determined by a competitive market.

5.      Plaintiffs and members of the Class bring this action to recover for the injury caused by defendants' conduct and seek injunctive relief, treble damages, costs of suit and reasonable attorneys' fees arising from defendants' violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

## II.      JURISDICTION AND VENUE

6.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337(a) and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

7.    Venue is proper in this District, pursuant to 15 U.S.C. §§ 15 and 22, and 28 U.S.C. § 1391(b) and (c), because at least one of the defendants resides in this District, is licensed to do business or is doing business in this District, and because a substantial portion of the affected interstate trade and commerce described below has been carried out in this District.

8.    This Court has personal jurisdiction over each defendant because, *inter alia*, each defendant: (a) transacted business throughout the United States, including in this District; (b) manufactured, sold, shipped, and/or delivered substantial quantities of potash throughout the United States, including this District; (c) had substantial contacts with the United States, including this District; and/or (d) engaged in an antitrust conspiracy that was directed at and had a direct, foreseeable and intended effect of causing injury to the business or property of persons residing in, located in, or doing business throughout the United States, including this District.

### III.    PARTIES

**A.    Plaintiffs**

9.    Plaintiff Gage's Fertilizer & Grain, Inc. is a Missouri corporation with its headquarters in Stanberry, Missouri.  It purchased potash directly from one or more defendants during the Class Period and suffered antitrust injury as a result of the violations alleged in this Complaint.

10.    Plaintiff Kraft Chemical Company is an Illinois corporation with its principal place of business in Melrose Park, Illinois.  It purchased potash directly from one or more of the defendants during the Class Period and suffered antitrust injury as a result of the violations alleged in this Complaint.

11.    Plaintiff Minn-Chem, Inc. is a Minnesota corporation with its principal place of business in Sanborn, Minnesota.  It purchased potash directly from one or more of the defendants

during the Class Period and suffered antitrust injury as a result of the violations alleged in this Complaint.

12.     Plaintiff Shannon D. Flinn is a resident of Milton, Florida. Flinn purchased potash directly from one or more of the defendants during the Class Period and suffered antitrust injury as a result of the violations alleged in this Complaint.

13.     Plaintiff Westside Forestry Services, Inc. d/b/a Signature Lawn Care is a Michigan corporation with its principal place of business in Novi, Michigan. It purchased potash directly from one or more of the defendants during the Class Period and suffered antitrust injury as a result of the violations alleged in this Complaint.

14.     Plaintiff Thomasville Feed & Seed, Inc. is an Alabama corporation with its principal place of business in Thomasville, Alabama. It purchased potash directly from one or more of the defendants during the Class Period and suffered antitrust injury as a result of the violations alleged in this Complaint.

**B.      Defendants**

**<u>Agrium</u>**

15.     Defendant Agrium Inc. is a Canadian corporation with its headquarters in Calgary, Alberta, Canada. In 2007, Agrium was the third largest Canadian potash producer with 2.1 million tons capacity and 1.7 million tons of production. During the Class Period, Agrium Inc. sold and distributed potash in the United States, directly or through its affiliates.

16.     Agrium U.S. Inc., a Colorado corporation, is a wholly owned subsidiary of Agrium Inc. with its headquarters in Denver, Colorado. During the Class Period, Agrium U.S. Inc. sold and distributed potash in the United States, directly or through its affiliates.

17.     Defendants Agrium Inc. and Agrium U.S. Inc. are collectively referred to herein as "Agrium."

**Mosaic**

18.     Defendant Mosaic Company is a Delaware corporation with its headquarters in Plymouth, Minnesota.   Mosaic Company was formed in January 2004 when Cargill, Incorporated purchased IMC Global Inc. and merged the business with its subsidiary, Cargill Crop Nutrition.   Mosaic is the world's second largest potash producer by capacity and sells approximately one-half its potash in North America, where it holds the leading market share in the potash industry.   During the Class Period, Mosaic Company sold and distributed potash in the United States, directly or through its affiliates.

19.     Defendant Mosaic Crop Nutrition L.L.C. is a Minnesota limited liability company with its headquarters in Riverview, Florida.   Mosaic Crop Nutrition L.L.C. is a wholly-owned operating subsidiary of Mosaic Company.   During the Class Period, Mosaic Crop Nutrition L.L.C. sold and distributed potash in the United States, directly or through its affiliates.

20.     Defendants Mosaic Company and Mosaic Crop Nutrition L.L.C. are collectively referred to herein as "Mosaic."

**PCS**

21.     Defendant Potash Corporation of Saskatchewan, Inc. ("Potash Corp.") is a Canadian corporation with its principal place of business in Saskatchewan, Canada.   Potash Corp. is the world's largest potash producer by capacity, with revenues from sales worldwide of $3.858 billion in 2008.   During the Class Period, Potash Corp. sold and distributed potash in the United States, directly or through its affiliates.

22.     Defendant PCS Sales (USA), Inc. ("PCS Sales") is a Delaware corporation with its headquarters in Northbrook, Illinois.  PCS Sales is a wholly owned subsidiary of defendant Potash Corp.  During the Class Period, PCS Sales sold and distributed potash in the United States, directly or through its affiliates.

23.     Defendants Potash Corp. and PCS Sales are collectively referred to herein as "PCS."

**Uralkali**

24.     Defendant JSC Uralkali ("Uralkali") is a Russian joint stock company with its headquarters in Moscow, Russia.  Uralkali is the fifth largest potash producer in the world, and in 2007 produced 5.1 million tons of potash, earning $887 million in sales.  As of April 2005, Uralkali owned a one-half interest in Belarusian Potash Company, a joint venture with defendant RUE PA Belaruskali, through which it markets, sells and distributes potash.  During the Class Period, Uralkali sold and distributed potash in the United States, directly or through its affiliates.

**Belaruskali**

25.     Defendant RUE PA Belaruskali ("Belaruskali") is a business entity organized under the laws of Belarus with its headquarters in Soligorsk, Republic of Belarus.  Belaruskali accounts for nearly 18% of the global fertilizer market.  Since April 2005, Belaruskali has owned a 50% interest in the Belarusian Potash Company, through which it markets, sells and distributes potash.  During the Class Period, Belaruskali sold and distributed potash in the United States, directly or through its affiliates.

**BPC**

26.     Defendant JSC Belarusian Potash Company ("Belarusian Potash Company") is a joint venture between Uralkali and Belaruskali with its headquarters in Minsk, Republic of

Belarus. Established in April 2005, Belarusian Potash Company is the exclusive worldwide distributor of potash produced by Uralkali and Belaruskali. In 2006, BPC accounted for approximately 34% of world potash export volume, and in 2008, sales in the United States accounted for 4% of BPC's total sales. During the Class Period, Belarusian Potash Company sold and distributed potash in the United States, directly or through its affiliates.

27. Defendant BPC Chicago L.L.C. is an Illinois limited liability company with its headquarters in Buffalo Grove, Illinois. Formed around 2007, BPC Chicago L.L.C. is a wholly-owned operating subsidiary of Belarusian Potash Company. During the Class Period, BPC Chicago L.L.C. sold and distributed potash in the United States, directly or through its affiliates.

28. Defendants Belarusian Potash Company and BPC Chicago L.L.C. are collectively referred to herein as "BPC."

**Silvinit**

29. Defendant JSC Silvinit ("Silvinit") is a Russian joint stock company with its headquarters in Solikamsk, Russia. In 2007, Silvinit controlled 12% of the world's export market and 7% of the world's capacity for potash. In 2008, Silvinit produced approximately 3.05 million tons of potash and exported 2.54 million tons. In 2006, Silvinit reported potash sales of $672 million. During the Class Period, Silvinit sold and distributed potash in the United States, directly or through its affiliates.

**IPC**

30. Defendant JSC International Potash Company ("IPC") is a Russian joint stock company with its headquarters in Moscow, Russia. IPC, the exclusive distributor of potash produced by Silvinit, accounts for approximately 14% of world potash export volume. During

the Class Period, IPC sold and distributed potash in the United States, directly or through its affiliates.

## IV.    AGENTS AND CO-CONSPIRATORS

31.    Canpotex Ltd. is a Canadian corporation with its headquarters in Singapore and offices in Hong Kong, Tokyo, Vancouver, and Saskatoon.  Canpotex is owned in equal shares by defendants PCS, Agrium and Mosaic, and acts as a unified sales, marketing and distribution company for these companies' potash supplies throughout the world, except in Canada and the United States.  During the Class Period, Canpotex participated in the violations alleged herein and has performed acts and made statements in furtherance thereof.

32.    Various entities not named as defendants have participated in the violations alleged herein and have performed acts and made statements in furtherance thereof.  Plaintiffs reserve the right to name some or all of these entities as defendants at a later date.

33.    The acts alleged herein that were done by each of the co-conspirators were fully authorized by each of those co-conspirators, or ordered, or done by duly authorized officers, agents, employees, or representatives of each co-conspirator while actively engaged in the management, direction, or control of its affairs.

34.    Defendants are also liable for acts done in furtherance of the alleged conspiracy by companies they acquired through mergers and acquisitions.

## V.    CLASS ACTION ALLEGATIONS

35.    Plaintiffs bring this action on behalf of themselves and as a class action pursuant to Federal Rules of Civil Procedure, Rule 23(a), (b)(2) and (b)(3), on behalf of the following class:

> All persons and entities who purchased potash in the United States
> directly from one or more defendants between July 1, 2003 and the

present. Excluded from the Class are defendants, their parent companies, subsidiaries and affiliates, all governmental entities, and any judges or justices assigned to hear any aspect of this action.

36.     Plaintiffs do not know the exact number of class members because such information is in the exclusive control of defendants. Plaintiffs believe that due to the nature of the trade and commerce involved there are most likely thousands of class members geographically dispersed throughout the United States, such that joinder of all class members is impracticable.

37.     Plaintiffs are members of the Class. Plaintiffs' claims are typical of the claims of the Class in that plaintiffs are direct purchasers of potash, plaintiffs and all Class members were damaged by the same wrongful conduct of defendants and their co-conspirators as alleged herein, and the relief sought is common to the class.

38.     Numerous questions of law or fact common to the class arise from defendants' anticompetitive, including but not limited to:

a.     whether defendants combined or conspired to fix, raise, maintain, or stabilize prices of potash sold in the United States;

b.     whether defendants combined or conspired to restrict output of potash sold in the United States;

c.     whether defendants shared non-public information, allocated markets and customers, restricted output of potash sold in the United States, and committed other conduct in furtherance of the alleged conspiracy;

d.     whether defendants' conduct caused the prices of potash sold in the United States to be at artificially high and noncompetitive levels;

> e.    whether plaintiffs and the other members of the Class were injured by defendants' conduct, and, if so, the appropriate class-wide measure of damages for Class members; and
>
> f.    whether plaintiffs and the other members of the Class are entitled to, among other things, injunctive relief and, if so, the nature and extent of such injunctive relief.

39.    These and other questions of law and fact are common to the Class, and predominate over any questions affecting only individual Class members, including legal and factual issues relating to liability and damages.

40.    Plaintiffs will fairly and adequately represent the interests of the Class in that plaintiffs are direct purchasers of potash and have no conflict with any other members of the Class.   Furthermore, plaintiffs have retained competent counsel experienced in antitrust, class action, and other complex litigation.

41.    Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

42.    This class action is superior to the alternatives, if any, for the fair and efficient adjudication of this controversy.   Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, effectively, and without the duplication of effort and expense that numerous individual actions would engender.   Prosecution as a class action will eliminate the possibility of repetitive litigation.   Class treatment will also permit the adjudication of relatively small claims by class members who otherwise could not afford to litigate an antitrust claim such as is asserted herein. There will be no material difficulty in the management of this action as a class action.

43.     The Class is readily definable and is one for which records likely exist in the files of defendants and their co-conspirators.

44.     The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for defendants.

## VI.     TRADE AND COMMERCE

45.     During the Class Period, each defendant, directly or through its subsidiaries or other affiliates, sold potash in the United States in a continuous and uninterrupted flow of interstate commerce and foreign commerce, including through and into this judicial district.

46.     During the Class Period, defendants collectively controlled a majority of the market for potash, both globally and in the United States.

47.     Defendants' business activities substantially affected interstate trade and commerce in the United States and caused antitrust injury in the United States.

## VII.     FACTUAL ALLEGATIONS

### A.     The Potash Industry

48.     Potash refers to mineral and chemical salts that contain potassium.  Potash is mined from naturally occurring ore deposits that were formed when seas and oceans evaporated, many of which are now covered with several thousand feet of earth.  It is principally used as an agricultural fertilizer because it is a source of soluble potassium, which is one of three primary nutrients required for plant growth and maturation.  Farmers throughout the world use large amounts of potash to help crops fight disease and to enhance crop yields.  Other commercial uses of potash include industrial applications in metal plating, and production of glass, ceramics,

soaps, and animal feed supplements. There is no cost-effective substitute for potash as an agricultural fertilizer.

49.     Fertilizers, including potash, are critical inputs in crop production. Restrictions in the supply of potash, like those described herein, may result in lower crop yields and ultimately to higher prices for food commodities, particularly for those crops that require significant quantities of potash.

50.     Potash reserves are confined to relatively few areas throughout the world. While over 150 countries consume potash, mostly as fertilizer, there are only 15 countries that produce notable quantities of it. Belarus, Canada, Germany, Israel, Jordan and Russia have about 90% of the global potash supply within their borders. Over half of the world's global capacity is located in just two regions -- Canada and the former Soviet Union (specifically Russia and Belarus). The largest deposits are in Saskatchewan, Canada. More than 50% of Saskatchewan's potash sales are exported to offshore markets.

51.     The United States and China are the largest consumers of potash. In 2008, the United States consumed approximately 6.2 million tons of potash, 5.3 million of which was imported from outside the United States. North America accounts for 17.1% of the world's potash consumption. In 2007, 344,000 tons of potash produced in Russia were exported into the United States.

52.     Canada is the world's largest producer and exporter of potash, accounting for nearly a third of total production and 40% of world trade. Nearly half of Canada's exports go to the United States, and that accounts for roughly 70% of the yearly consumption of potash in the United States. The vast majority of potash sales in the United States are made by PCS, Mosaic,

Agrium and BPC, at prices that are set according to benchmarks established by defendants based on sales to buyers in China, India, Brazil and elsewhere.

53.     Potash is a homogenous commodity product.  Potash supplied by one producer is interchangeable with potash supplied by other producers.  As a result, buyers make purchase decisions based largely, if not entirely, on price.

54.     Because the cost of potash is a relatively small part of total crop production costs, and there are no ready substitutes for the product, demand for potash is inelastic.  In the United States, a $100 per ton increase in the price of potash adds only $0.03 to the production cost of a bushel of corn.  Thus, as potash prices increase, buyers tend to purchase at the higher price, rather than decrease the amount of their purchases, making a supply restriction cartel attractive to producers.

55.     The majority of production costs for potash producers are variable.  All other factors being equal, when variable costs are a high percentage of production costs, there is less incentive for a producer to operate its facilities at full capacity, and this may allow a cartel to boost prices artificially with greater success than when fixed costs are the largest component of production costs.

56.     The potash industry has very high barriers to entry.  A single new mine requires approximately $2.5 billion or more in upfront costs, five to seven years of development time, and additional outlays for associated roads and other infrastructure.  Such barriers are conducive to a conspiracy because they protect existing suppliers from competition and perpetuate the high market concentration.

**B.     High Market Concentration in the Potash Industry**

57.     The potash industry is dominated by relatively few companies that market, sell and distribute potash throughout the world and within the United States.  As of 2008, three producers with mines located in Canada (PCS, Mosaic and Agrium), and three former Soviet Union producers (Uralkali, Belaruskali and Silvinit), accounted for approximately 71% of the potash market.  The market share of these entities has not changed in any material way during the Class Period.

58.     Indeed, one analyst has observed that "the global trade in potash is even more concentrated than OPEC for oil."  Another industry analyst referred to the small group of producers as the "Organization of Potash Exporting Countries."

59.     Wayne Brownlee, defendant PCS's CFO, has stated:  "The best thing about the potash business is it's an oligopoly; there are not a lot of producers....  There's not a lot of competition out there and there's not a lot of government involvement."

60.     Prior to and during the Class Period, there has been a significant degree of consolidation within the potash industry.

61.     Beginning in 2003, PCS began acquiring substantial interests in a variety of smaller potash producers throughout the world.  In October 2003, PCS announced that it had acquired a 26% interest in Arab Potash Company ("APC"), which had 2 million tons of potash capacity.  As the second largest shareholder in APC, PCS had the right to nominate key financial, production and marketing personnel to APC's management and nominated four key personnel to operate APC, including the general manager of the company.

62. In December 2004, PCS acquired approximately 25% of the total shares of Sociedad Quimica y Minera de Chile ("SQM"), a potash supplier in Chile, which supplies about 1 million tons of potash per year.

63. PCS also held a 9% interest in Israel Chemicals Ltd ("ICL"), a company that during the Class Period accounted for approximately 11% of the world's potash production.

64. Around February 2004, IMC Global Inc. and Cargill International announced an agreement to combine IMC Global Inc. and Cargill Crop Nutrition to create defendant Mosaic.

65. In March 2004, Mississippi Chemical Company announced the sale of its two potash subsidiaries (Mississippi Potash Inc. and Eddy Potash Inc.) to Intrepid Mining L.L.C., which combined the two companies to create Intrepid Potash Inc., the largest potash producer in the United States. Since 2005, PCS has been the exclusive overseas marketer for Intrepid Potash Inc.

66. This significant level of consolidation facilitated defendants' ability to implement the conspiracy.

## C. High Level of Cooperation in the Potash Industry

67. The potash industry is marked by a high degree of cooperation among supposed competitors. As noted above, the major potash suppliers have joint ventures or overlapping ownership interests that involve competitors in the potash market. In addition to these formal business relationships, defendants have fostered a striking degree of cooperation through reciprocal visits to their production facilities, participation in trade associations and attendance at industry conferences.

68. PCS, Agrium and Mosaic are equal shareholders in Canpotex. Each company has an equal voting interest in Canpotex as a shareholder through its nominees on the board of

directors of Canpotex, and each company has agreed that it will not independently make offshore sales (with the exception of sales into the United States).

69.     Canpotex potash sales are allocated among the producers based on the production capacity of each shareholder.  If a shareholder cannot satisfy demand for potash by Canpotex, the remaining shareholders are entitled to satisfy that demand pro rata based on their allotted production capacity.  In 2007, PCS supplied 55% of Canpotex's requirements, Mosaic supplied 37.5% and Agrium supplied the balance.  Through participation in Canpotex, PCS, Agrium and Mosaic have access to each other's sensitive information about production capacity and pricing.

70.     Canpotex was initially formed to coordinate sales of potash produced in Canada, but it has entered into cooperative marketing agreements with producers from the former Soviet Union.  For example, in January 2000 Canpotex agreed to form a joint marketing agreement with Uralkali.  Under that agreement, Canpotex agreed to market Uralkali potash outside North America and Europe beginning in 2001.  Similarly, Canpotex and IPC participated at least through 2003 in a joint venture in Malaysia named "Bulk Logistics" for joint marketing purposes to notify its purchasers of price increases.

71.     Producers from the former Soviet Union, like their Canadian counterparts, have consolidated sales and marketing of their potash supplies with a single entity, BPC.  Formed in 2005 as a joint venture between Uralkali and Belaruskali, BPC jointly markets and sells these defendants' potash throughout the world, including in the United States.  With the combined potash supplies of Uralkali and Belaruskali, BPC supplies 34% of the world's exports of potash.

72.     Silvinit, which supplies potash through the International Potash Company, is aligned with the other producers of potash in the former Soviet Union.  Silvinit and Uralkali share common ownership by Dmitry Rybolovlev, who owns at least 66% of the stock of Uralkali

and about 20% of the voting shares of Silvinit.  Silvinit has been in active negotiations to join BPC, raising the prospect of further consolidation of the potash industry.

73.     Rybolovlev has acknowledged the true anticompetitive motive underlying these joint ventures, explaining that, "joint operation allows [potash producers] to avoid needless competition."

74.     According to news reports, representatives of the defendant companies have routinely held meetings during the Class Period as part of an "exchange program of mutual visits."  The exchange of visits, according to defendants' representatives, "promote[d] the discussion of current issues affecting the potash industry and the sharing of experience."

75.     During one such visit, on October 11, 2005, senior executives of defendants visited Uralkali in the former Soviet Union and discussed, among other things, what could be deemed highly sensitive production plans of at least one of the world's largest potash suppliers. This meeting was attended by William Doyle, President and CEO of Potash Corp.; Michael Wilson, President and CEO of Canpotex; James T. Thompson, Executive Vice President of the Mosaic Company; Vladislov Baumgertner, General Director, President and CEO of Uralkali; as well as other representatives of Belaruskali and Silvinit.

76.     In July 2006, as part of the same "exchange program," a delegation of Uralkali management visited Mosaic Company in Canada.  Mosaic's Executive Vice President, James Thompson, participated in the visit with the companies from the former Soviet Union.  During the visit, the delegation learned about Mosaic's management structure and toured potash mining operations of the company, including its most up to date mining technologies.  The Uralkali visitors noted the "friendly attitude of the hosts" and exclaimed "[w]e were shown everything we wanted to see."

77.     Petr Kondrashev, Director General of Silvinit, acknowledged in a 2005 interview published in <u>The Chemical Journal</u>, which covers the potash industry, that the company has "old and friendly connections with potassium manufacturers from Belarus and [that] we still are pretty good partners." He added that representatives of Silvinit and Belaruskali often visit each other.

78.     Defendants have conducted numerous such visits during the Class Period, and these visits have provided opportunities to conspire and exchange highly sensitive competitive information. In the absence of collusion among these supposed competitors, it would have been contrary to the independent economic interest of each to allow its competitors access to such sensitive competitive information.

79.     Defendants' high level of cooperation and their involvement in long-standing joint ventures has given these supposed competitors continuous opportunities to discuss pricing, capacity utilization, and other important prospective market information. The mutually beneficial nature of the business relations among defendants not only provided the opportunity to conspire, but it also created a financial incentive to do so.

**D.     Use of Trade Associations and Trade Events To Facilitate the Conspiracy**

80.     Plaintiffs are informed and believe, and thereon allege, that defendants' collusive activities have been furthered by trade associations and trade events that provided opportunities to conspire and share information.

81.     Defendants are all members of the International Fertilizer Industry Association ("IFIA"), which sponsors annual conferences that are attended by senior officials of the defendants. Defendants regularly used IFIA conferences as a venue to negotiate prices for the sale of potash to their customers around the world.

82.     In May 2007, representatives of PCS, Mosaic, Agrium, Belaruskali, Canpotex, BPC and others attended the 75th annual IFIA conference in Istanbul, Turkey.  At the IFIA meetings, representatives of the manufacturers conferred about the potash market and "market tendencies."   Significantly, during this May 2007 IFIA conference, the major potash manufacturers announced an additional price increase on their potash products.

83.     In addition to the IFIA, defendants are members of the Fertilizer Institute ("TFI"), and have regularly used TFI conferences as a venue to negotiate prices for sales of potash to customers around the world.

84.     During a TFI conference in 2003 in Boston, Massachusetts, Canpotex conducted negotiations with its customers for sales of potash during the second of half of that year.  During a TFI conference in 2004, IPC met with Chinese customers to negotiate prices for potash sales in China.

85.     TFI, together with the Fertilizer Industry Round Table, sponsors an annual conference titled the "Fertilizer Outlook and Technology Conference."  The conference is geared towards industry members, financial analysts, business consultants, trade press representatives and government economists.

86.     At the Fertilizer Outlook and Technology Conference held in Arlington, Virginia on November 6-8, 2006, Michael R. Rahm, Mosaic Company Vice President, Market & Economic Analysis, presented an analysis of the potash industry.  Representatives of at least one other defendant attended the same conference.

**E.      Defendants' Coordinated Reductions in Manufacturing Capacity**

87.     Defendants implemented their conspiracy, at least in part, through coordinated restrictions in potash output, which resulted in higher prices in the potash market.  In the absence

of an agreement among these supposed competitors, these restrictions would have been contrary to the independent economic interests of the individual producers.

88.     For example, as global demand for potash declined in the second half of 2005, defendants jointly restricted output of potash for the purpose of fixing, maintaining and stabilizing the prices at which potash was sold.  PCS announced in November 2005 that it would shut down two of its mines from December 11, 2005 to January 7, 2006 for inventory control purposes, removing approximately 250,000 to 300,000 tons of potash from the market.  PCS also announced on December 22, 2005 that it was shutting its Rocanville mine in January and early February 2006.  These shutdowns resulted in the removal of 1.34 million tons of potash from the market.

89.     At the same time, Mosaic announced temporary output cuts at several of its North American locations that were set to occur in November and December 2005.  Mosaic's shutdowns resulted in the removal of 200,000 tons of potash from the market.

90.     Defendants agreed to joint cutbacks in sales to international customers as well.  In Brazil, where demand for potash dropped by 20.9% during 2005, defendants from Canada and from the former Soviet Union agreed to nearly identical pro-rata cuts in their exports to that country.  Producers from the former Soviet Union cut their combined exports to Brazil by 20.9%, and the producers from Canada cut their combined exports by almost exactly the same percentage.

91.     Defendants' joint reductions continued into 2006.  During the first quarter of 2006, PCS took 32 mine shutdown weeks in response to the reduced demand, which cut its production for the quarter to 1.3 million tons compared to 2.4 million tons in the first quarter of the prior year.

92.  Around January 2006 the two partners in BPC also announced measures to adjust supply.  Uralkali immediately shut down its potash production, removing approximately 200,000 tons of production.  Belaruskali immediately cut exports by 50 percent, removing approximately 250,000 tons of potash from the market.  Finally, IPC announced that Silvinit would shut down its mines as well, removing approximately 100,000 tons in the second quarter of 2006.

93.  As a group, the defendants in the former Soviet Union removed approximately 500,000 tons of potash from the market in April 2006 alone.  Other suppliers applauded the "discipline" of the producers from the former Soviet Union, noting that many years earlier when demand for potash declined those same producers had sought to maintain volume over price and flooded the market with excess supply.

94.  Throughout 2006, during difficult negotiations over potash prices, Canpotex and BPC (and their members) jointly restricted supply in an effort to compel Chinese buyers (the largest consumers in the world) to accept a price increase that would eliminate their "discount" and set a benchmark for other buyers around the world.  The Chairman of Uralkali explained the action as follows: "here the point is not to supply [potash] to them with USD 30-40 discount, as earlier, but to adjust the prices to the level of the neighbor Asian consumers.  Therefore we will never ship anything there, until we get a contract reasonable from our point of view."

95.  Consistent with their efforts to eliminate the Chinese discount and increase prices to purchasers in China, the leading suppliers of potash around the world jointly limited the supply of potash to Chinese consumers.  Uralkali reduced its utilization rate during the first half of 2006 to 68% and PCS reduced its utilization to less than 60%.  Through this limitation of production, Uralkali and PCS reduced their sales of potash by 23% and 20%, respectively, from the prior year, and this behavior served to eliminate the "discount" to China that existed prior to

the negotiations. Defendants' actions led to a price increase for potash sales in China and, shortly thereafter, as defendants intended, for sales throughout the world, including the United States.

96.     In a December 2007 report, an industry analyst explained the episode as follows: "The decline in 2006 production (-23% Y/Y) was mostly caused by the voluntary decision of Uralkali to reduce operating rates as price negotiations with China were delayed by several months. This was an industry-wide issue, as evidenced by Potash Corp.'s similar 20% decline in production. This behavior served to limit the decline in prices that China's hard line negotiations would have theoretically caused."

97.     Commenting on potash pricing in 2006, a Russian securities brokerage found "no fundamental factors to explain [the] decline of supply by potash producers" and viewed "simultaneous reduction of production capacities by companies in different parts of the world as motivated by their common wish to hold prices at the current high level . . . (or even to push prices higher)." The brokerage added that "consumers have no alternatives to potash or means to store it as a guard against future higher prices."

98.      Defendants again jointly restricted supply in 2007 in order to impose price increases in the potash market. Around October 25, 2007, Silvinit announced that it might have to suspend shipments of potash from one of its mines due to the presence of a sinkhole caused by mine flooding.

99.     Within a day of Silvinit's announcement, PCS, Uralkali, Agrium and BPC, all purportedly competitors, announced that they too would suspend sales of their own potash because of the suspension of sales by Silvinit. Announcement of PCS's suspension of sales was

made by its supposed competitor, Uralkali, which declared that "these decisions could have an upward impact on potash prices, including in those markets where Uralkali's potash is sold."

100.    At the International Fertilizer Industry Association in Vancouver, Canada, in late October 2007, in response to a question about the Silvinit mine shutdown's impact, PCS's President and CEO Doyle replied, "In terms of guessing where the price could go, I'd just say hold on to your hat because it would have a major impact on pricing."

101.    Approximately 12 days after the initial announcement concerning the shutdown, on November 6, 2007, Silvinit announced that it would resume sales of potash, declaring that the sinkhole was advancing more slowly than had previously been feared.  Within a day after Silvinit announced the resumption of its potash sales, Uralkali announced that BPC would also resume sales of Uralkali potash after the 12-day stoppage.  Uralkali refused to explain the reason for resuming sales; however, a BPC official told a reporter the decision had been made "after studying the market."  On November 7, 2007, PCS and Agrium announced that they too would resume potash sales.

102.    Shortly after these announcements that the major suppliers of potash were resuming sales, potash prices increased to "record highs on fears of a global shortage."

103.    The joint suspension of sales by PCS, Uralkali, Agrium and BPC during the shutdown by Silvinit, a supposed competitor, makes no economic sense absent a cartel.  Had the market truly been competitive, defendants would have the incentive to *increase*, not suspend, production to take advantage of their competitor's reduced output and thus gain market share.

104.    Less than a year after the defendants jointly suspended potash sales because of the sinkhole discovered near the Silvinit mine, Silvinit disclosed in May 2008 that another expanding sinkhole threatened its supply of potash and suggested that it might shut down

production for two or three weeks.  A spokesman for the company stated that "the situation is keeping us in suspense, but we are sure a crisis can be averted."  Within two weeks, the company announced that the sinkhole had stopped growing and "the situation can in no way get worse."

105.    Nevertheless, shortly after the disclosure of the threatened shutdown, prices for potash increased dramatically.  On July 8, 2008, PCS announced that prices of potash to the United States would increase by $250 per ton, an increase of 48 percent over the previous price.

106.    Shortly thereafter, Canpotex announced a spot price of $1,000 per ton, effective in the fourth quarter of 2008, and BPC contracted to supply 30,000 tons of potash to U.S. buyers at $1,000 per ton, with shipments starting in August 2008.

107.    On November 1, 2008, with prices for potash pushing above $1,000 per ton, Uralkali announced that it would cut potash production, supposedly due to the current decrease in potash fertilizers purchased in the global market.  In December 2008, PCS and Agrium also announced production cutbacks.  Specifically, PCS cut its potash production by two million tons for the first quarter of 2009, representing about 15% of projected 2009 capacity.  Agrium announced that it would cut production in its North American plants because of what it described as a significant build in its inventories.  An analyst noted that PCS and Agrium's production cutbacks were "an attempt to support pricing and demonstrate discipline."

108.    In December 2008, as potash prices soared over $1,000 per ton, PCS's CFO Brownlee complimented the Belarusian defendants on their "tremendous discipline . . . in terms of managing supply in the marketplace."  On another occasion that same month, Brownlee commented on why potash prices had not fallen as other fertilizer prices had:  "[A] big part of the story that is here is that you're just seeing a lot of good discipline by all the producers right now in the marketplace, whether they're cutting back production or building some inventory."

## F.    Defendants' Pricing Behavior

109.    In addition to the output and supply restrictions noted above, defendants conspired to coordinate potash prices and price increases so as to fix, raise, maintain, and stabilize the price at which potash was sold in the United States at artificially inflated and anticompetitive levels.

110.    Defendants' collusion is evidenced by unusual price movements in the potash market.   Throughout the 1990s the potash industry was characterized by stable pricing, but during the Class Period this stability gave way to a remarkable run-up in potash prices to unprecedented levels.

111.    Defendants negotiate term contracts for purchases of potash throughout the world. Agreements with buyers in Brazil, India and China typically are made first, and the prices established in those markets directly influence prices in other major markets.   Once defendants establish these prices, they use them to determine potash prices in other major markets, including the United States.   The prices for cartelized term contracts become benchmarks for spot market sales, which typically are higher than those of term contracts.

112.    Defendants knew and intended that their global conspiracy would directly affect prices of potash in the United States, as well as in world markets generally.   The prices that defendants established for sales to buyers abroad directly affected the prices that United States potash purchasers had to pay.   During the Class Period, defendants have instituted a number of price increases resulting in an unprecedented rise in potash prices.

113.    The following chart illustrates how potash prices during the Class Period have dramatically deviated from historical patterns:

Figure 1



114.    The potash prices that *Green Markets* charts, as reflected in Figure 1, are considered benchmark prices in the industry: Saskatchewan and Carlsbad because they are producer mines; Vancouver because it is the hub for large volume contract prices to the export market; the Midwest and the Western US because there are ample storage facilities in these regions to support local agriculture.

115.    All prices are expressed in dollar per US ton.  The Vancouver price is a long-term contract price negotiated periodically between producers and export buyers, often for quantities of 1 million tons or more.  The Midwest, Carlsbad and Saskatchewan prices are spot prices and the Western U.S. prices are delivered prices.

116.     As the chart above illustrates, after a period of extended stability in the potash market, beginning in 2003 defendants began a series of parallel price increases that dramatically increased the price of potash during the Class Period.

117.     In early 2003, IPC announced that it would increase its potash prices by eight dollars per ton.  Within a month Canpotex announced that it would seek a nearly identical price increase for its sales in Brazil.  By mid-2003 all suppliers to Brazil were announcing that they had achieved an increase of eight dollars per ton.

118.     Also in March 2003 IMC Global Inc. (the predecessor to Mosaic) announced a price increase of the same amount for its sales in the United States, thereby increasing the price of its standard red MOP (fob mine Saskatchewan) from $81 to $89 per ton and other products by a corresponding amount.  PCS also disclosed that it would seek an increase of eight dollars per ton.

119.     An industry analyst observed at that time that suppliers were becoming more vocal in their determination to raise prices in most markets and that they were also successful in doing so.  Notably, the same analyst observed that production cutbacks had been used by producers, especially those in Canada, to keep supplies "under control."

120.     After successfully imposing a price increase on the market, defendants began another round of increases beginning in January 2004.  Canpotex announced the initial price increase to buyers in Brazil, and IPC announced a price increase to buyers in India.  Shortly after these announcements, PCS announced two five dollar per ton increases within a five week period.  IMC Global Inc. also announced two separate increases of five dollars per ton.  By February 2004 both PCS and IMC Global Inc. had set prices for standard and granular MOP at $108 and $110 per ton (fob mine Saskatchewan) for their United States customers.

121. By May 2004, defendants again imposed a round of lockstep price increases. Initially, Canpotex announced a $20 per ton price increase to certain customers. Shortly thereafter, the two major suppliers to the United States – PCS and IMC Global Inc. – announced an increase of five dollars per ton (effective immediately) that was to be followed by another increase of $15 per ton beginning in July 2004. Thus, by May 2004, PCS and IMC Global Inc. set prices for standard and granular MOP (fob mine Saskatchewan) of $113 and $118 per ton, respectively. Defendants' prices were scheduled to increase to $128 and $133 per ton for standard and granular MOP (fob mine Saskatchewan) on July 19, 2004.

122. By late 2004, defendants began to impose additional price increases. In September 2004 IMC Global Inc. led with a $10 per ton price increase and PCS soon followed with its own increase in the same amount.

123. Defendants continued to raise prices to customers around the world. At a TFI conference in September 2004, IPC announced in meetings with its customers from China that it was seeking from them an increase of about $40 per ton. Canadian suppliers announced that they would seek a similar price increase but that serious talks about the prices would not occur until mid-October at the earliest so that importers from China would have an opportunity to raise prices in their domestic market.

124. On November 5, 2004, IPC confirmed that it had negotiated a price increase of $40 and $43 per metric ton for red and white standard MOP, respectively, to certain customers in China. PCS and Mosaic (previously IMC Global Inc.) announced that on the same date Canpotex had entered into an agreement to sell potash to certain Chinese customers at the same price. Within weeks Uralkali announced its own agreement to sell at the same prices, except that it sold its white standard MOP at $43.50 per metric ton.

125.     By December PCS announced that it would increase prices to customers in the United States by an additional $20 per ton beginning in February 2005.  Mosaic announced two weeks later that it too would increase prices by a nearly identical amount in February 2005.  As a result, prices for standard and granular MOP (fob mine Saskatchewan) were set to increase to $158 and $163, respectively, by early 2005.

126.     In May 2005, PCS announced two additional price increases to buyers in the United States effective June 1, 2005 and September 1, 2005, raising prices for standard and granular MOP (fob mine Saskatchewan) to $178 and $183, respectively.  PCS announced these price increases despite estimates that there would be a massive 44% decline in purchases from customers in Brazil, which was one of the largest importers of potash in the world.

127.     Through much of 2006, price increases were muted as purchasers awaited the outcome of negotiations over a proposed increase to customers in China.  After potash producers reached an agreement on a price increase to customers in China in late July 2006, and Brazil later in 2006, potash prices in the United States increased as well, as defendants knew and intended.

128.     On July 8, 2008, PCS announced that prices of potash to the United States would increase by $250 per ton, an increase of 48 percent over the previous price.  Shortly thereafter, BPC contracted to supply 30,000 tons of potash to U.S. buyers at $1,000 per ton, with shipments starting in August 2008.

129.     Prices for potash have risen exponentially during the last five years, with North American prices for potash rising approximately 60% in 2004-2005, and essentially doubling in 2007 and early 2008.  These increases have occurred in lockstep throughout the Class Period and are not commensurate with producers' costs of production or other input costs during the Class

Period.  Such dramatic and unusual price behavior is inconsistent and at variance with legitimate market forces and economic trends in this market.

130.    Defendants' dramatic price increases cannot be explained by demand factors. After 2008, demand for potash (and other fertilizers) began to decline.  While prices for other fertilizers began to decline dramatically in late 2008 and early 2009, prices for potash remained stubbornly high and, in fact, continued to increase.

## G.    Defendants Had Excess Capacity

131.    During the Class Period, potash suppliers repeatedly attributed dramatic price increases to a "tight supply/demand balance" when in fact a number of defendants had excess potash capacity.  Potash suppliers' statements regarding the supply and demand balance were a pretext to conceal defendants' conspiracy to restrict supply and fix prices of potash.

132.    Throughout the Class Period, while potash suppliers repeatedly lamented the lack of supply, PCS had excess potash capacity.  In 2004, PCS announced to analysts in Toronto, Canada that it intended to increase the utilization of its Saskatchewan mines from 58% to 65%, partly by moving to a four shift system at its Lanigan and Allan mines.  From 2004 to the present, PCS seldom exceeded that utilization rate, though it could have readily done so if it wanted.

133.    As the chart below demonstrates, PCS – the world's largest supplier – operated at the following low utilization rates (potash production as a percentage of capacity) between 2003 and 2008:

| YEAR | UTILIZATION RATE |
|------|------------------|
| 2003 | 58% |
| 2004 | 65% |
| 2005 | 68% |
| 2006 | 54% |
| 2007 | 69% |
| 2008 | 66% |

134.    Likewise, other defendants confirmed excess capacity in the industry.    In a December 2007 presentation to investors, Uralkali claimed that it had the "ability to add significant capacity on the cheapest basis vs. global peers."    In a 2007 interview, BPC Director Vladimir Nikolaenko stated that if a potash producer was unable to fill a customer order, "missing volumes can be purchased from other producers."    Finally, the CEO of Mosaic, Jim Prokopanko, describing the potash market in 2008, explained that "the rally [in agriculture] is fundamentally different because it is being driven by demand, *not by supply shortages*." (emphasis added).

135.    In January 2008, Mosaic released a report titled, "Why are Potash Supplies so Tight?" in which it explained that "[a]lthough all of the Canadian producers have expanded capacity, some projects have not started up on time and others have not operated as planned." The report falsely attributed the problem to "production hiccups" and increasing demand in world markets.    In fact, agriculture economists believe that defendants' references to capacity as the root cause of recent price increases are mistaken because, as one economist noted in a May 2008 Wall Street Journal article, "[t]here's not really a supply issue at the moment."

## H.   Defendants Signaled Their Willingness to Avoid Price Competition

136.   Defendants, ostensibly competitors in the potash market, publicly signaled their willingness to avoid price competition.  For example, Uralkali admitted in 2006 that it sought to "ensure success of a 'price over volume' strategy" that would "[a]chieve long-term price stability."

137.   An industry analyst confirmed in 2007 that Uralkali "intends to follow a price over volume strategy whereby it will reduce its utilization rate from time to time to match potential declines in demand."

138.   Dmitry Rybolovlev, majority owner of Uralkali, and part owner of Silvinit, publicly acknowledged in an interview in April 2006 that "an acceptable price level is more important than expansion of market share and production."  He added that "[w]e won't start a universal war in order to reduce prices . . . ."

139.   Defendants have readily admitted that their joint ventures facilitate price stability in the potash market.  In a presentation to investors, representatives of Uralkali extolled BPC's role as an "effective pricing tool" in the potash industry.  A BPC official, noting the company had invited the Russian producer, Silvinit, to join the joint venture, explained that "[w]e would not like to compete with Russian companies in the potash market, that is why we offered Silvinit [an opportunity] to join the BPC on equal terms with everyone."

140.   BPC has acknowledged that the purpose of this proposed consolidation is to enhance its market power.  As one of its officials recently admitted, "[w]e will be the strongest and most powerful company that will set to a great degree the rules of the game in the world's potash market, which means billions of dollars."

141.     BPC's intention to set the "rules of the game" includes cooperation with Canadian producers.  According to a presentation made by Uralkali to company analysts, the "[t]wo major export associations [Canpotex and BPC] ensure [a] stable pricing environment" for potash.

142.     An outside analyst reached the same conclusion, explaining that "BPC and Canpotex have a dominant role in setting annual prices with large potash customers such as China, India and Brazil."

143.     In 2007, after obtaining significant price increases for potash sales, Vladimir Nikolaenko, BPC's Director General, claimed that "the company is not only an efficient pursuer of its shareholders' interests, but is actually *a leader to create an acceptable world market price condition* for all manufacturers of potash fertilizers."  (emphasis added).

## I.     Impact of Defendants' Conduct on United States Prices

144.     Defendants knew and intended that their global conspiracy would directly impact prices of potash on world markets and within the United States.  Representatives of Uralkali, in a presentation to analysts in December 2007, set forth each step in the chain of events resulting in increased prices throughout the world and in the United States:  "[1] contract settlement in the key markets immediately tied up volumes of potash producers . . . [2] causing demand competition on SPOT markets followed by increase in prices . . . [3] conclusion of Indian contract on the back of the SPOT markets' growth -- even less volume is available . . . [4] boom on SPOT market continues stimulating increased Chinese discount and a stronger reason to bring it down in 2008."

145.     Because of the global nature of the potash market, defendants' conduct in other countries has had a direct and intended impact on the potash market in the United States.  Canada is the world's largest producer and exporter of potash, accounting for nearly one third of total

production and 40 percent of world trade. Nearly one half of Canada's exports go to the United States. The vast majority of potash sales in the United States are made by PCS, Mosaic, Agrium and BPC at prices that are set according to benchmarks established by defendants based on sales in India, China and elsewhere.

146.    Global prices set a benchmark for domestic potash prices. According to one analyst, "[t]he barriers that we have seen in the past between domestic and international prices have just fallen down. We're now participating in a global fertilizer market."

147.    According to data from the United States Department of Agriculture, the increase in potash prices has far exceeded increases in the price of seeds (30%), livestock (27%), and *even fuels* (43%). As one Goldman Sachs analyst recently commented, potash producers are simply able to "raise prices at will."

148.    Defendants' combination and conspiracy has been immensely profitable for them. As a result of dramatic price increases, several defendants have posted significantly increased income. For example, PCS posted first quarter 2008 income figures that were triple the year-earlier figure. Mosaic's earnings for the first quarter of 2008 were up more than ten -fold from a year earlier.

## VIII.    EFFECTS OF DEFENDANTS' ANTITRUST VIOLATIONS

149.    Defendants' combination and conspiracy has had the following effects, among others:

> a.    price competition in the sale of potash by defendants and their co-conspirators has been restrained, suppressed and eliminated throughout the United States;

    b.    prices for potash sold by defendants have been raised, fixed, maintained and stabilized at artificially high and noncompetitive levels throughout the United States; and

    c.    direct purchasers of potash from defendants have been deprived of the benefit of free and open competition in the purchase of potash.

150.    As a direct and proximate result of defendants' unlawful conduct, plaintiffs and other members of the Class have been injured in their business and property in that they paid more for potash than they otherwise would have paid in the absence of the defendants' unlawful conduct.

## IX.    FRAUDULENT CONCEALMENT

151.    Plaintiffs had neither actual nor constructive knowledge of the facts constituting their claim for relief. Plaintiffs and members of the Class did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until shortly before filing their initial complaints. Defendants engaged in a secret conspiracy that did not reveal facts that would put plaintiffs or the Class on inquiry notice that there was a conspiracy to fix prices for potash.

152.    Because defendants' agreement, understanding and conspiracy was kept secret, plaintiffs and Class members were unaware of defendants' unlawful conduct alleged herein and did not know that they were paying artificially high prices for potash.

153.    The affirmative acts of the defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

154.    By its very nature, defendants' price-fixing conspiracy was inherently self-concealing.

155.    The combination and conspiracy alleged herein was fraudulently concealed by defendants by various means and methods, including, but not limited to secret meetings, surreptitious communications between defendants by the use of the telephone or in-person meetings at trade association meetings (and elsewhere) in order to prevent the existence of written records, limiting any explicit reference to competitor pricing communications on documents, and concealing the existence and nature of their competitor pricing discussions from non-conspirators (including customers).

156.    As alleged above, in 2003, after years of stable and sometimes declining prices, the price of potash began to increase dramatically.    Defendants falsely attributed the price increase to increasing global demand and limited supply.    This was a pretext used to cover up the conspiracy.    In fact, this price rise was the result of collusive conduct among defendants, which was undisclosed at the time.

157.    Plaintiffs are informed and believe, and thereon allege, that defendants' purported reasons for the price increases of potash were materially false and misleading and made for the purpose of concealing defendants' anti-competitive scheme as alleged herein.

158.    As a result of defendants' fraudulent concealment of their conspiracy, the running of any statue of limitations has been tolled with respect to any claims that plaintiffs and the Class members have as a result of the anticompetitive conduct alleged in this complaint.

## X.    CLAIM FOR VIOLATIONS OF 15 U.S.C. § 1

159.    Beginning at least as early as July 1, 2003, the exact date being unknown to plaintiffs, defendants and their co-conspirators entered into a continuing combination or

conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition in the United States.

160.  In particular, defendants have combined and conspired to raise, fix, maintain or stabilize the prices of potash sold in the United States.

161.  As a result of defendants' unlawful conduct, prices for potash were raised, fixed, maintained and stabilized in the United States.

162.  The combination or conspiracy among defendants consisted of a continuing agreement, understanding and concerted action among defendants and their co-conspirators.

163.  For purposes of formulating and effectuating their combination or conspiracy, defendants and their co-conspirators did those things they combined or conspired to do, including:

  a.  participating in meetings and conversations to discuss the prices and supply of potash;

  b.  communicating in writing and orally to fix prices and manipulate the supply of potash;

  c.  agreeing to manipulate prices and supply of potash sold throughout the world and in the United States, and to allocate customers of such products, in a manner that deprived direct purchasers of free and open competition;

  d.  issuing price announcements and price quotations in accordance with the agreements reached;

  e.  selling potash to customers in the United States at non-competitive prices; and,

  f.  providing false statements to explain increased prices for potash.

164.     As a result of defendants' unlawful conduct, plaintiffs and the other members of the Class have been injured in their businesses and property in that they have paid more for potash than they otherwise would have paid in the absence of defendants' unlawful conduct.

## XI.     DAMAGES

165.     During the Class Period, plaintiffs and the other members of the Class purchased potash directly from defendants, or their subsidiaries, agents, and/or affiliates, and, by reason of the antitrust violations herein alleged, paid more for potash than they would have paid in the absence of such antitrust violations.  As a result, plaintiffs and the other members of the Class have sustained damages to their business and property in an amount to be determined at trial.

## XII.     REQUEST FOR RELIEF

WHEREFORE, plaintiffs request that the Court enter judgment on their behalf and on behalf of the Class herein, adjudging and decreeing that:

A.     This action may proceed as a class action, with plaintiffs as the designated Class representatives and their counsel as Class Counsel;

B.     Defendants have combined and conspired in a *per se* violation of Section 1 of the Sherman Act (15 U.S.C. § 1), and that plaintiffs and the members of the Class have been injured in their business and property as a result of defendants' violations;

C.     Plaintiffs and the members of the Class recover damages sustained by them, as provided by the federal antitrust laws, and that judgment in favor of plaintiffs and the Class be entered against defendants, jointly and severally, in an amount to be trebled in accordance with such laws;

D.     Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees thereof and all other persons acting

or claiming to act on their behalf be permanently enjoined and restrained from continuing and maintaining the conspiracy or agreement alleged herein, including:

> 1.  continuing, maintaining or renewing the contract, combination or conspiracy alleged herein, or from engaging in any other contract combination or conspiracy having any similar purpose or effect, and from adopting or following any practice, plan, program or device having a similar purpose or effect; and

> 2.  communicating or causing to be communicated to any other person engaged in the manufacture, distribution or sale of potash, information concerning prices, customers, markets or other terms or conditions of sale of any such product except to the extent necessary in connection with *bona fide* sales transaction between the parties to such communications.

E.      Plaintiffs and members of the Class be awarded pre-judgment and post-judgment interest, and that such interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

F.      Plaintiffs and members of the Class recover their costs of this suit, including reasonable attorneys' fees as provided by law; and,

G.      Plaintiffs and members of the Class receive such other or further relief as may be just and proper.

## XIII.   JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38(b), plaintiffs demand a trial by jury of all

of the claims asserted in this Complaint so triable.

Dated:  April 3, 2009                    Respectfully submitted,

LOCKRIDGE GRINDAL NAUEN P.L.L.P.


s/W. Joseph Bruckner
W. Joseph Bruckner
Richard A. Lockridge
Heidi M. Silton
Matthew R. Salzwedel
100 Washington Avenue South
Suite 2200
Minneapolis, MN  55401
Tel:     (612) 339-6900
Fax:     (612) 339-0981
Email:  wjbruckner@locklaw.com
           ralockridge@locklaw.com
           hmsilton@locklaw.com
           mrsalzwedel@locklaw.com


PEARSON SIMON WARSHAW & PENNY, LLP


s/Bruce Simon
Bruce L. Simon
Jonathan M. Watkins
44 Montgomery Street, Suite 1430
San Francisco, California 94104
Tel:     (415) 433-9000
Fax:     (415) 433-9008
Email:  bsimon@pswplaw.com
           jwatkins@pswplaw.com

*Direct Purchaser Plaintiffs' Interim Lead Counsel*

Steven A. Hart Esq. (#6211008)
SEGAL McCAMBRIDGE
 SINGER & MAHONEY, LTD
233 South Wacker Drive
Sears Tower-Suite 5500
Chicago, IL  60606
Tel:     (312) 645-7800
Fax:     (312) 645-7711
Email:  shart@smsm.com

*Direct Purchaser Plaintiffs'*
*Interim Liaison Counsel*

Gary L. Specks
KAPLAN FOX & KILSHEIMER LLP
423 Sumac Road
Highland Park, IL  60035
Tel:     (847) 831-1585
Fax:     (847) 831-1580
Email:  gspecks@kaplanfox.com

Robert N. Kaplan
Gregory K. Arenson
Linda P. Nussbaum
Susan R. Schwaiger
KAPLAN FOX & KILSHEIMER LLP
805 Third Avenue, 14th Floor
New York, NY  10022
Tel:     (212) 687-1980
Fax:     (212) 687-7714
Email:  rkaplan@kaplanfox.com
           lnussbaum@kaplanfox.com
           garenson@kaplanfox.com
           sschwaiger@kaplanfox.com

Edmund W. Searby
Mark V. Jackowski
McDONALD HOPKINS LLC
600 Superior Avenue East, Suite 2100
Cleveland, OH  44114
Tel:     (216) 348-5400
Fax:     (216) 348-5474
Email:  esearby@mcdonaldhopkins.com
           mjackowski@mcdonaldhopkins.com

Richard L. Coffman
THE COFFMAN LAW FIRM
505 Orleans Street, Suite 505
Beaumont, TX  77701
Tel:     (409) 833-7700
Fax:     (866) 835-8250
Email:  rc@cofflaw.com

John L. Jernigan, III
JERNIGAN & MCMILLAN, P.C.
319 Belleville Avenue
P.O. Box 828
Brewton, AL  36427
Tel:    (251) 809-2981
Fax:    (251) 809-2980
Email: johnjernigan@bellsouth.net


Bernard Persky
Hollis L. Salzman
Jay L. Himes
Kellie Safar Lerner
William V. Reiss
LABATON SUCHAROW LLP
140 Broadway
New York, NY  10005
Tel:    (212) 907-0700
Fax:    (212) 818-0477
Email: bperskey@labaton.com
          hsalzman@labaton.com
          jhimes@labaton.com
          klerner@labaton.com
          wreiss@labaton.com


John R. Malkinson
MALKINSON & HALPERN, P.C.
223 W. Jackson Blvd, Suite 1010
Chicago, IL  60606
Tel:    (312) 427-9600
Fax:    (312) 427-9629
Email: mhpc@aol.com


P. John Brady
Daniel D. Owen
Christopher K. Wilson
POLSINELLI SHUGHART P.C.
Twelve Wyandotte Plaza
120 West 12th Street, Suite 1700
Kansas City, MO  64105
Tel:    (816) 421-3355
Fax:    (816) 374-0509
Email: jbrady@polsinelli.com
          dowen@polsinelli.com
          cwilson@poslinelli.com


Howard J. Sedran
Austin B. Cohen
LEVIN, FISHBEIN, SEDRAN
  & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA  19106-3697
Tel:    (215) 592-1500
Fax:    (215) 592-4663
Email: hsedran@lfsblaw.com
          acohen@lfsblaw.com


Michael J. Freed
Steven A. Kanner
Douglas A. Millen
Robert J. Wozniak
FREED KANNER LONDON
  & MILLEN LLC
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
Tel:    (224) 632-4500
Fax:    (224) 632-4519
Email: mfreed@fklmlaw.com
          skanner@fklmlaw.com
          dmillen@fklmlaw.com
          rwozniak@fklmlaw.com

Eugene A. Spector
Jeffrey L. Kodroff
Jeffrey J. Corrigan
Jay S. Cohen
William G. Caldes
SPECTOR, ROSEMAN KODROFF
  & WILLIS, PC.
1818 Market Street, Suite 2500
Philadelphia, PA  19103
Tel:    (215) 496-0300
Fax:    (215) 496-6611
Email: espector@srkw-law.com
       jkodroff@srkw-law.com
       jcorrigan@srkw-law.com
       jcohen@srkw-law.com
       bcaldes@srkw-law.com

E. Powell Miller
Martha J. Olijnyk
THE MILLER LAW FIRM, P.C.
950 W. University Dr., Suite 300
Rochester, MI  48307
Tel:    (248) 841-2200
Fax:    (248) 652-2852
Email: pmiller@millerlawpc.com
       molijnyk@millerlawpc.com

M. Stephen Dampier
VICKERS, RIIS, MURRAY
  AND CURRAN, L.L.C.
Regions Bank Building
Eleventh Floor
106 St. Francis Street
Mobile, AL  36602
Tel:    (251) 432-9772
Fax:    (251) 432-9781
Email: sdampier@vickersriis.com

Manuel J. Dominguez
BERMAN DeVALERIO
4280 Professional Center Drive, Suite 350
Palm Beach Gardens, FL 33410
Tel:    (561) 835-9400
Fax:    (561) 835-0322
Email: jdominguez@bermandevalerio.com

*COUNSEL FOR PLAINTIFFS AND THE PLAINTIFF CLASS*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| Gage's Fertilizer & Grain, Inc., and Kraft Chemical Company, on behalf of themselves and others similarly situated, | MDL Docket No. 1996 |
| Plaintiffs, | CASE NO. 08-cv-5192 (Consolidated with 08-cv-5635) |
| vs. | Judge Castillo |
| Agrium Inc., Agrium U.S. Inc., Mosaic Company, Mosaic Crop Nutrition L.L.C., Potash Corporation of Saskatchewan Inc., PCS Sales (USA), Inc., JSC Uraskali, RUE PA Belaruskali, RUE PA Belarusian Potash Company, BPC Chicago L.L.C., JSC Silvinit and JSC International Potash Company. | Magistrate Judge Keys |
| | **JURY TRIAL DEMANDED** |
| Defendants. | |

**DIRECT PURCHASER CONSOLIDATED CLASS ACTION COMPLAINT**

## I.    INTRODUCTION

1.    Plaintiffs bring this action on behalf of themselves individually and on behalf of a plaintiff class (the "Class") consisting of all persons and entities who purchased potash in the United States directly from one or more named defendants between July 1, 2003 and the present (the "Class Period"). This complaint consolidates separate nationwide class actions brought by direct purchasers of potash in this judicial district, and seeks treble damages and injunctive relief, as well as attorneys' fees and costs, pursuant to the antitrust laws of the United States.

2.      Potash is a key agricultural fertilizer and defendants are the leading suppliers of potash in the world. In 2007, defendants collectively generated well over $2 billion in gross revenue. During the Class Period, defendants sold millions of tons of potash in the United States.

3.      During the 1990s, potash producers, particularly those located in the former Soviet Union, increased the supply of potash in world markets, resulting in substantial price declines and limiting the profits of producers around the world. Plaintiffs are informed and believe, and thereon allege, that in order to maintain price stability and increase profitability, defendants conspired and combined to fix, raise, maintain, and stabilize the price at which potash was sold in the United States. As part of, and in furtherance of, this conspiracy, defendants exchanged sensitive, non-public information about prices, capacity, sales volumes, and demand; allocated market shares, customers, and volumes to be sold; and coordinated on output, including the limitation of production. Plaintiffs are informed and believe that defendants fraudulently concealed their anticompetitive conduct from plaintiffs and the Class in furtherance of the conspiracy.

4.      As a result of defendants' unlawful conduct, plaintiffs and the other members of the Class paid artificially inflated prices for potash during the Class Period. Such prices exceeded the amount they would have paid if the price for potash had been determined by a competitive market.

## II.      JURISDICTION AND VENUE

5.      Plaintiffs bring this action to obtain injunctive relief and to recover damages, including treble damages, costs of suit, and reasonable attorneys' fees arising from defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

6.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and

1337(a) and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

7.      Venue is proper in this judicial district, pursuant to 15 U.S.C. §§ 15 and 22, and

28 U.S.C. § 1391(b) and (c), because at least one of the defendants resides in this judicial district,

is licensed to do business, or is doing business in this judicial district, and because a substantial

portion of the affected interstate trade and commerce described below has been carried out in this

judicial district.

8.      This Court has personal jurisdiction over each defendant because, inter alia, each

defendant: (a) transacted business throughout the United States, including in this District; (b)

manufactured, sold, shipped, and/or delivered substantial quantities of potash throughout the

United States, including this District; (c) had substantial contacts with the United States,

including this District; and/or (d) engaged in an antitrust conspiracy that was directed and had a

direct, foreseeable and intended effect of causing injury to the business or property of persons

residing in, located in, or doing business throughout the United States, including this District.

## III.    PARTIES

### A.    Plaintiffs

9.      Plaintiff Gage's Fertilizer & Grain, Inc. ("Gage's") is a business entity with its

headquarters located in Stanberry, Missouri. Gage's purchased potash directly from one or more

defendants during the Class Period.

10.     Plaintiff Kraft Chemical Company ("Kraft") is an Illinois corporation with its

principal place of business in Melrose Park, Illinois.  Kraft purchased potash directly from one or

more of the defendants during the Class Period.

**B.     Defendants**

**Agrium**

11.     Defendant Agrium Inc. is a Canadian corporation with its headquarters in Calgary, Canada.  During the Class Period, Agrium Inc. sold and distributed potash throughout the United States, directly or through its affiliates.

12.     Agrium U.S. Inc. is a wholly-owned subsidiary of Agrium Inc. with its headquarters in Denver, Colorado.  During the Class Period, Agrium U.S. Inc. sold and distributed potash throughout the United States, directly or through its affiliates.

13.     Defendants Agrium Inc. and Agrium U.S. Inc. are collectively referred to herein as "Agrium."

**Mosaic**

14.     Defendant Mosaic Company is a Delaware corporation with its headquarters in Plymouth, Minnesota.  During the Class Period, Mosaic Company sold and distributed potash throughout the United States, directly or through its affiliates.

15.     Defendant Mosaic Crop Nutrition L.L.C. is a limited liability company with its headquarters in Riverview, Florida. Mosaic Crop Nutrition L.L.C. is a wholly-owned operating subsidiary of Mosaic Company.  During the Class Period, Mosaic Crop Nutrition L.L.C. sold and distributed potash throughout the United States, directly or through its affiliates.

16.     Defendants Mosaic Company and Mosaic Crop Nutrition L.L.C. are collectively referred to herein as "Mosaic."

**PCS**

17.    Defendant Potash Corporation of Saskatchewan Inc. ("Potash Corp.") is a Canadian corporation with its principal place of business in Saskatchewan, Canada. During the Class Period, Potash Corp. sold and distributed potash throughout the United States, directly or through its affiliates.

18.    Defendant PCS Sales (USA), Inc. ("PCS Sales") is a Delaware corporation with its headquarters in Northbrook, Illinois. PCS Sales is a wholly owned subsidiary of defendant Potash Corp. During the Class Period, PCS Sales sold and distributed potash throughout the United States, directly or through its affiliates.

19.    Defendants Potash Corp. and PCS Sales are collectively referred to herein as "PCS."

20.    PCS, Mosaic and Agrium are often referred to collectively as the Saskatchewan Potash Producers because each company operates mines in Saskatchewan, Canada.

**Uralkali**

21.    Defendant JSC Uralkali ("Uralkali") is a Russian joint stock company with its headquarters in Moscow, Russia. As of April 2005, Uralkali owned a one-half interest in Belarusian Potash Company, a joint venture with defendant Belaruskali, through which it markets, sells and distributes potash. During the Class Period, Uralkali sold and distributed potash throughout the United States, directly or through its affiliates.

**Belaruskali**

22.     Defendant RUE PA Belaruskali ("Belaruskali") is a business entity organized under the laws of Belarus with its headquarters in Soligorsk, Republic of Belarus. During the Class Period, Belaruskali sold and distributed potash throughout the United States, directly or through its affiliates.

**BPC**

23.     Defendant RUE PA Belarusian Potash Company ("Belarusian Potash Company") is a joint venture between Uralkali and Belaruskali with its headquarters in Minsk, Republic of Belarus. Established in April 2005, Belarusian Potash Company is the exclusive distributor of potash produced by Uralkali and Belaruskali throughout the world. During the Class Period, Belarusian Potash Company sold and distributed potash throughout the United States, directly or through its affiliates.

24.     Defendant BPC Chicago L.L.C. is a limited liability company with its headquarters in Buffalo Grove, Illinois. BPC Chicago L.L.C. is a wholly-owned operating subsidiary of Belarusian Potash Company. During the Class Period, BPC Chicago L.L.C. sold and distributed potash throughout the United States, directly or through its affiliates.

25.     Defendants Belarusian Potash Company and BPC Chicago L.L.C. are collectively referred to herein as "BPC."

**Silvinit**

26.     Defendant JSC Silvinit ("Silvinit") is a Russian joint stock company with its headquarters in Solikamsk, Russia. During the Class Period, Silvinit sold and distributed potash throughout the United States, directly or through its affiliates.

**IPC**

27.    Defendant JSC International Potash Company ("IPC") is a Russian joint stock company with its headquarters in Moscow, Russia.  During the Class Period, IPC, the exclusive distributor of potash produced by Silvinit, sold and distributed potash throughout the United States, directly or through its affiliates.

### IV.    AGENTS AND CO-CONSPIRATORS

28.    Various entities not named as defendants have participated in the violations alleged herein and have performed acts and made statements in furtherance thereof.  Plaintiffs reserve the right to name some or all of these entities as defendants at a later date.

29.    On information and belief, other potash suppliers, John Does 1 through 10, are co-conspirators with defendants in their unlawful restraint of trade.  These co-conspirators have facilitated, adhered to, participated in, and/or communicated with others regarding the conspiracy.  These other co-conspirators have either acted willingly, or due to coercion, unwillingly, in furtherance of the unlawful restraint of trade.

30.    The acts alleged herein that were done by each of the co-conspirators were fully authorized by each of those co-conspirators, or ordered, or done by duly authorized officers, agents, employees, or representatives of each co-conspirator while actively engaged in the management, direction, or control of its affairs.

31.    Defendants are also liable for acts done in furtherance of the alleged conspiracy by companies they acquired through mergers and acquisitions.

## V.    CLASS ACTION ALLEGATIONS

32.    Plaintiffs bring this action both on behalf of themselves, and as a class action

pursuant to Federal Rules of Civil Procedure, Rule 23(a), (b)(2) and (b)(3), on behalf of the

following class:

> All persons and entities who purchased potash in the United States
> directly from one or more defendants between July 1, 2003 and the
> present.    Excluded from the Class are defendants, their parent
> companies, subsidiaries and affiliates, any co-conspirators, all
> governmental entities, and any judges or justices assigned to hear
> any aspect of this action.

33.    Plaintiffs do not know the exact number of class members because such

information is in the exclusive control of defendants.  Plaintiffs believe that due to the nature of

the trade and commerce involved there are most likely thousands of class members

geographically dispersed throughout the United States, such that joinder of all class members is

impracticable.

34.    Plaintiffs are members of the Class.  Plaintiffs' claims are typical of the claims of

the Class in that plaintiffs are direct purchasers of potash, plaintiffs and all Class members were

damaged by the same wrongful conduct of defendants and their co-conspirators as alleged

herein, and the relief sought is common to the class.

35.    Numerous questions of law or fact arise from defendants' anticompetitive conduct

that is common to the Class, including but not limited to:

a.    whether defendants combined or conspired to fix, raise, maintain, or

stabilize prices of potash sold in the United States;

b.    whether defendants combined or conspired to restrict output of potash sold

in the United States;

c.    whether defendants shared non-public information, allocated markets and

customers, restricted output of potash sold in the United States, and

committed other conduct in furtherance of the alleged conspiracy;

d.    whether defendants' conduct caused the prices of potash sold in the United

States to be at artificially high and noncompetitive levels;

e.    whether plaintiffs and the other members of the Class were injured by

defendants' conduct, and, if so, the appropriate class-wide measure of

damages for Class members; and,

f.    whether plaintiffs and the other members of the Class are entitled to,

among other things, injunctive relief, and, if so, the nature and extent of

such injunctive relief.

36.    These and other questions of law and fact are common to the Class, and

predominate over any questions affecting only individual Class members, including legal and

factual issues relating to liability and damages.

37.    Plaintiffs will fairly and adequately represent the interests of the Class in that

plaintiffs are direct purchasers of potash and have no conflict with any other members of the

Class. Furthermore, plaintiffs have retained competent counsel experienced in antitrust, class

action, and other complex litigation.

38.    Defendants have acted on grounds generally applicable to the Class, thereby

making final injunctive relief appropriate with respect to the Class as a whole.

39.     This class action is superior to the alternatives, if any, for the fair and efficient adjudication of this controversy.  Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, effectively, and without the duplication of effort and expense that numerous individual actions would engender. Prosecution as a class action will eliminate the possibility of repetitive litigation.  Class treatment will also permit the adjudication of relatively small claims by class members who otherwise could not afford to litigate an antitrust claim such as is asserted herein. There will be no material difficulty in the management of this action as a class action.

40.     The Class is readily definable and is one for which records likely exist in the files of defendants and their co-conspirators.

41.     The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for defendants.

## VI.    TRADE AND COMMERCE

42.     During the Class Period, each defendant, directly or through its subsidiaries or other affiliates, sold potash in the United States in a continuous and uninterrupted flow of interstate commerce and foreign commerce, including through and into this judicial district.

43.     During the Class Period, defendants collectively controlled a majority of the market for potash, both globally and in the United States.

44.     Defendants' business activities substantially affected interstate trade and commerce in the United States and caused antitrust injury in the United States.

## VII.    FACTUAL ALLEGATIONS

### A.    The Potash Industry

45.     Potash refers to mineral and chemical salts that contain potassium. Potash is mined from naturally occurring ore deposits that were formed when seas and oceans evaporated, many of which are now covered with several thousand feet of earth. It is principally used as an agricultural fertilizer because it is a source of soluble potassium, which is one of three primary nutrients required for plant growth and maturation. Farmers throughout the world use large amounts of potash to help crops fight disease and to enhance crop yields. Other commercial uses of potash include industrial applications in metal plating, and production of glass, ceramics, soaps, and animal feed supplements. There is no cost-effective substitute for potash.

46.     Fertilizers, including potash, are critical inputs in crop production. Restrictions in the supply of potash, like those described herein, may result in lower crop yields and ultimately to higher prices for food commodities, particularly for those crops that require significant quantities of potash.

47.     Potash reserves are confined to relatively few areas throughout the world. While over 150 countries consume potash, mostly as fertilizer, there are only 15 countries that produce notable quantities of it. Belarus, Canada, Germany, Israel, Jordan and Russia have about 90% of the global potash supply within their borders. Over half of the world's global capacity is located in just two regions -- Canada and the former Soviet Union (specifically Russia and Belarus). The largest deposits are in Saskatchewan, Canada. More than 50% of Saskatchewan's potash sales are exported to offshore markets.

48.     Potash is a homogenous commodity product. Potash supplied by one producer is interchangeable with potash supplied by other producers. As a result, buyers make purchase decisions based largely, if not entirely, on price.

49.     Because the cost of potash is a relatively small part of total crop production costs, and there are no ready substitutes for the product, demand for potash is inelastic.

50.     The majority of production costs for potash producers are variable. Where variable costs are a high percentage of production costs, there is less incentive for a producer to operate its facilities at full capacity, and this may allow a cartel to boost prices artificially with greater success than where fixed costs are the largest component of production costs.

51.     The potash industry has very high barriers to entry. A single new mine requires approximately $2.5 billion or more in upfront costs, five to seven years of development time, and additional outlays for associated roads and other infrastructure. Such barriers are conducive to a conspiracy because they protect existing suppliers from competition and perpetuate the high market concentration.

**B.     High Market Concentration in the Potash Industry**

52.     During the Class Period, the potash industry has been dominated by relatively few companies that market, sell and distribute potash throughout the world and within the United States. Indeed, one analyst has observed that "the global trade in potash is even more concentrated than OPEC for oil." Another industry analyst referred to the small group of producers as the "Organization of Potash Exporting Countries."

53.     PCS is the largest potash supplier in the world, supplying nearly one-third of the world's potash. As of 2008, three producers with mines located in Canada (PCS, Mosaic and Agrium), and three former Soviet Union producers (Uralkali, Belaruskali and Silvinit) accounted

for approximately 71% of the potash market. The market share of these entities has not changed in any material way during the Class Period.

54.    This concentration of market share facilitated defendants' ability to implement the conspiracy.

**C.    High Level of Cooperation in the Potash Industry**

55.    The potash industry is marked by a high degree of cooperation among supposed competitors. The major potash suppliers have joint ventures or overlapping ownership interests that involve competitors in the potash market. In addition to these formal business relationships, defendants have fostered a striking degree of cooperation through reciprocal visits to their production facilities, participation in trade associations and attendance at industry conferences.

56.    PCS holds significant interests in a number of smaller potash suppliers throughout the world, including the following: (a) a 26 percent interest (and the right to nominate key financial, production and marketing personnel) in Arab Potash Company, a potash producer headquartered in Jordan, which in 2007 produced approximately 2 million tons of potash; (b) a nine percent interest in Israel Chemicals Ltd ("ICL"), which in 2005 produced 5 million tons of potash; (c) a 32 percent interest in Sociedad Quimica y Minera de Chile ("SQM"), a potash supplier located in Chile, which supplies about 1 million tons of potash per year; and (d) a 20 percent interest in Sinofert Holdings Limited, the largest potash distributor in China. Since 2005, PCS has been the exclusive overseas marketer for Intrepid Potash, the largest potash producer in the United States.

57.    PCS, Agrium and Mosaic are equal shareholders in Canpotex Ltd. ("Canpotex"), which acts as a unified sales, marketing and distribution company for these companies' potash supplies throughout the world -- except in Canada and the United States. Each company has an

equal voting interest in Canpotex as a shareholder through its nominees on the board of directors of Canpotex, and each company has agreed that it will not independently make offshore sales (with the exception of sales into the United States).

58.    Canpotex potash sales are allocated among the producers based on the production capacity of each shareholder. If a shareholder cannot satisfy demand for potash by Canpotex, the remaining shareholders are entitled to satisfy that demand pro rata based on their allotted production capacity. In 2007, PCS supplied 55 percent of Canpotex's requirements, Mosaic supplied 37.5 percent and Agrium supplied the balance. Through participation in Canpotex, PCS, Agrium and Mosiac have access to sensitive information about production capacity and pricing.

59.    Canpotex was initially formed to coordinate sales of potash produced in Canada, but it has entered into at least one cooperative marketing agreement with producers from the former Soviet Union. For example, in January 2000 Canpotex agreed to form a joint marketing agreement with Uralkali. Under that agreement, Canpotex agreed to market Uralkali potash outside North America and Europe beginning in 2001.

60.    Producers from the former Soviet Union, like the Canadian producers, have consolidated sales and marketing of their potash supplies with a single entity, the BPC. Formed in 2005 as a joint venture between Uralkali and Belaruskali, BPC jointly markets and sells their potash throughout the world, including in the United States. With the combined potash supplies of Uralkali and Belaruskali, BPC supplies 34% of the world's exports of potash.

61.    Silvinit, which supplies potash through the International Potash Company, is aligned with the other producers of potash in the former Soviet Union. Silvinit and Uralkali share common ownership by Dmitry Rybolovlev, who owns at least 66% of the stock of Uralkali

and about 20% of the voting shares of Silvinit. Silvinit has been in active negotiations to join

BPC, raising the prospect of further consolidation of the potash industry.

62.    In a 2006 interview, Rybolovlev acknowledged the true anticompetitive motive

underlying these joint ventures. He explained that, "joint operation allows [potash producers] to

avoid needless competition."

63.    According to news reports, representatives of the defendant companies have

routinely held meetings during the Class Period as part of an "exchange program of mutual

visits." The exchange of visits, according to defendants' representatives, "promote[d] the

discussion of current issues affecting the potash industry and the sharing of experience."

64.    During one such visit, on October 11, 2005, senior executives of defendants

visited Uralkali in the former Soviet Union and discussed, among other things, what could be

deemed highly sensitive production plans of at least one of the world's largest potash suppliers.

This meeting was attended by William Doyle, President and CEO of Potash Corp.; Michael

Wilson, President and CEO of Canpotex; James T. Thompson, Executive Vice President of the

Mosaic Company; Vladislov Baumgertner, General Director, President and CEO of Uralkali; as

well as other representatives of Belaruskali and Silvinit.

65.    In July 2006, as part of the same "exchange program," a "delegation of Uralkali

management" visited Mosaic in Canada. Mosaic's Executive Vice President, James Thompson

participated in the visit with the companies from the former Soviet Union. During the visit, the

delegation learned about the Mosaic "management structure" and toured potash mining

operations of the company, including its most up to date mining technologies. The Uralkali

visitors noted the "friendly attitude of the hosts" and exclaimed "[w]e were shown everything we

wanted to see."

66.    Petr Kondrashev, Director General of Silvinit, acknowledged in a 2005 interview published in The Chemical Journal, which covers the potash industry, that the company has "old and friendly connections with potassium manufacturers from Belarus and [that] we still are pretty good partners." He added that "[q]uite often we have visiting groups from Belaruskali" and that representatives of Silvinit also visit the Belarus producer.

67.    Defendants have conducted numerous such visits during the Class Period, and these visits have provided opportunities to conspire and exchange highly sensitive competitive information. In the absence of collusion among these supposed competitors, it would have been contrary to the independent economic interest of each to allow its competitors access to such sensitive competitive information.

68.    Defendants' high level of cooperation and their involvement in long-standing joint ventures has given these supposed competitors continuous opportunities to discuss pricing, capacity utilization, and other important prospective market information. The mutually beneficial nature of the business relations among defendants not only provided the opportunity to conspire, but it also created a financial incentive to do so.

**D.    Use of Trade Associations and Trade Events To Facilitate the Conspiracy**

69.    Plaintiffs are informed and believe, and thereon allege, that defendants' collusive activities have been furthered by trade associations and trade events that provided opportunities to conspire and share information.

70.    Defendants are all members of the International Fertilizer Industry Association ("IFA"), which sponsors annual conferences that are attended by senior officials of the defendants. In May 2007, representatives of PCS, Mosaic, Agrium, Belaruskali, Canpotex, BPC and others attended the 75th annual IFA conference in Istanbul, Turkey. At the IFA meetings,

representatives of the manufacturers conferred about the potash market and "market tendencies." Significantly, during this May 2007 IFA conference, the major potash manufacturers announced an additional price increase on their potash products.

71.     In addition to the IFA, defendants are members of the Fertilizer Institute, which together with the Fertilizer Industry Round Table, sponsors an annual conference titled the "Fertilizer Outlook and Technology Conference."  The conference is geared towards industry members, financial analysts, business consultants, trade press representatives and government economists.

72.     At the Fertilizer Outlook and Technology Conference held in Arlington, Virginia on November 6-8, 2006, Michael R. Rahm, Mosaic Company Vice President, Market & Economic Analysis, presented an analysis of the potash industry.  Representatives of at least one other defendant attended the same conference.

**E.     Defendants Coordinated Reductions in Manufacturing Capacity**

73.     Defendants implemented their conspiracy, at least in part, through coordinated restrictions in potash output, which resulted in higher prices in the potash market.

74.     Defendants negotiate term contracts for purchases of potash throughout the world. Agreements made with buyers in India and China are typically made first and the prices established in those markets directly influence prices in other major markets.

75.     In early 2006, during difficult negotiations over potash prices, Canpotex and BPC (and their members) jointly restricted supply in an effort to compel Chinese buyers (the largest consumers in the world) to accept a price increase that would eliminate their "discount" and set a benchmark for other buyers around the world.  The Chairman of Uralkali explained the action as follows: "here the point is not to supply [potash] to them with USD 30-40 discount, as earlier,

but to adjust the prices to the level of the neighbor Asian consumers. Therefore we will never ship anything there, until we get a contract reasonable from our point of view."

76. Consistent with this view, the leading suppliers of potash around the world jointly limited the supply of potash to bring Chinese consumers of potash in line with consumers in other countries, including the United States. Uralkali reduced its utilization rate during the first half of 2006 to 68% and PCS reduced its utilization to about 60%. Though this limitation of production by Uralkali and PCS reduced their sales of potash by 23% and 20%, respectively, from the prior year, this behavior served to discontinue the "discount" to China that existed prior to the negotiations. It led to a price increase for potash sales in China and, shortly thereafter, for sales throughout the world.

77. In a December 2007 report, an industry analyst explained the episode as follows: "The decline in 2006 production (-23% Y/Y) was mostly caused by the voluntary decision of Uralkali to reduce operating rates as price negotiations with China were delayed by several months. This was an industry-wide issue, as evidenced by Potash Corp.'s similar 20% decline in production. This behavior served to limit the decline in prices that China's hard line negotiations would have theoretically caused."

78. Commenting on potash pricing in 2006, a Russian securities brokerage found "no fundamental factors to explain [the] decline of supply by potash producers" and viewed "simultaneous reduction of production capacities by companies in different parts of the world as motivated by their common wish to hold prices at the current high level . . . (or even to push prices higher)." The brokerage added that "consumers have no alternatives to potash or means to store it as a guard against future higher prices."

79.     Defendants jointly restricted supply in 2007 in order to impose price increases in the potash market. On or about October 25, 2007, Silvinit announced that it might have to suspend shipments of potash from one of its mines due to the presence of a sinkhole caused by mine flooding.

80.     Within a day of Silvinit's announcement, PCS, Uralkali, Agrium and BPC, all purportedly competitors, announced that they would suspend sales of their own potash because of the suspension of sales by Silvinit. Announcement of PCS's suspension of sales was made by its supposed competitor, Uralkali, which declared that "these decisions could have an upward impact on potash prices, including in those markets where Uralkali's potash is sold."

81.     Approximately 12 days later, on November 6, 2007, Silvinit announced that it would resume sales of potash, declaring that the sinkhole was advancing more slowly than had previously been feared. Within a day after Silvinit announced the resumption of its potash sales, Uralkali announced that BPC would also resume sales of Uralkali potash after the 12 day stoppage. Uralkali refused to explain the reason for resuming sales; however, a BPC official told a reporter the decision had been made "after studying the market."

82.     On November 7, 2007, PCS and Agrium announced that they would also resume potash sales.

83.     Shortly after these announcements that the major suppliers of potash were resuming sales, potash prices increased to "record highs on fears of a global shortage."

84.     Less than a year after the defendants jointly suspended potash sales because of the sinkhole discovered near the Silvinit mine, Silvinit disclosed in May 2008 that another expanding sinkhole threatened its supply of potash and suggested that it might shut down production for two or three weeks. A spokesman for the company stated that "the situation is

keeping us in suspense, but we are sure a crisis can be averted." Within two weeks, the company

announced that the sinkhole had stopped growing and "the situation can in no way get worse."

85.     Shortly after the disclosure of the threatened shutdown, prices for potash

increased dramatically. On July 8, 2008, PCS announced that prices of potash to the United

States would increase by $250 per ton, an increase of 48 percent over the previous price.

86.     During the Class Period, potash suppliers repeatedly attributed dramatic price

increases to a "tight supply/demand balance" when in fact a number of defendants had excess

potash capacity. These statements were a pretext to conceal defendants' conspiracy to restrict

supply and fix prices of potash.

87.     Throughout the Class Period, while potash suppliers repeatedly lamented the lack

of supply, PCS repeatedly asserted that it had excess potash capacity. Likewise, in a December

2007 presentation to investors, Uralkali claimed that it had the "ability to add significant capacity

on the cheapest basis vs. global peers." Moreover, the CEO of Mosaic, Jim Prokopanko,

describing the potash market in 2008, explained that "the rally [in agriculture] is fundamentally

different because it is being driven by demand, *not by supply shortages*." (emphasis added).

88.     In January 2008, Mosaic released a report titled, "Why are Potash Supplies so

Tight?" in which it explained that "[a]lthough all of the Canadian producers have expanded

capacity, some projects have not started up on time and others have not operated as planned."

The report falsely attributed the problem to "production hiccups" and increasing demand in

world markets. In fact, agriculture economists believe that defendants' references to capacity as

the root cause of recent price increases are mistaken because, as one economist noted in a May

2008 Wall Street Journal article, "[t]here's not really a supply issue at the moment."

89.    Despite assertions of a current and future "tight supply/demand balance," the

Food and Agriculture Organization of the United Nations estimates, based on 2007 data, that

"[g]lobal potash supplies are expected to keep well ahead of total demand with the surplus

increasing from 5.7 to 6.7 million tonnes at an annual growth rate of 3%" through 2012.

90.    Throughout the Class Period, defendants jointly coordinated restrictions in the

supply of potash in order to increase prices for potash throughout the world and in the United

States.  In the absence of an agreement among these supposed competitors, these restrictions

would have been contrary to the independent economic interests of the individual producers.

F.    **Defendants Collude on Prices for Potash**

91.    Plaintiffs are informed and believe, and thereon allege, that in order to control and

maintain the profitability of potash, defendants conspired to fix, raise, maintain, and stabilize the

price at which potash was sold in the United States at artificially inflated and anticompetitive

levels.

92.    Defendants, ostensibly competitors in the potash market, publicly signaled their

willingness to avoid price competition.  For example, Uralkali admitted in 2006 that it sought to

"ensure success of a 'price over volume' strategy" that would "[a]chieve long-term price

stability."

93.    An industry analyst confirmed in 2007 that Uralkali "intends to follow a price

over volume strategy whereby it will reduce its utilization rate from time to time to match

potential declines in demand."

94.    Dmitry Rybolovlev, majority owner of Uralkali, and part owner of Silvinit,

publicly acknowledged in an interview in April 2006 that "an acceptable price level is more

important than expansion of market share and production." He added that "[w]e won't start a universal war in order to reduce prices . . . ."

95.    Defendants have readily admitted that their joint ventures facilitate price stability in the potash market. In a presentation to investors, representatives of Uralkali extolled BPC's role as an "effective pricing tool" in the potash industry. A BPC official, noting the company had invited the Russian producer, Silvinit, to join the joint venture, explained that "[w]e would not like to compete with Russian companies in the potash market, that is why we offered Silvinit [an opportunity] to join the BPC on equal terms with everyone."

96.    BPC has acknowledged that the purpose of this proposed consolidation is to enhance its market power. As one of its officials recently admitted, "[w]e will be the strongest and most powerful company that will set to a great degree the rules of the game in the world's potash market, which means billions of dollars."

97.    BPC's intention to set the "rules of the game" includes cooperation with Canadian producers. According to a presentation made by Uralkali to company analysts, the "[t]wo major export associations [Canpotex and BPC] ensure [a] stable pricing environment" for potash.

98.    An outside analyst reached the same conclusion, explaining that "BPC and Canpotex have a dominant role in setting annual prices with large potash customers such as China, India and Brazil."

99.    In 2007, after obtaining significant price increases for potash sales, Vladimir Nikolaenko, BPC's Director General, claimed that "the company is not only an efficient pursuer of its shareholders' interests, but is actually a leader to create an acceptable world market price condition for all manufacturers of potash fertilizers."

100.    Defendants' collusion is evidenced by unusual price movements in the potash

market. Throughout the 1990s the potash industry was characterized by stable pricing, but during

the Class Period this stability gave way to a remarkable run-up in potash prices to unprecedented

levels.  Spot prices for potash have risen exponentially during the last five years, with North

American prices for potash rising approximately 60% in 2004-2005, and essentially doubling in

2007 and early 2008.   These price increases are not commensurate with producers' costs of

production or other input costs during the Class Period.  Such dramatic price increases are

inconsistent and at variance with legitimate market forces and economic trends in this market.

101.    The following chart illustrates how potash prices during the Class Period have

dramatically deviated from historical patterns:



Source: Green Markets and Fertecon

102.    Defendants knew that their global conspiracy would directly impact prices of

potash on world markets and within the United States.  Representatives of Uralkali, in a

presentation to analysts in December 2007, set forth each step in the chain of events resulting in

increased prices throughout the world and in the United States: "[1] contract settlement in the

key markets immediately tied up volumes of potash producers . . . [2] causing demand competition on SPOT markets followed by increase in prices . . . [3] conclusion of Indian contract on the back of the SPOT markets' growth -- even less volume is available . . . [4] boom on SPOT market continues stimulating increased Chinese discount and a stronger reason to bring it down in 2008."

103.    Because of the global nature of the potash market, defendants' conduct in other countries has driven the potash market in the United States.  Canada is the world's largest producer and exporter of potash, accounting for nearly one third of total production and 40 percent of world trade.  Nearly one half of Canada's exports go to the United States.  The vast majority of potash sales in the United States are made by PCS, Mosaic, Agrium and BPC at prices that are set according to benchmarks established by defendants based on sales in India, China and elsewhere.

104.    Global prices set a benchmark for domestic potash prices.  According to one analyst, "[t]he barriers that we have seen in the past between domestic and international prices have just fallen down.  We're now participating in a global fertilizer market."

105.    According to data from the United States Department of Agriculture, the increase in potash prices has far exceeded increases in the price of seeds (30%), livestock (27%), and even fuels (43%).  As one Goldman Sachs analyst recently commented, potash producers are simply able to "raise prices at will."

106.    Defendants' combination and conspiracy has been immensely profitable for them. As a result of dramatic price increases, several defendants have posted significantly increased income.  For example, PCS posted first quarter 2008 income figures that were triple the year-

earlier figure. Mosaic's earnings for the first quarter of 2008 were up more than 10-fold from a year earlier.

## VIII.  EFFECTS OF DEFENDANTS' ANTITRUST VIOLATIONS

107.    Defendants' combination and conspiracy has had the following effects, among others:

     a.    price competition in the sale of potash by defendants and their co-conspirators has been restrained, suppressed and eliminated throughout the United States;

     b.    prices for potash sold by defendants have been raised, fixed, maintained and stabilized at artificially high and noncompetitive levels throughout the United States; and

     c.    direct purchasers of potash from defendants have been deprived of the benefit of free and open competition in the purchase of potash.

108.    As a direct and proximate result of defendants' unlawful conduct, plaintiffs and other members of the Class have been injured in their business and property in that they paid more for potash than they otherwise would have paid in the absence of the defendants' unlawful conduct.

## IX.    FRAUDULENT CONCEALMENT

109.    Plaintiffs had neither actual nor constructive knowledge of the facts constituting their claim for relief. Plaintiffs and members of the Class did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until shortly before the filing of their initial complaints. Defendants engaged in a secret

conspiracy that did not reveal facts that would put plaintiffs or the Class on inquiry notice that there was a conspiracy to fix prices for potash.

110.    Because the defendants' agreement, understanding and conspiracy was kept secret, plaintiffs and Class members were unaware of defendants' unlawful conduct alleged herein and did not know that they were paying artificially high prices for potash.

111.    The affirmative acts of the defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

112.    By its very nature, defendants' price-fixing conspiracy was inherently self-concealing.

113.    The combination and conspiracy alleged herein was fraudulently concealed by defendants by various means and methods, including, but not limited to, secret meetings, surreptitious communications between the defendants by the use of the telephone or in-person meetings at trade association meetings (and elsewhere) in order to prevent the existence of written records, limiting any explicit reference to competitor pricing communications on documents, and concealing the existence and nature of their competitor pricing discussions from non-conspirators (including customers).

114.    As alleged above, in 2003, after years of stable and sometimes declining prices, the price of potash began to increase dramatically. Defendants falsely attributed the price increase to increasing global demand and limited supply. This was a pretext used to cover up the conspiracy. In fact, this price rise was the result of collusive conduct among defendants, which was undisclosed at the time.

115.    Plaintiffs are informed and believe, and thereon allege, that defendants' purported reasons for the price increases of potash were materially false and misleading and made for the purpose of concealing defendants' anti-competitive scheme as alleged herein.

116.    As a result of defendants' fraudulent concealment of their conspiracy, the running of any statue of limitations has been tolled with respect to any claims that plaintiffs and the Class members have as a result of the anticompetitive conduct alleged in this complaint.

## X.    CLAIM FOR VIOLATIONS OF 15 U.S.C. § 1

117.    Plaintiffs incorporate by reference all the above allegations as if fully set forth herein.

118.    Beginning at least as early as July 1, 2003, the exact date being unknown to plaintiffs and exclusively within the knowledge of defendants, defendants and their co-conspirators entered into a continuing combination or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition in the United States.

119.    In particular, defendants have combined and conspired to raise, fix, maintain or stabilize the prices of potash sold in the United States.

120.    As a result of defendants' unlawful conduct, prices for potash were raised, fixed, maintained and stabilized in the United States.

121.    The combination or conspiracy among defendants consisted of a continuing agreement, understanding and concerted action among defendants and their co-conspirators.

122.    For purposes of formulating and effectuating their combination or conspiracy, defendants and their co-conspirators did those things they combined or conspired to do, including:

      a.     participating in meetings and conversations to discuss the prices and

            supply of potash;

      b.     communicating in writing and orally to fix prices;

      c.     agreeing to manipulate prices and supply of potash sold throughout the

            world and in the United States, and to allocate customers of such products,

            in a manner that deprived direct purchasers of free and open competition;

      d.     issuing price announcements and price quotations in accordance with the

            agreements reached;

      e.     selling potash to customers in the United States at non-competitive prices;

            and,

      f.     providing false statements to explain increased prices for potash.

123.    As a result of defendants' unlawful conduct, plaintiffs and the other members of

the Class have been injured in their businesses and property in that they have paid more for

potash than they otherwise would have paid in the absence of defendants' unlawful conduct.

## XI.   DAMAGES

124.    During the Class Period, plaintiffs and the other members of the Class purchased

potash directly from defendants, or their subsidiaries, agents, and/or affiliates, and, by reason of

the antitrust violations herein alleged, paid more for potash than they would have paid in the

absence of such antitrust violations. As a result, plaintiffs and the other members of the Class

have sustained damages to their business and property in an amount to be determined at trial.

## XII.    REQUEST FOR RELIEF

WHEREFORE, plaintiffs request that the Court enter judgment on their behalf and on behalf of the Class herein, adjudging and decreeing that:

A.    This action may proceed as a class action, with plaintiffs as the designated Class representatives and their counsel as Class Counsel;

B.    Defendants have combined and conspired in a per se violation of Section 1 of the Sherman Act (15 U.S.C. § 1), and that plaintiffs and the members of the Class have been injured in their business and property as a result of defendants' violations;

C.    Plaintiffs and the members of the Class recover damages sustained by them, as provided by the federal antitrust laws, and that a joint and several judgment in favor of plaintiffs and the Class be entered against the defendants in an amount to be trebled in accordance with such laws;

D.    Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees thereof and all other persons acting or claiming to act on their behalf be permanently enjoined and restrained from continuing and maintaining the conspiracy or agreement alleged herein, including:

1. continuing, maintaining or renewing the contract, combination or conspiracy alleged herein, or from engaging in any other contract combination or conspiracy having any similar purpose or effect, and from adopting or following any practice, plan, program or device having a similar purpose or effect; and,

2. communicating or causing to be communicated to any other person engaged in the manufacture, distribution or sale of potash, information concerning prices,

customers, markets or other terms or conditions of sale of any such product except

to the extent necessary in connection with bona fide sales transaction between the

parties to such communications.

E.      Plaintiffs and members of the Class be awarded pre-judgment and post-judgment

interest, and that such interest be awarded at the highest legal rate from and after the date of

service of the initial complaint in this action;

F.      Plaintiffs and members of the Class recover their costs of this suit, including

reasonable attorneys' fees as provided by law; and,

G.      Plaintiffs and members of the Class receive such other or further relief as may be

just and proper.

## XIII.   JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38(b), plaintiffs demand a trial by jury of all

of the claims asserted in this Complaint so triable.

/s/Steven A. Hart
Steven A. Hart Esq. (#6211008)
Attorneys for Plaintiff
SEGAL McCAMBRIDGE
SINGER & MAHONEY, LTD
233 South Wacker Drive
Sears Tower-Suite 5500
Chicago, Illinois 60606
Telephone: (312)645-7800
Facsimile: (312)645-7711

Bruce L. Simon
Jonathan M. Watkins
PEARSON SIMON SOTER
WARSHAW & PENNY, LLP
44 Montgomery Street, Suite 1430
San Francisco, California 94104
Telephone: (415) 433-9000
Facsimile: (415) 433-9008

P. John Brady
Daniel D. Owen
SHUGHART THOMSON & KILROY P.C.
Twelve Wyandotte Plaza
120 W. 12th Street
Kansas City, MO 64105
Telephone:  (816) 421-3355
Facsimile:  (816) 374-0509

John R. Malkinson
MALKINSON & HALPERN, P.C.
223 W. Jackson Blvd., Suite 1010
Chicago, IL 60606
Telephone: (312) 427-9600
Facsimile: (312) 427-9629

Bernard Persky
Hollis L. Salzman
Kellie Lerner
William V. Reiss
LABATON SUCHAROW LLP
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477

Howard Sedran
LEVIN, FISHBEIN, SEDRAN &
BERMAN
510 Walnut Street, Suite 500
Philadelphia , Pennsylvania 19106-3697
Telephone: (215)592-1500
Facsimile: (215)592-4663

Richard M. Volin
L. Kendall Satterfield
Michael G. McClellan
FINKELSTEIN THOMPSON LLP
1050 30th Street, N.W.
Washington, D.C. 2007
Telephone: (202) 337-8000
Facsimile: (202) 337-8090

*Counsel for Plaintiff and Proposed Direct
Purchaser Class*

# EXHIBIT 11

```
                         *********************
                   ***     TX REPORT     ***
                         *********************


         TRANSMISSION OK

         TX/RX NO              2400
         RECIPIENT ADDRESS
         DESTINATION ID
         ST. TIME             05/27 17:30
         TIME USE             05'34
         PAGES SENT            10
         RESULT               OK
```

```
                      *********************
                  ***    TX REPORT    ***
                      *********************


     TRANSMISSION OK

     TX/RX NO            2401
     RECIPIENT ADDRESS
     DESTINATION ID
     ST. TIME            05/27 17:37
     TIME USE            10'09
     PAGES SENT           18
     RESULT              OK
```

Case: 1:08-cv-06910 Document #: 156-4 Filed: 08/17/09 Page 180 of 197 PageID #:1768

```
                          *********************
                      ***    TX REPORT    ***
                          *********************


        TRANSMISSION OK

        TX/RX NO              2402
        RECIPIENT ADDRESS
        DESTINATION ID
        ST. TIME             05/27 17:50
        TIME USE             19'34
        PAGES SENT            36
        RESULT               OK
```

```
                    ********************
                *** TX REPORT  ***
                    ********************


        TRANSMISSION OK


        TX/RX NO              2404
        RECIPIENT ADDRESS
        DESTINATION ID
        ST. TIME             05/27 18:14
        TIME USE             17'36
        PAGES SENT           30
        RESULT               OK
```

```
                              ********************
                              ***   TX REPORT   ***
                              ********************


         TRANSMISSION OK

         TX/RX NO              2406
         RECIPIENT ADDRESS
         DESTINATION ID
         ST. TIME             05/27 18:37
         TIME USE             19'50
         PAGES SENT            39
         RESULT               OK
```

```
                    ********************
                    ***   TX REPORT   ***
                    ********************


     TRANSMISSION OK

     TX/RX NO            2408
     RECIPIENT ADDRESS
     DESTINATION ID
     ST. TIME            05/27 19:21
     TIME USE            11'36
     PAGES SENT           24
     RESULT              OK
```

```
                         *********************
                    ***   TX REPORT   ***
                         *********************


        TRANSMISSION OK

        TX/RX NO              2409
        RECIPIENT ADDRESS
        DESTINATION ID
        ST. TIME             05/27 19:39
        TIME USE             12'34
        PAGES SENT           25
        RESULT               OK
```

# EXHIBIT 12

**Potteiger, Heather N.**

| | |
|---|---|
| **From:** | Johansen, Cheryl T. on behalf of Bruckner, W. Joseph |
| **Sent:** | Wednesday, May 27, 2009 4:01 PM |
| **To:** | 'ipc@ipcmos.com' |
| **Cc:** | Bruckner, W. Joseph; Silton, Heidi M.; Potteiger, Heather N.; Salzwedel, Matthew R. |
| **Subject:** | In re Potash Antitrust Litigation (II) |
| **Attachments:** | Ltr to IPC - Russian.pdf; ORDER - Russian.pdf; SUMMONS IPC - Russian.pdf; CAC Russian Translation.pdf; Consolidated Complaint - russian translation.pdf; Ltr to IPC - English.pdf; ORDER - English.pdf; SUMMONS IPC - English.pdf; CAC Complaint - English.pdf; Consolidated Complaint - English.pdf |

Please see attached.

W. Joseph Bruckner | Attorney
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue S | Suite 2200 | Minneapolis MN 55401
V: 612-339-6900 | F: 612-339-0981 | www.locklaw.com

# EXHIBIT 13

```
                        *********************
                        ***   TX REPORT   ***
                        *********************


      TRANSMISSION OK

      TX/RX NO              2432
      RECIPIENT ADDRESS     +7495 2586172
      DESTINATION ID
      ST. TIME             06/01 14:02
      TIME USE             03'20
      PAGES SENT             7
      RESULT               OK
```


Локридж
Гриндал
Науен
Пи.Л.Л.Пи.

МИННЕАПОЛИС
Офис 2200
100 Вашингтон Авенью Юг
Миннеаполис, Миннесота 55401-2197
Т 612.339.6900
Ф 612.339.0981

ВАШИНГТОН ДиСи
Офис 210
415 Вторая улица Северо-Восток
Вашингтон, округ Колумбия
20002-4900
Т 202.544.9840
Ф 202.544.9850

—————
Адвокаты

*www.locklaw.com*

В. Джозеф Брукнер
Телефон: 612-339-6900
wjbruckner@locklaw.com ОТВЕТ
ВЫСЫЛАЙТЕ НА МИННЕАПОЛИС

1 июня 09 г.

**ПО ЭЛ. ПОЧТЕ: ipc@ipcmos.com**
**ПО ФАКСУ: 7-495-258-61-72/91**
**ПО КУРЬЕРСКОЙ ПОЧТЕ:**
**Федеральный Экспресс Интернешнл**

ЗАО «Международная калийная компания»
Россия
Москва, 119034,
Пожарский пер., д.12, офис 64

Re:     *В деле об Антимонопольном Судопроизводстве касающемся Калийных
Удобрений (II)* Гражданское Дело № 1:08-cv-06910

Уважаемые Дамы и Господа:

К этому письму прилагается перевод на русский и оригинал на английском Судебной
Повестки о Вызове в Суд с Поправками в выше-указанном судебном процессе.

Пожалуйста выходите на связь напрямую или через своих юристов, если у Вас есть
какие-либо вопросы.

С уважением,

ЛОКРИДЖ ГРИНДАЛ НАУЕН ПиЛЛПи
-подпись-
В. Джозеф Брукнер

ПИРСОН, САЙМОН, ВОРСОУ И ПЕННИ, ЛЛПи
-подпись-
Джонатан М. Уоткинс

С приложениями

404588.1

АО 440 (Rev. 05/00) Судебная Повестка по Гражданскому Делу

## ОКРУЖНОЙ СУД СОЕДИННЁНЫХ ШТАТОВ АМЕРИКИ

### СЕВЕРНЫЙ РАЙОН ШТАТА ИЛЛИНОЙС

| | |
|---|---|
| Истцы:<br>Юридические лица Gage's Fertilizer & Grain, Inc. (Гейджз Фёртилайзер и Грэйн Инк.) и Kraft Chemical Company (Крафт Кемикал Компани), представляющие свои интересы, а также интересы группы предприятий, оказавшихся в аналогичной ситуации.<br><br>Ответчики:<br>Agrium Inc., Agrium U.S. Inc. (Агриум Инк., Агриум Корпорация США), Mosaic Company, Mosaic Crop Nutrition L.L.C. (Мозаик Компания, ООО «Мозаик Кроп Нутришн»), Potash Corporation of Saskatchewan Inc. (Калиевая Корпорация Саскачевана Инк.), PCS Sales (USA), Inc., (ПиСиЭс Сейлс США Инк.), ОАО «Уралкалий», РУП «ПО Беларуськалий», РУП «ПО Белорусская калийная компания», BPC Chicago L.L.C., (ООО «БКК Чикаго»), ОАО «Сильвинит», и ЗАО «Международная Калиевая Компания». | **СУДЕБНАЯ ПОВЕСТКА ПО ГРАЖДАНСКОМУ ДЕЛУ**<br><br>MDL Docket No. 1996<br><br>НОМЕР ДЕЛА 08-CV-5192<br>(консолидировано с Делом 08-CV-5635)<br><br>Судья Кастильо<br><br>Магистрат-Судья Кейс |

КОМУ: (Имя и адрес Ответчика)

ЗАО «Международная калийная компания»
Россия
Москва, 119034,
Пожарский пер., д.12, офис 64

**ВАС ВЫЗЫВАЮТ В СУД** и вы обязаны вручить АДВОКАТУ ИСТЦА на имя и адрес:

Брюс Л. Саймон
Джонатан М. Уоткинс
ТОО «Пирсон, Симон, Варшау & Пенни»
США, 94104 г. Сан-Франциско, штат Калифорния
Ул. Монтгомери д. 44 (офис 1430)

ответ на Исковое Заявление, которое было Вам вручено вместе с этой Повесткой, в течение 20 дней после вручения этих документов, не считая дня вручения. Если вы этого не сделаете, решение по умолчанию будет принято против Вас, в соответсвии с требованиями заявленными в Исковом Заявлении. Вы также обязаны подать Ответ Клерку в Суд в течение разумного периода времени после вручения его Истцу. *[Примечание: Когда при печати появляется окно диалога, обязательно снимите отметку с выбором аннотации.]*

МАЙКЛ В. ДОББИНС, КЛЕРК

\ПОДПИСЬ И ШТАМП\

28 МАЯ 2009 г.

_____
Заместитель Клерка

_____
Дата

АО 440 (Rev. 05/00) Судебная Повестка по Гражданскому Делу

## СВИДЕТЕЛЬСТВО О ВРУЧЕНИИ СУДЕБНЫХ ДОКУМЕНТОВ

| Вручение Судебной Повестки по Гражданскому Делу и Искового Заявления было осуществлено мной[1] | ДАТА |
|---|---|
| ИМЯ ОТВЕТСВЕННОГО ЛИЦА (печатным шрифтом) | СЛУЖЕБНОЕ ПОЛОЖЕНИЕ |

*Отметьте один из следующих способов вручения судебных документов:*

☐ Путём доставки Ответчику, который принял их добровольно. Место вручения: _____
_____

☐ Путём доставки на место проживания Ответчика и вручения лицу, совершеннолетного возраста проживающего по адресу Ответчика. Имя лица, которому были вручены Судебная Повестка по Гражданскому Делу и Исковое Заявление: _____
_____

☐ Документы не были вручены по следующим причинам: _____
_____
_____

☐ Другие (укажите): _____
_____
_____
_____

## ТРЕБОВАНИЕ ОБ ОПЛАТЕ ЗА УСЛУГИ

| Место Доставки | Услуги | Всего |
|---|---|---|
| | | |

## ДЕКЛАРАЦИЯ ОТВЕТСТВЕННОГО ЛИЦА

Я заявляю, под страхом наказания за лжесвидетельство по законам Соединенных Штатов Америки о том, что выше-указанная информация, содержащаяся в Свидетельстве о Вручении Судебных Документов и в Требовании об Оплате за Услуги, является достоверной и точной.

Подпись_____ Дата_____

Адрес Ответственного Лица_____

[1] О том, кто и в каком порядке имеет право вручать судебные документы, см. Статью № 4 Федеральных Правил Гражданского Производства.



# LOCKRIDGE GRINDAL NAUEN
### P.L.L.P.
Attorneys at Law

www.locklaw.com

| | |
|---|---|
| **MINNEAPOLIS** | **WASHINGTON, D.C.** |
| Suite 2200 | Suite 210 |
| 100 Washington Avenue South | 415 Second Street, N.E. |
| Minneapolis, MN 55401-2179 | Washington, DC 20002-4900 |
| T 612.339.6900 | T 202.544.9840 |
| F 612.339.0981 | F 202.544.9850 |

**W. Joseph Bruckner**
Phone: 612-339-6900
wjbruckner@locklaw.com
REPLY TO MINNEAPOLIS

June 1, 2009

**VIA ELECTRONIC MAIL ipc@ipcmos.com**
**VIA FACSIMILE 7-495-258-61-72/91**
**VIA FEDERAL EXPRESS INTERNATIONAL**

JSC International Potash Company
Office 64, 12 Pozharsky Lane
Moscow, 119034
Russia

>      Re:      *In re Potash Antitrust Litigation (II)*
>               Civil No. 1:08-cv-06910

Dear Sir or Madam:

Enclosed and served on you are the Russian translation and English Amended Summons in the above-referenced matter.

Please contact us, or have your legal counsel contact us, with any questions.

Very truly yours,

LOCKRIDGE GRINDAL NAUEN P.L.L.P.

W. Joseph Bruckner

PEARSON, SIMON, WARSHAW & PENNY, LLP

Jonathan M. Watkins

Enclosures

404588.1

AO 440 (Rev. 05/00) Summons in a Civil Action

# UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS

## SUMMONS IN A CIVIL CASE

Gage's Fertilizer & Grain, Inc., and Kraft Chemical Company,
on behalf of themselves and others similarly situated,
            Plaintiffs,

                V.

Agrium Inc., Agrium U.S. Inc., Mosaic Company, Mosaic Crop
Nutrition L.L.C., Potash Corporation of Saskatchewan Inc., PCS
Sales (USA), Inc., JSC Uraskali, RUE PA Belaruskali, RUE PA
Belarusian potash Company, BPC Chicago L.L.C., JSC Silvinit
and JSC International Potash Company.
                Defendants.

MDL Docket No. 1996

CASE NUMBER:   CASE NO. 08-cv-5192
(Consolidated with 08-cv-5635)

ASSIGNED JUDGE:   Judge Castillo

DESIGNATED
MAGISTRATE JUDGE:   Magistrate Judge Keys

TO: (Name and address of Defendant)

    JSC International Potash Company
    Office 64, 12 Pozharsky Lane,
    Moscow,119034, Russia

**YOU ARE HEREBY SUMMONED** and required to serve upon PLAINTIFF'S ATTORNEY (name and address)

    Bruce L. Simon
    Jonathan M. Watkins
    PEARSON SIMON SOTER WARSHAW & PENNY, LLP
    44 Montgomery Street, Suite 1430
    San Francisco, California 94104

an answer to the complaint which is herewith served upon you, within _____20_____ days after service of this
summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the
relief demanded in the complaint. You must also file your answer with the Clerk of this Court within a reasonable period of time
after service.

NOTE: When the print dialogue
box appears, be sure to uncheck
the Annotations option.

MICHAEL W. DOBBINS, CLERK

MAY 2 8 2009

(By) DEPUTY CLERK

DATE

AO 440  (Rev. 05/00)  Summons in a Civil Action

## RETURN OF SERVICE

| | DATE |
|---|---|
| Service of the Summons and complaint was made by me[1] | |
| NAME OF SERVER (PRINT) | TITLE |

*Check one box below to indicate appropriate method of service*

**G**   Served personally upon the defendant.  Place where served: _____

_____

**G**   Left copies thereof at the defendant's dwelling house or usual place of abode with a person of suitable age and discretion then residing therein.

Name of person with whom the summons and complaint were left: _____

**G**   Returned unexecuted: _____

_____

_____

**G**   Other (specify): _____

_____

_____

## STATEMENT OF SERVICE FEES

| TRAVEL | SERVICES | TOTAL |
|---|---|---|
| | | |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Return of Service and Statement of Service Fees is true and correct.

Executed on _____       _____
                  Date                              *Signature of Server*

                                       _____
                                                  *Address of Server*

_____
(1) As to who may serve a summons see Rule 4 of the Federal Rules of Civil Procedure.

# EXHIBIT 14

**Potteiger, Heather N.**

| | |
|---|---|
| **From:** | Johansen, Cheryl T. on behalf of Bruckner, W. Joseph |
| **Sent:** | Monday, June 01, 2009 2:35 PM |
| **To:** | 'ipc@ipcmos.com' |
| **Cc:** | Bruckner, W. Joseph; Silton, Heidi M.; Salzwedel, Matthew R.; Potteiger, Heather N. |
| **Subject:** | In re Potash Antitrust Litigation (II) |
| **Attachments:** | LTR to JSC IPC - Russian.pdf; SUMMONS JSC IPC - Russian.pdf; LTR to JSC IPC - English.pdf; SUMMONS JSC IPC - English.pdf |

Please see attached.

W. Joseph Bruckner | Attorney
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue S | Suite 2200 | Minneapolis MN  55401
V: 612-339-6900 | F: 612-339-0981 | www.locklaw.com

8/10/2009